**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Criminal Case No. 12-cr-00033-JLK**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**

**2.  BAKHTIYOR JUMAEV,**

        **Defendant.**

---

**DEFENDANT JUMAEV'S REPLY TO "GOVERNMENT'S UNCLASSIFIED MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO SUPPRESS EVIDENCE OBTAINED OR DERIVED FROM SURVEILLANCE UNDER THE FISA AMENDMENTS ACT AND MOTION FOR DISCOVERY"
(Related to Doc. 559)**

---

Defendant Bakhityor Jumaev ("Mr. Jumaev"), by and through his attorneys, replies to the "Government's Unclassified Memorandum In Opposition To Defendants' Motion To Suppress Evidence Obtained Or Derived From Surveillance Under The FISA Amendments Act And Motion For Discovery" (Doc. 559) by informing the Court as follows:

## I. INTRODUCTION

More than a year ago, evidence of the United States government's mass surveillance program first began appearing in the *Guardian* newspaper.  The source of the *Guardian's* information was NSA contractor Edward Snowden. In some circles, Mr. Snowden has been vilified. In others, he has been praised. Since early July 2013 to the present, hundreds of articles from the *Guardian* and other worldwide publications, including the *Washington Post* and *New York*

*Times,* have revealed the existence of a government operation aimed at collecting, storing, reviewing, and using the personal and political communications of millions of American people and millions of people abroad.[1] A global maelstrom has erupted as a result.

Plaintiffs in the case of *Clapper v. Amnesty International,* ___ U.S.___, 133 S. Ct. 1138, 185 L.Ed2d 264 (2013) challenged one of the statutes upon which the U.S. government has relied in its implementation of this secret mass surveillance program, namely, the FISA Amendment Act of 2008 ("the FAA"). During oral argument before the United States Supreme Court on October 29, 2012, upon being asked who has standing under the statute to make a constitutional challenge to the interceptions, the Solicitor General, Donald B. Verrilli, Jr. responded: "The first is if an aggrieved person, someone who is a party to a communication, gets notice that the government intends to introduce information in a proceeding against him."  *See* transcript of oral argument, available at www.supremecourt.gov/oral_arguments/argument.../11-1025.pdf at 3-4; *see also Exhibit H,* attached to Mr. Jumaev's *Motion for Notice of Whether the Government Intends to Use Evidence Obtained under or Derived* from *Surveillance Authorized by the FISA Amendment Act of 2008 ("FAA")* (Doc. 458). Oops!  Could it be possible that people working down the hall from the Solicitor General had not even informed him of what the government's inner sanctum was doing since, unbeknownst to Mr. Verrilli, his colleagues in the National Security

---

[1] Ordinary Internet users, Americans and non-Americans alike, far outnumber legally targeted foreigners in the communications intercepted by the National Security Agency from U.S. digital networks, according to a four-month investigation by the *Washington Post* reported on July 5, 2014 in an article,

Division had determined that notice was not required under the FAA! It took the government nearly a year from the oral argument in *Clapper, supra,* to provide the first defendant in a criminal proceeding with the notice that their advocate before the Supreme Court said was required.

Did a "gotcha" before the Supreme Court result in the United States having to finally accord an accused the constitutional right of due process and whatever attendant rights flowed from it?   After all, the executive branch disclosed this information to one of the FAA's champions in the United States Senate, Senator Diane Feinstein, to enable her in December 2012 to argue the efficacy of the FAA as part of her persuasion to extend the FAA another five years. *See* Doc. 458 at 3-4 and Exhibit E attached thereto. This combination of events led the United States on October 25, 2013, for the first time since the FAA's enactment in 2008, to inform a criminal accused that information obtained or derived from a FAA collection would be used against him.   That notice to the co-defendant Jamshid Muhtorov in this case has spawned the presentation of the myriad pleadings that now await this Court's determination. This Reply by Mr. Jumaev may be the culmination of that process.[2]

It would be presumptuous of Mr. Jumaev in this Reply to try to fashion a more articulate, better reasoned, or more thorough answer to the Government's Response of issues common to both defendants than what has been presented by Mr. Muhtorov in Doc. 602.  As a result, Mr. Jumaev will invoke the court's local rule that will allow him to adopt that pleading.  Mr. Jumaev will, however, address

---

[2] The Procedural History from the First FISA Notice to Mr. Muhtorov (Doc. 12) filed on (date, 2012) to his Reply to the Government's Response (Doc. 602) filed on July 2, 2014 is described in the attached Appendix A.

the issues that are unique to him, namely: (1) whether he has standing to raise a motion to suppress, including the issue of "evidence derived from;" (2) whether he has standing to challenge the constitutionality of the FAA; and (3) the constitutional implications of the FAA.

## II. ADOPTION OF MR. MUHTOROV'S MOTION

Mr. Jumaev, pursuant to D.C.Colo.LCr 12.1(b), respectfully approves, adopts, and incorporates by reference any or all of the reasons stated, arguments advanced, and/or authorities cited by the Mr. Muhtorov's "Reply to Government's Response (Doc. 559, 569)" (Doc. 602).

## III. THE GOVERNMENT IS INCORRECT IN ASSERTING THAT MR. JUMAEV LACKS STANDING AND THAT HIS MOTION TO SUPPRESS SHOULD BE SUMMARILY DENIED

The Government Response, while 97 pages long, contains wholesale redactions – indeed, entire headings, sections, and presumably lengthy segments of text – in an attempt to render it largely bullet proof. The armor, however, has its soft spots.

Mr. Jumaev has repeatedly requested the government to answer two basic questions:  (1) whether the electronic surveillance described in its FISA Notice was conducted pursuant to the pre-2008 provisions of FISA, or instead, the FAA; and (2) whether the affidavit and other evidence offered in support of any FISA order relied on information obtained under or derived from an FAA surveillance order? Jumaev Motion for Notice (Doc. 458), at 21; Reply in Support of Jumaev Motion for Notice (Doc. 501), at 19-20.

The government has refused to directly answer either question, but instead has relied on its election not to provide Mr. Jumaev with a Second FISA Notice similar to what was served upon Mr. Muhtorov, stating that Mr. Jumaev would have received such notice if he had satisfied the statutory criteria for notice. *See* Doc. 470 at 4 and Doc. 525 at 2-3. The Government Response (Doc. 559) at 16, parrots its prior explanations by stating:

> In its response and surreply to Jumaev's motion, the government stated that it does not intend to introduce or otherwise use or disclose against Jumaev in any trial, hearing or other proceeding in this case evidence obtained or derived from Section 702 acquisition to which Jumaev is an aggrieved person.  Thus, Jumaev is not entitled to any additional notice under FISA.

**A. The Test For Standing Proposed by the Government is Formulated from FISA and Inapplicable To Defendants' Challenge to the Legality Of The FAA and Evidence Derived Therefrom**

In essence, the government claims that Mr. Jumaev's challenge to the constitutionality of FAA should be denied for the same reason it claims he is not entitled to a direct response to his request for notice, namely, he lacks standing. The government reaches this conclusion in the mistaken belief that there is a five-part test determinative of whether Mr. Jumaev is entitled to notice under the FAA, thereby affording him standing to challenge the constitutionality of the FAA. According to the government, its notice obligation only arises when:

> The government (1) "intends to enter into evidence or otherwise use or disclose" (2) "against any aggrieved person" (3) in a "trial, hearing or other proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States"; (4) any "information obtained or derived from" (5) an "electronic surveillance [or physical search] of that aggrieved person." 50 U.S.C. §1806(d); *see* 50 U.S.C. § 1825(d); *see also* 50 U.S.C. § 1881e(a).

Government Response (Doc. 559), at 33 (bracketed material original). Further compounding the government's opaque response is its failure to explain how Mr. Jumaev has not met any of these five elements. The government, in essence, has said that Mr. Jumaev has not met at least one of these five elements, yet it refuses to directly state which element or elements have not been met.[3]

Mr. Jumaev has not found, and the government has not cited, any judicial authority for the position that the government's five-part test is the applicable standard for entitlement to notice under the FAA or is the prerequisite for challenging the constitutionality of FAA. Rather, the government's position for standing appears rooted in a fundamental misunderstanding between the original FISA provisions and its amendments in 2008 as the FAA and, in particular, the mistaken belief that the full FISA criteria for notice have to be met in order to

---

[3] Not only has the government refused to answer these simple two questions, it has gone even further in stonewalling Mr. Jumaev's efforts to discover relevant information to enable him to challenge the introduction of anticipated evidence against him.  At p. 14 of its Response, the government has redacted the entire section under the heading "1. The FBI's Investigation of the Defendants."  This redaction is inappropriate because both defendants have been provided with thousands of pages of discovery regarding the government's investigation of each of them.  Furthermore, it is inconceivable that the two simple questions referenced above, along with the more fundamental question -- was Mr. Jumaev subject to electronic surveillance under the FAA? -- could not have been addressed in the discussion of the FBI investigation in a manner that did not compromise national security but still provided basic, necessary information to the defense.  This issue was more fully addressed in Mr. Jumaev's "Motion to Require the Government to Disclose, or Otherwise Provide Him Access to, its Classified Pleadings (Doc. 569) and Objection to the Ex Parte, In Camera Submission to and Final Determination by the Court of Such Pleadings and Related Documents Without Disclosure and Attendant Proceedings First Afforded to Defendant" (Doc. 590) at 7-9; the Court is requested to take judicial notice of that discussion.

trigger any notice requirement under the FAA or standing to mount a constitutional challenge to the FAA.

Although the differences between FISA and the FAA have been explained in Mr. Jumaev's Reply (Doc. 499) at 21-23, a summary of that discussion bears recitation here. The second element of the government's five-part test, *i.e.*, that Mr. Jumaev must be an "aggrieved person" to be entitled to notice under the FAA or challenge its constitutionality, is inapplicable to a FAA notice.   The term "aggrieved person" is a FISA concept that predated the enactment the FAA. FISA defines "aggrieved person" at two locations within the statute: 50 U.S.C. 1801(k) states: "'Aggrieved person' means a person who is the target of an electronic surveillance or any other person whose communications or activities were subject to electronic surveillance"; 50 U.S.C. § 1821(2) states: "'Aggrieved person' means a person whose premises, property, information, or material is the target of physical search or any other person whose premises, property, information, or material was subject to physical search."

The FAA, enacted in 2008, on the other hand, contains no definition of "aggrieved person." The FAA's definitional section, 50 U.S.C. § 1881(a), specifically prescribes that nine words or phrases have the same definition under the FAA as in section 1801 of FISA; "aggrieved person" is not one of those phrases.[4]   50 U.S.C. § 1881(b) provides definitions for five additional terms;

---

[4] 50 U.S.C.  §1881(a) states: "The terms "agent of a foreign power", "Attorney General", "contents", "electronic surveillance", "foreign intelligence information", "foreign power", "person", "United States", and "United States person" have the meanings given such terms in section 101 [50 USCS § 1801], except as specifically provided in this title [50 USCS §§ 1881 *et seq*.].

"aggrieved person" is not one of them.[5] If Congress wanted the concept of "aggrieved person" to have the same meaning in the FAA as it does in the original FISA, it would have said so.

It is no wonder that the FAA nowhere defines "aggrieved person," for while FISA includes requirements of individualized suspicion and particularity in identifying targets (50 U.S.C. §1805(c)), the FAA contains none of these requirements and facilitates the issuance of blanket authorizations for conducting electronic surveillance (50 U.S.C. §1881a(d)(1)(g)(4)). Under FISA, 50 U.S.C. § 1805(a)(2)(A), the FISC is required to find probable cause both that surveillance target is "foreign power" or agent thereof and that facilities to be monitored were being used or about to be used by foreign power or its agent; whereas under the FAA, 50 U.S.C. § 1881a(i)(3)(A), the FISC no longer needs to make any probable cause determination. *Id*. The government seeks to blend FISA and FAA together and to piggyback the requirement of FAA notice onto FISA's notice provisions contained in 50 U.S.C. §§ 1806(c) and 1825(d).

Consequently, because it is nowhere defined under the FAA, it is impossible to be an "aggrieved person" with respect to FAA surveillance. The government thus has crafted a five-part test that includes an element that it is impossible for anyone to meet. This exemplifies why the government's five-part test for standing for notice under the FAA and opportunity to challenge the constitutionality of the FAA is without merit.

---

[5]  The additional terms defined at 50 U.S.C. § 1881(b) are: "congressional intelligence committees," "Foreign Intelligence Surveillance Court"/"Court," "Foreign Intelligence Surveillance Court of Review"/"Court of Review," "electronic communication service provider," and "intelligence committee."

**B. The Government Should Not Be the Sole Arbiter of What "Derived from" Means under the FAA**

In the face of Mr. Jumeav's concerns as to whether evidence "derived from" FAA surveillance will be used against him, the government asks the Court and Mr. Jumeav to rely on the government's judgment as to when and if "derived from evidence" will be utilized. The government refuses to even state whether evidence derived from FAA surveillance was later utilized in obtaining warrants for FISA surveillance.

On the one hand, the government attempts to assuage the Court and counsel that FAA  "derived from" evidence will not be used against Mr. Jumeav. On the other, the government has made the opposite representation at least three times now in this case. First, in the "Discovery Conference Memorandum and Order" (Doc. 89), p. 5, § E, ¶ 3, the govement states that in this case there have been leads obtained by electronic surveillance of the defendant's person or premises. Second, the "Declaration and Claim of Privilege of the Attorney General of the United States," executed by Attorney General Eric H. Holder, Jr. and attached to the Government's Response states in ¶ 2 that: "I have been advised that the Government presently intends to use in the above-identified criminal proceeding information obtained or derived from the targeting of non-US persons outside the United States conducted pursuant to FISA." Third, the Government Response at 8 concedes that FAA "derived from" evidence has already been used in this case, as the government discloses "that the government has offered into evidence or otherwise used or disclosed in proceedings, including at trial, in this case information derived from the

acquisition of foreign intelligence information conducted pursuant to the Foreign Intelligence Surveillance Act of 1978 [FISA], as amended, 50 U.S.C. § 1881a." [bracketed material in original; internal quotations omitted].

The meaning of "derived from" is well established in constitutional law regarding surveillance.  Evidence is "derived" from illegal surveillance when it is the "product" of that surveillance or "is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (*quoting Nardone v. United States*, 308 U.S. 338, 341(1939)). "Derived" evidence is a "well established term of art" and carries context, carrying a meaning that pre-dates and was incorporated into FISA. *Chandler v. U.S. Army*, 125 F.3d 1296, 1304 (9th Cir. 1997)*; see also United States v. Giordano*, 416 U.S. 505, 531-32 (1974) (interpreting the meaning of derived evidence in relation to a sequence of electronic intercepts and wiretap orders).

Nevertheless, and despite the FAA's enactment six years ago, the government has been unable to settle on a consistent definition of what "derived from" means as used in that statute. Although the criminal Complaint was lodged against Mr. Muhtorov in January 2012, the government did not provide him with notice that it intended to use FAA acquired evidence against him until October 25, 2013. The government attempts to mitigate this noncompliance with the explanation in the Government Response, at 9 n.2, that its decision to give notice was a result of recent consideration of "the particular question of whether and

under what circumstances information obtained through an electronic surveillance under Title I or physical search under Title III could also be considered to have derived from prior collection under Title VII." One wonders if the Solicitor General's embarrassment before the Supreme Court in *Clapper, supra*, had anything to do with the government's "recent consideration." Effectively the government has conceded that it now ascribes a different meaning to the term "derived from" than it did two years ago.  In doing so, the government further concedes that its earlier interpretation of "derived from" was incomplete and incorrect.

Even more inexplicable is the government's grossly belated notice in the recent case of *United States v. Mohamud*, No. 3:10-CR-00475-KI-1, 2014 WL 2866749, 2014 U.S. Dist. LEXIS 85452 (D. Or. June 24, 2014).  There, the defendant was convicted in January 2013 of attempting to use a weapon of mass destruction. It was not until November 19, 2013 -- 11 months after the defendant's conviction -- that the government provided notice that FAA-acquired evidence had been used during the trial to obtain the defendant's conviction. Neither this Court nor Mr. Jumaev should have to rely upon the government's ever morphing interpretation of what evidence is "derived from" FAA surveillance.

The government's apparent position that it intends to use FAA-acquired evidence against Mr. Muhtorov, but not against Mr. Jumaev, is a legal impossibility. The government ignores that Count 1 of the Superseding Indictment charges both Messrs. Muhtorov and Jumaev with conspiracy. Consequently, any statement by either defendant determined to have been made

during the course and scope of the conspiracy generally will be admissible against the codefendant. *See* Fed. R. Evid. 810(d)(2)(E). Additionally, under the Pinkerton doctrine of co-conspirator liability, a conspirator generally is liable for the substantive offenses committed by a co-conspirator when they are reasonably foreseeable and committed in furtherance of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640 (1946); *United States v. Cherry*, 217 F.3d 811, 817 (10th Cir. 2000) (explaining and applying *Pinkerton*). Thus, it is a legal and factual impossibility for FAA-acquired evidence to be utilized at trial against Mr. Muhtorov and not Mr. Jumaev. As a result, Mr. Jumaev would be harmed by the introduction of FAA-acquired evidence in this case, and therefore he certainly has standing to receive notice and to challenge the constitutionality of the FAA.

Mr. Jumaev has standing to challenge the constitutionality of the FAA because there is a "realistic danger of sustaining a direct injury as a result of the statute's operation." *Pennell v. San Jose*, 485 U.S. 1, 8 (1988); *see also Davis v. Federal Election Comm'n,* 554 U.S. 724, 734-735 (2008) (self-financed congressional candidate challenged the constitutionality of election law that relaxed the limits on an opponent's contributions when self-financed candidate's spending itself exceeded certain limits, where opponent had decided not taken advantage of allowable increased statutory contribution limits, plaintiff had standing due to "realistic and impending threat" opponent would do so); *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, (1978) (plaintiffs who lived near proposed nuclear power plant challenged

constitutionality of statute that limited the plant's liability for nuclear accident; Court found standing due to generalized concern about exposure to radiation").

## IV. INDEPENDENT PANEL REVIEWS EMPHASIZE THE RIGHT TO PRIVACY AND QUESTION THE CONSTITUTIONALITY OF THE FAA

Many of the constitutional arguments raised by Messrs. Muhtorov and Jumaev (Docs. 520, 521, and 602) have also been addressed and countenanced in many respects by two independent panels: one commissioned specifically by the President, and the other by the executive branch's advisory board established by Congress in 2004. They are cited *infra*, and relevant excerpts from each to this case are now discussed.

### A. The FAA Violates The Fourth Amendment

"The right to privacy is essential to a free and self-governing society.  The rise of modern technologies makes it all the more important that democratic nations respect people's fundamental right to privacy, which is a defining part of individual security and personal liberty."   The President's Review Group on Intelligence and Communications Technologies, *Liberty and Security in a Changing World, December 12, 2013,* at 12 (the "President's Review").

Excessive surveillance and unjustified secrecy can threaten civil liberties, public trust, and the core processes of democratic self-government. All parts of the government, including those that protect our national security, must be subject to the rule of law."  *Id.*

While it is the government's responsibility to protect this country's national security, the government is equally responsible for protecting the fundamental values of our homeland security as captured in the Fourth Amendment:  "The

right of the people to be *secure* in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated..." (emphasis added). *Id.* at 15. The underlying goal is to achieve the right "balance" between the two forms of security. *Id.* at 16.

To achieve this balance, the President's Review endorsed new steps to protect those within the United States engaged in communications with non-US persons, including restrictions on the ability of the FISC to compel third parties (such as telephone providers) to disclose private information to the government, and restrictions on the issuance of National Security Letters (by which the FBI now compels individuals and organizations to turn over certain otherwise private records), recommending prior judicial review except in emergencies where time is of the essence.  *Id.* at 18.

The President's Review recommended that if the government legally intercepts a Section 702 communication directed at a non-US person who is located outside the US, and if the communication either includes a US person as a participant or reveals information about a US person: (1) any information about the US person should be purged upon detection unless it either has foreign intelligence value or is necessary to prevent serious harm to others; (2) any information about the US person may not be used in evidence in any proceeding against that US person; and (3) the government may not search the contents of Section 702 communications in an effort to identify communications of a particular US person, except (a) when the information is necessary to prevent a threat of death or serious bodily harm, or (b) when the government obtains a

warrant based on probable cause to believe the US person is planning or is engaged in acts of international terrorism. *Id.* at 28-29 ("Recommendation 12").

Although the President's Review did acknowledge that Section 702 "does play an important role in the nation's efforts to prevent terrorist attacks across the globe," (Doc. 559 at 57), the question remains whether it achieves that goal in a way that unnecessarily sacrifices individual privacy and damages foreign relations. *Id.* at 145.  The President's Review concluded that Section 702 has a potentially troubling impact on the privacy of US persons because of the risk of inadvertent interception. *Id.* As a result, the panel made Recommendation 12 for reasons that included the following:

The government cannot lawfully target communications of a US person whether the individual is in or outside the US, without satisfying probable cause of both FISA and 4th Amendment. However, under the FAA, targeting of a non-US person located outside the United States requires only that the government reasonably believe that the target is such a person. Thus, US persons are appreciably more likely to have their constitutionally protected communications inadvertently intercepted under this lower standard whenever the government engages in Section 702 surveillance.  President's Review, at 147.

In standard practice involving Title III, 18 U.S.C. § 2510, *et seq.*, if the government wiretaps an individual's phone because he is suspected of, for example, drug trafficking, and during that tap a completely innocent persons is overheard talking on that phone about non-related criminal activity, the government customarily will discontinue listening to and even discontinue the

interception of the call to implement necessity protocols, thus effectively purging the call from its collection.  However, that standard practice occurs under the rigors of probable cause, necessity, and individualized targeting for the application's initial approval and under stringent minimization and a limited time period for the collection of the interceptions.  None of the foregoing rigors apply to Section 702 collection, which because of its lower standard of "reasonably believed" increases the likelihood that the innocent person's communications with a foreign-friend, physician, or attorney abroad would be inadvertently intercepted. Indeed, the "NSA treats all content intercepted incidentally from third parties as permissible to retain, store, search, and distribute to its government customers." *Washington Post*, at 4.  In fact, "the NSA does not generally attempt to remove irrelevant personal content, because it is difficult for one analyst to know what might become relevant to another."  *Id.*

Second, it is often difficult to determine whether an e-mail address, internet communication, Skype address, or telephone number of the non-targeted participant in a legally acquired Section 702 communication belongs to a US person. In such circumstances, there is a significant risk that Section 702 communications involving US persons will be retained indefinitely in a government database.  *Id.* at 149.  Third, the concept of information of "foreign intelligence value" has a degree of vagueness and can lead to the preservation of private information about US persons whose communications are incidentally intercepted under a Section 702 collection.  *Id.*

For the above reasons, there is a risk that the government after it incidentally collects information about US persons during the course of a Section 702 collection will be able to later search its database of communications in a way that invades the legitimate privacy interests of persons in the United States. The underlying rationale of Section 702 is to protect the privacy interests of US persons even when they communicate with non-US persons abroad. They should not lose that protection merely because the government has legally targeted non-US persons abroad under a legal standard that could not be employed to target a US person who participates in that communication. *Id.* at 150.

The President Review's Recommendation 12 would allow the government to target non-US persons abroad while at the same time preserving the privacy and security interests of the US person and reduce the incentive of the government to use Section 702 in an effort to gather evidence against US persons in a way that would circumvent the underlying values of both FISA and the 4th Amendment. *Id.*

A second review panel, the Privacy and Civil Liberties Oversight Board ("PCLOB"), recently issued its *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* ("PCLOB Report"). The Panel noted that "evaluating the constitutionality of the Section 702 program poses unique challenges" since it is "complex surveillance program – one that entails many separate decisions to monitor large numbers of individuals, resulting in the annual collection of hundreds of millions of

communications of different types, obtained through a variety of methods, pursuant to multiple foreign intelligence imperatives, and involving four intelligence agencies that each have their own rules governing how they may handle and use the communications that are acquired."  PCLOP Report, July 2, 2014, 86.

The PCLOP Report acknowledged that "the relevant Fourth Amendment interests are those of U.S. persons whose communications may be acquired despite not themselves having being targeted for surveillance."  *Id. a*t 87. The acquisitions can occur in four main situations:

(1) An "incidental" collection – when a U.S. person communicates by telephone or Internet with a targeted non-U.S. person located abroad;

(2) An "about" collection – when a U.S. person sends or receives an Internet communication that is routed internationally and which communication makes reference to a targeted email address; here neither the sender nor recipient of the communication is a targeted non-U.S. person;

(3) A "multiple-communications transaction" – when a U.S. person sends or receives an Internet communication that is embedded within the same "transaction" as a different communication that meets the requirements for acquisition;

(4) An "inadvertent" collection – when a U.S. person's communications are acquired by mistake due to a targeting error, an implementation error, or a technological malfunction.

*Id.*  Any Fourth Amendment assessment of the Section 702 program must take into account the cumulative privacy intrusions and risks of all four categories above, together with the limits and protections built into the program that mitigate them. *Id.*

Here, it has been shown that Mr. Jumaev has communicated with persons overseas. *See* Doc. 499 at 15. He and Mr. Muhtorov have engaged in Internet communications wherein the foreign email address of sodiqlar.com, an IJU site, was mentioned.  *Id.* at 16. The facilitator of sodiqlar.com is most likely a non-U.S. person targeted under Section 702.  *Id. at 17-18.*  Internet communications of Mr. Jumaev most likely fall within one or more of the above categories.   The government refuses to state whether that is so, other than to obliquely note that even if one's communications were acquired under Section 702, but the government does not intend to use them in any proceeding against the U.S. person, then that person is not entitled to be informed whether such communications were indeed acquired. It is not within the government's exclusive domain to decide if information is "derived from" such a collection, if the information is relevant to any of Mr. Jumaev's defenses, or if the information is favorable to Mr. Jumaev under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.


### V. SUMMARY AND CONCLUSION

The government's refusal to answer two basic questions with a simple "yes" or "no" has unduly hampered Mr. Jumaev's efforts at a full and meaningful

challenge to the FAA evidence that the government has stated will be introduced in this criminal proceeding.

Mr. Jumaev has standing to challenge the constitutionality of the FAA because he will be harmed by the introduction of FAA acquired information or evidence derived therefrom in the criminal proceedings against him.

Mr. Jumaev has standing to seek suppression of the information obtained or derived from the FAA collection because he was likely intercepted or overheard during such surveillance and/or his activities were the subject of such surveillance.

Evidence uncovered over the course of more than a year's investigation of the true workings of the government's use of the FAA has questioned the notion of incidental and inadvertent collection of information and more and more appears as if specific individuals may have been targeted in order to avoid the more stringent collection, preservation, and use standards under FISA.

Based upon the reasons discussed herein, Mr. Jumaev seeks discovery of the materials described in Defendants' Motions to Suppress and suppression of any information obtained or derived from FAA surveillance, and for such further relief as the Court may deem appropriate.

Dated this 11th day of July, 2014.

Respectfully submitted,

s/David B. Savitz
David B. Savitz
1512 Larimer Street, 600
Denver, CO 80202
303-825-3109
303-830-0804 (fax)
SavMaster@aol.com


s/Mitchell Baker
Mitchell Baker
1543 Champa Street, Suite 400
Denver, CO  80202
(303) 592-7353
mitchbaker@estreet.com

(*Attorneys for Defendant Bakhtiyor Jumaev*)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th day of July, 2014 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel of record:

> Gregory A. Holloway
> Email: Gregory.Holloway@usdoj.gov
>
> Erin Martha Creegan
> National Security Division for U.S. Department of Justice
> Email: erin.creegan@usdoj.gov
>
> Kathryn J. Stimson
> Counsel for Jamshid Muhtorov
> Email: kathryn@stimsondefense.com
>
> Brian Rowland Leedy
> Office of the Federal Public Defender
> Counsel for Jamshid Muhtorov
> Email: Brian_Leedy@fd.org
>
> Warren Richard Williamson
> Office of the Federal Public Defender
> Counsel for Jamshid Muhtorov
> Email: Rick_Williamson@fd.org

> s/Pat Austin
> Pat Austin, Paralegal to David B. Savitz

**APPENDIX A**

**PROCEDURAL HISTORY**

On April 4, 2012, the government filed a "Notice of Intent to Use Foreign Intelligence Information" ("Jumaev FISA Notice") (Doc. No. 68) against Mr. Jumaev, informing the Court and Mr. Jumaev that pursuant to 50 U.S.C. §§ 1806(c) and 1825(d), the government intends to offer into evidence or otherwise use or disclose in any proceedings in the above-captioned matter, information obtained and derived from electronic surveillance and physical searches conducted pursuant to the Foreign Intelligence Surveillance Act of 1978, as amended, 50 U.S.C. §§ 1801 - 1811, 1821 - 1829. (Doc. 68).  A similar notice had been previously filed against codefendant Jamshid Muhtorov ("Mr. Muhtorov") ("Muhtorov First FISA Notice") (Doc. 12).

On October 25, 2013, the government provided Mr. Muhtorov with a second notice that expanded the nature of the foreign intelligence information that it intended to use against this defendant, namely, evidence acquired or derived from the FAA. ("Muhtorov Second FISA Notice") (Doc. 457).

On October 28, 2013, because he had not been afforded a notice similar to Doc. 457, Mr. Jumaev filed his "Motion for Notice of Whether the Government Intends to Use Evidence Obtained Under or Derived from Surveillance Authorized by the FISA Amendment Act of 2008 ("FAA")"  (Doc. 458) ("Jumaev Motion for Notice").

On November 19, 2013, the government filed a Response to the Jumaev Motion for Notice (Doc. 470).  On January 10, 2014, Mr. Jumaev filed a Reply in

support of the Motion for Notice (Doc. 501), and on *February 4, 2014, the government fled its Sur-Reply on* (Doc. 525). Mr. Jumaev's Motion for Notice then became at-issue.  By then, the round of pleadings, seeking suppression of the FAA acquired evidence had already begun.

On January 29, 2014, Mr. Muhtorov, filed a "Motion to Suppress Evidence Obtained or Derived from Surveillance Under the FISA Amendments Act and Motion for Discovery" (Doc. 520). One day later, Mr. Jumaev filed a similar motion that both adopted Mr. Muhtorov's arguments pursuant to D.C.Colo.LCr. 12.1(b), and presented additional arguments germane to Mr. Jumaev. (Doc. 521).

On May 9, 2014, the government filed a combined response to both suppression motions, and defense counsel was provided with an "unclassified" version of the response. (Doc. 559). ("Government Response"). The Government Response also included an appended "Declaration and Claim of Privilege" executed by Attorney General Eric H. Holder.  On May 22, 2014, the government filed *in camera, ex parte,* and under seal its classified response (Doc. 569) ("Government's Classified Response").

The Government Response, while 97 pages long, contains wholesale redactions – indeed, entire headings, sections, and presumably lengthy segments of text.  Consequently, on June 12, 2014, Mr. Muhtorov filed a pleading styled, "Defendant Muhtorov's Motion for Order Requiring Government to Disclose or Provide His Counsel Access to its Classified Pleadings and Objection to Ex Parte Proceedings". (Doc. 584); on June 18, 2014, Mr. Jumaev

filed "Motion to Require the Government to Disclose, or Otherwise Provide Him Access to, its Classified Pleadings (Doc. 569) and Objection to the Ex Parte, In Camera Submission to and Final Determination by the Court of Such Pleadings and Related Documents Without Disclosure and Attendant Proceedings First Afforded to Defendant" (Doc. 590) (collectively "Motions for Disclosure").

On July 2, 2014, the government filed a combined response to the Motions for Disclosure. (Doc. 600).  The motions for disclosure are now at issue.

Also, on July 2, 2014, the Government's Response was supplemented with the opinion in *United States v. Mohamud*, No. 3:10-CR-00475-KI-1, 2014 WL 2866749, 2014 U.S. Dist. LEXIS 85452 (D. Or. June 24, 2014). (Doc. 601).

On July 3, 2014, Mr. Muhtorov filed "Defendant's Reply to Government's Response (Doc. 559, 569)" (Doc. 602) ("Muhtorov's Reply").  Mr. Jumaev's Reply filed today presumably renders the matters of suppression and for discovery at issue.

Thus, pending for the Court's consideration are: Mr. Jumaev's Motion for Notice, the Defendants' motions for disclosure, and the Defendants' motions to suppress and for discovery.