# <u>APPENDIX – INDICTMENTS IN CASES</u>

# <u>CITED IN GOVERNMENT'S RESPONSE</u>

## TABLE OF CONTENTS

1.  **United States v. Awan**,
    No. 06-154(S-2) (CPS) (E.D.N.Y.)……………………………00G

2.  **United States v. Hassan**,
    No. 5:09cr216 (E.D.N.C.)………………………………………..00J

3.  **United States v. Hassoun**,
    No. 0:04-cr-60001-MHC (S.D.Fla.)……………………………02H

4.  United States v. Mehanna,
    No. 1:09-cr-10017-GAO (D.Mass.)……………………………05I

5.  United States v. Satter and Stewart,
    No. 02 Cr. 395 (S.D.N.Y.)………………………………….......094

APPENDIX 2

KTC:LPF:LK
F.#2006R00416

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     -against-

KHALID AWAN,

       Defendant

- - - - - - - - - - - - - - - X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 23 2006 ★

BROOKLYN OFFICE

S U P E R S E D I N G
I N D I C T M E N T

Cr. No. 06-154(S-2)(CPS)
(T. 18, U.S.C., §§
1956(a)(2)(A),
1956(c)(7)(B)(ii), 2339A(a)
(2001), 2339A(a)(2005), 2
and 3551 et seq.)

THE GRAND JURY CHARGES:

INTRODUCTION

     At all times relevant to this Indictment, unless otherwise indicated:

     1.  The defendant KHALID AWAN was a dual Pakistani-Canadian citizen residing in Garden City, New York.

     2.  The Khalistan Commando Force was a group operating primarily in India and Pakistan that was composed of members of the Sikh religion.  The Khalistan Commando Force's stated purpose was to compel the Indian government to permit the creation of an independent state, controlled by members of the Sikh religion, called "Khalistan."

     3.  In order to compel the Indian government to create the state of Khalistan, the Khalistan Commando Force engaged in a series of bombings, kidnappings and murders in India.

     4.  Paramjit Singh Panjwar ("Panjwar") resided in

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 3 of 53
Case 1:06-cr-00154-ARR-VVP   Document 86   Filed 10/25/06   Page 2 of 9 PageID #: 508
APPENDIX 3

Lahore, Pakistan and was the leader of the Khalistan Commando Force.  Because of the activities of the Khalistan Commando Force, Panjwar was listed as a "terrorist" by the government of India and was wanted for criminal prosecution.

5.   Coconspirator #1, an individual whose identity is known to the grand jury, was a member of the Khalistan Commando Force residing in Queens, New York.  From 1999 through 2001, Coconspirator #1 hosted fundraisers for Panjwar and the Khalistan Commando Force at his home.  During some of these fundraisers, Panjwar addressed the attendees by conference call and explained the importance of providing money in support of the Khalistan Commando Force.

6.   Coconspirator #2, an individual whose identity is known to the grand jury, was a resident of Queens, New York.  From 1999 through 2001, Coconspirator #2 hosted fund-raisers for the Khalistan Commando Force at his home.

Provision of Currency, Monetary Instruments and Financial Services

7.   In or about November 2000, Coconspirator #1, Coconspirator #2 and others met with the defendant KHALID AWAN at his residence and gave him a sum of United States currency, collected during the above-described fundraisers, for AWAN to transmit to Panjwar for use by the Khalistan Commando Force to conduct attacks in India.

8.   In approximately Spring 2001, Coconspirator

Case 1:12-cr-00033-JLK  Document 1175  Filed 11/28/16  USDC Colorado  Page 4 of 53
Case 1:06-cr-00154-ARR-VVP  Document 86  Filed 10/25/06  Page 3 of 9 PageID #: 509
APPENDIX 4

#2 met with the defendant KHALID AWAN and gave him a sum of United States currency for AWAN to transmit to Panjwar for use by the Khalistan Commando Force to conduct attacks in India.

<u>Provision of Personnel</u>

9.    In or about October 2001, the defendant KHALID AWAN was incarcerated at the Metropolitan Detention Center ("MDC"), a federal correctional facility located in Brooklyn, New York, on fraud charges.

10.    While incarcerated at the MDC, AWAN maintained contact with Panjwar by telephone.

11.    While incarcerated at the MDC, AWAN met John Doe, an individual whose identity is known to the grand jury, who was also incarcerated at the MDC and who was a Sikh.  AWAN told John Doe in sum and substance that he was closely associated with Panjwar and the Khalistan Commando Force and was responsible for transferring funds from supporters of the Khalistan Commando Force in the United States to Panjwar in Pakistan for use by the Khalistan Commando Force to conduct attacks in India.

12.    On or about March 12, 2004, the defendant KHALID AWAN introduced John Doe to Panjwar by telephone.  AWAN told John Doe in sum and substance that, upon John Doe's release from prison, AWAN would arrange for him to travel to Pakistan in order to receive training from Panjwar to join the Khalistan Commando Force to conduct attacks in India.

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 5 of 53
Case 1:06-cr-00154-ARR-VVP   Document 86   Filed 10/25/06   Page 4 of 9 PageID #: 510
APPENDIX 5

4

<u>COUNT ONE</u>
(Conspiracy to Provide Material Support or Resources
to Terrorists)

13.   The allegations contained in paragraphs 1 through
12 are realleged and incorporated as if fully set forth in this
paragraph.

14.   In or about and between 1998 and February 2005,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendant KHALID AWAN,
together with others, did knowingly and intentionally conspire to
provide material support and resources, to wit: currency, monetary
instruments, financial services and personnel, knowing and
intending that they were to be used in preparation for, and in
carrying out, a conspiracy to commit at a place outside the United
States an act that would constitute the offense of murder,
kidnapping or maiming if committed in the special maritime and
territorial jurisdiction of the United States, in violation of
Title 18, United States Code, Section 956(a).

15.   In furtherance of this conspiracy and to effect
its objectives, within the Eastern District of New York and
elsewhere, the defendant KHALID AWAN committed and caused to be
committed, among others, the following:

a.   In or about November 2000, the defendant
KHALID AWAN met with Coconspirator #1, Coconspirator #2 and others
at his residence in Garden City, New York and received a sum of

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 6 of 53
Case 1:06-cr-00154-ARR-VVP   Document 86   Filed 10/25/06   Page 5 of 9 PageID #: 511
APPENDIX 6

5

United States currency, which AWAN was to transmit to Panjwar and the Khalistan Commando Force for use in its attacks in India.

b.   In or about Spring 2001, the defendant KHALID AWAN met with Coconspirator #2 at his residence in Garden City, New York and received a sum of United States currency, which AWAN was to transmit to Panjwar and the Khalistan Commando Force for use in its attacks in India.

c.   On or about July 26, 2001, the defendant KHALID AWAN caused a wire transfer in the amount of $25,000 to be sent from an account he controlled at the Bank of America, in the name of "Tee Jays Fashion & Wholesale," to an account he controlled in his name at Habib Bank Limited in Lahore, Pakistan.

d.   On March 12, 2004, while incarcerated at the MDC, the defendant KHALID AWAN telephoned Panjwar in Lahore, Pakistan and introduced him to John Doe.

(Title 18, United States Code, Sections 2339A(a) (2005) and 3551 et seq.)

## COUNT TWO
(Providing Material Support or Resources to Terrorists)

16.   The allegations contained in paragraphs 1 through 12 are realleged and incorporated as if fully set forth in this paragraph.

17.   In or about and between 1998 and October 25, 2001, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant KHALID AWAN did

Case 1:12-cr-00033-JLK  Document 1175  Filed 11/28/16  USDC Colorado  Page 7 of 53
Case 1:06-cr-00154-ARR-VVP  Document 86  Filed 10/25/06  Page 6 of 9 PageID #: 512
APPENDIX 7

6

knowingly and intentionally provide material support and

resources, to wit: currency, monetary instruments and financial

services, knowing and intending that they were to be used in

preparation for, and in carrying out, a conspiracy to commit at a

place outside the United States an act that would constitute the

offense of murder, kidnapping or maiming, if committed in the

special maritime and territorial jurisdiction of the United

States, in violation of Title 18, United States Code, Section

956(a).

(Title 18, United States Code, Sections 2339A(a) (2001),

2 and 3551 et seq.)

COUNT THREE
(Money Laundering to Promote Terrorism)

18.  The allegations contained in paragraphs 1 through

12 are realleged and incorporated as if fully set forth in this

paragraph.

19.  In or about and between 1998 and November 6, 2001,

both dates being approximate and inclusive, within the Eastern

District of New York and elsewhere, the defendant KHALID AWAN did

knowingly and intentionally transport, transmit and transfer

monetary instruments and funds from a place in the United States

to a place outside the United States with the intent to promote

the carrying on of specified unlawful activity, to wit: an offense

against a foreign nation, to wit: India, involving murder as

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 8 of 53
Case 1:06-cr-00154-ARR-VVP   Document 86   Filed 10/25/06   Page 7 of 9 PageID #: 513
APPENDIX 8

7

defined by Indian Penal Code Section 300 and destruction of property by means of explosive or fire as defined by Indian Penal Code Section 435.

(Title 18, United States Code, Sections 1956(a)(2)(A), 2 and 3551 et seq.)

A TRUE BILL

FOREPERSON

ROSLYNN R. MAUSKOPF
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY:_____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.136

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:09cr216-1 FL
NO. 5:09cr216-2 FL
NO. 5:09cr216-3 FL
NO. 5:09cr216-4 FL
NO. 5:09cr216-5 FL
NO. 5:09cr216-6 FL
NO. 5:09cr216-7 FL
NO. 5:09cr216-8 FL

FILED IN OPEN COURT
ON 7.22-09 vdl
Dennis P. Iavarone, Clerk
US District Court
Eastern District of NC

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | |
| DANIEL PATRICK BOYD, ) | I N D I C T M E N T |
| a/k/a "Saifullah," ) | UNDER SEAL |
| HYSEN SHERIFI ) | |
| ANES SUBASIC ) | |
| ZAKARIYA BOYD, a/k/a "Zak" ) | |
| DYLAN BOYD, a/k/a "Mohammed" ) | |
| JUDE KENAN MOHAMMAD ) | |
| MOHAMMAD OMAR ALY HASSAN ) | |
| ZIYAD YAGHI ) | |

THE GRAND JURY CHARGES THAT:

General Allegations

At all times relevant to this Indictment:

1.     Defendant DANIEL PATRICK BOYD a/k/a "Saifullah" (meaning

Sword of God) is a United States citizen living in the Eastern

District of North Carolina.

2.     Defendant HYSEN SHERIFI, a native of Kosovo and a legal

permanent resident of the United States, is located in the Eastern

District of North Carolina at the time of this Indictment.

1

3.    Defendant ANES SUBASIC is a naturalized citizen of the United States, residing in the Eastern District of North Carolina.

4.    Defendant ZAKARIYA BOYD, a/k/a "Zak," is a United States citizen living in the Eastern District of North Carolina.

5.    Defendant DYLAN BOYD, a/k/a "Mohammed," is a United States citizen living in the Eastern District of North Carolina.

6.    Defendant JUDE KENAN MOHAMMAD is a citizen of the United States who was residing in the Eastern District of North Carolina at all times pertinent to this conspiracy.

7.    Defendant MOHAMMAD OMAR ALY HASSAN is a citizen of the United States, and is residing in the Eastern District of North Carolina.

8.    Defendant ZIYAD YAGHI is a naturalized citizen of the United States, and is residing in the Eastern District of North Carolina.

9.    In the period from 1989 - 1992, DANIEL PATRICK BOYD a/k/a "Saifullah" traveled to Pakistan and Afghanistan where he received military style training in terrorist training camps for the purpose of engaging in violent *jihad*.  Following this training, Boyd fought in Afghanistan against the Soviet Union.

COUNT ONE
(Conspiracy to provide material support to terrorists)
18 U.S.C. § 2339A

10.    The Grand Jury realleges and incorporates by reference the General Allegations contained in paragraphs 1 through 9 of this

2

Indictment, and further alleges that:

## I. Conspiracy

11. Beginning on a date unknown but no later than November 9, 2006, and continuing through at least July, 2009, within the Eastern District of North Carolina and elsewhere, the defendants DANIEL PATRICK BOYD, a/k/a "Saifullah," HYSEN SHERIFI, ANES SUBASIC, ZAKARIYA BOYD, a/k/a "Zak," DYLAN BOYD, a/k/a "Mohammed," JUDE KENAN MOHAMMAD, MOHAMMAD OMAR ALY HASSAN, and ZIYAD YAGHI, did knowingly, willfully, and unlawfully combine, conspire, confederate and agree with other individuals known and unknown to the grand jury to knowingly provide material support and resources, as that term is defined in 18 U.S.C. § 2339A(b) to wit: currency, training, transportation, and personnel, and to conceal and disguise the nature, location, source, and ownership of material support and resources, knowing and intending that they were to be used in preparation for, and in carrying out, a violation or violations of Title 18, United States Code, Section 956, (Conspiracy to murder, kidnap, maim or injure persons in a foreign country), that is, conspiring with one or more persons to commit, at any place outside the jurisdiction of the United States, an act that would constitute the offense of murder (the unlawful killing of human beings with malice aforethought), kidnapping, maiming, and injuring, if committed in the special maritime and territorial jurisdiction of the United States and in so doing, commit an act within the United

3

States to effect an object of such conspiracy.

## II. Manner and Means

12. It was the purpose and object of the conspiracy to advance violent *jihad* including supporting and participating in terrorist activities in specific locations outside the United States and committing acts of murder, kidnapping or maiming persons outside the United States. The manner and means by which the conspiracy was sought to be accomplished included, among other things, the following during the dates of the alleged conspiracy:

a. It was part of the conspiracy that the defendants and their co-conspirators prepared to become "*mujihadeen*" and die "*shahid*"— that is, as martyrs in furtherance of violent *jihad.*

b. It was further a part of the conspiracy that certain of the defendants radicalized others, mostly young muslims or converts to Islam, to believe in "*fard 'ayn,*" the idea that violent *jihad* was a personal obligation on the part of every good muslim.

c. It was further part of the conspiracy to offer training in weapons and financing, and to assist in arranging overseas travel and contacts so the others could wage *violent jihad*.

d. It was a part of the conspiracy to raise money to support the defendants' efforts in training and provision of personnel, and to disguise the destination of such monies from the donors.

e. It was further a part of the conspiracy to obtain weapons like the AK-47, to develop familiarity and skills with the weapons

4

of choice used by *mujihadeen* in Afghanistan and elsewhere.

### III. Overt Acts

13.   In furtherance of the conspiracy and to effect the illegal objects thereof, the defendants and their co-conspirators performed overt acts, in the Eastern District of North Carolina, and elsewhere, including but not limited to the following:

14.   On or about March 11, 2006, DANIEL PATRICK BOYD, a/k/a "Saifullah," defendant herein, did travel to Gaza and attempted to enter Palestine in order to introduce his son to individuals who also believed that violent *jihad* was a personal obligation on the part of every good Muslim.

15.   On or about October 7, 2006, defendant ZIYAD YAGHI departed the U.S. for Jordan, to engage in violent *jihad*.

16.   On or about November 9, 2006, DANIEL PATRICK BOYD, a/k/a "Saifullah," defendant herein, purchased a Bushmaster M4 A3 16 inch patrolman carbine rifle and an ETA M16 V System C-MAG magazine.

17.   On or about February 21, 2007, DANIEL PATRICK BOYD, a/k/a "Saifullah," defendant herein, purchased airline tickets to Israel from the United States for himself and defendant ZAKARIYA BOYD, a/k/a "Zak."

18.   On or about March 13, 2007, DANIEL PATRICK BOYD, a/k/a "Saifullah," purchased a Ruger mini 14 long gun.

19.   On or about March, 29, 2007, Boyd purchased airline tickets to Israel from the United States for defendant DYLAN BOYD,

5

a/k/a "Mohammed."

20. On or about April 3, 2007, tickets were purchased for defendants ZIYAD YAGHI and MOHAMMAD OMAR ALY HASSAN, to travel from the United States to Israel.

21. On June 12, 2007, defendants DANIEL PATRICK BOYD, a/k/a "Saifullah," and ZAKARIYA BOYD, a/k/a "Zak," departed the U.S. for Tel Aviv, Israel.

22. On June 13, 2007, defendants ZIYAD YAGHI and MOHAMMAD OMAR ALY HASSAN departed Raleigh for Tel Aviv, Israel. Having failed in their attempt to engage in violent *jihad*, ZIYAD YAGHI returned to the United States on July 16, 2007, and MOHAMMAD OMAR ALY HASSAN returned to the United States on July 21, 2007.

23. On July 18, 2007, DANIEL PATRICK BOYD a/k/a "Saifullah," DYLAN BOYD a/k/a "Mohammed," and ZAKARIYA BOYD a/k/a "Zak," returned to the United States having failed in their attempt to engage in violent *jihad*.

24. Upon his arrival in the United States, DANIEL PATRICK BOYD a/k/a "Saifullah," lied to agents of Customs and Border Protection during an interview at the Atlanta airport by denying that he had intended to meet up in Israel with defendants ZIYAD YAGHI and MOHAMMAD OMAR ALY HASSAN.

25. On August 2, 2007, DANIEL PATRICK BOYD a/k/a "Saifullah," lied to agents of the FBI in Raleigh, North Carolina, by denying that he had intended to meet up in Israel with defendants ZIYAD

6

YAGHI and MOHAMMAD OMAR ALY HASSAN.

26.    On or about February 28, 2008, defendant DANIEL PATRICK BOYD, a/k/a "Saifullah," solicited money to fund the travel of individuals overseas to engage in violent *jihad*.

27.    On 21 March 2008, Anes SUBASIC stated to Daniel BOYD that "We can do something," and "I'm gonna go, we can go together," and that "I can find a few other brothers."  During this conversation, BOYD states that the "kuffar" have called the police on him and he was once turned away from Israel. SUBASIC responds that they need to find BOYD a new passport.  During the same discussion, BOYD states that some in the news unsuccessfully attempted to wage jihad and were caught for doing foolish things.  At this point, SUBASIC stated that anyone, not only these young men, should be taught to cross the border and how to navigate at night.

28.    On or about April 18, 2008, defendants DANIEL PATRICK BOYD, a/k/a "Saifullah," and ANES SUBASIC, engaged in a coded conversation in which they discussed preparing to send two individuals overseas to engage in violent *jihad*.

29.    On April 28, 2008, defendant DANIEL PATRICK BOYD, a/k/a "Saifullah," sent to defendant HYSEN SHERIFI e-mail which attached literature extolling the virtues of dying *shahid*.

30.    On or about June 7, 2008, defendant DANIEL PATRICK BOYD, a/k/a "Saifullah," accepted five hundred dollars ($500) in cash from defendant HYSEN SHERIFI to be used to help fund violent *jihad*

7

overseas.

31. On or about June 17, 2008, defendant DANIEL PATRICK BOYD, a/k/a "Saifullah," showed defendant HYSEN SHERIFI how to use and operate a Kalashnkov (AK-47) in BOYD's living room.

32. On or about July 30, 2008, defendant HYSEN SHERIFI departed from Raleigh, North Carolina to travel to Pristina, Kosovo to engage in violent *jihad*.

33. On or about October 7, 2008, defendant JUDE KENAN MOHAMMAD departed the United States to travel to Pakistan to engage in violent *jihad*.

34. On November 3, 2008, defendant DANIEL PATRICK BOYD, a/k/a "Saifullah," purchased a Mossburg 100 ATR .270 rifle and a Llama Comanche III .357 revolver.

35. On November 6, 2008, defendant DANIEL PATRICK BOYD, a/k/a "Saifullah," purchased a Century Arms AK Sporter 7.62 X 39 rifle.

36. On November 11, 2008, defendant DANIEL PATRICK BOYD, a/k/a "Saifullah," purchased a Ruger mini 30 7.62 X 39 rifle.

37. On November 26, 2008, defendant HYSEN SHERIFI stated "everything is going as planned," and that he had "good news," "Allah has opened a way for me." The recipient of the statement believed this to be a reference to engaging in violent jihad.

38. On February 11, 2009, defendant DANIEL PATRICK BOYD, a/k/a "Saifullah," purchased an Ishmash SAGA .308 rifle.

39. On March 2, 2009, defendant DANIEL PATRICK BOYD, a/k/a

"Saifullah," purchased a Century Arms Polish Tantal 5.45X39 rifle.

40.    On March 31, 2009, defendant DANIEL PATRICK BOYD, a/k/a "Saifullah," purchased a Century Arms C91 rifle .308.

41.    On April 3, 2009, defendant DANIEL PATRICK BOYD, a/k/a "Saifullah," purchased a Century Arms M70B1 7.62X34 rifle, a Ruger mini 14 5.56 rifle, and a Smith & Wesson MP15 .223 rifle.

42.    On April 5, 2009, defendant HYSEN SHERIFI returned to the United States for the purpose of soliciting funds and personnel to support the *mujihadeen*.

43.    In 2009, defendant DANIEL PATRICK BOYD, a/k/a "Saifullah," stopped attending services at the masjids (muslim houses of worship) in the Raleigh, North Carolina area due to ideological differences.    Instead, BOYD and others, known and unknown, met for Friday prayer at the BOYD home.

44.    On June 10, 2009, defendants DANIEL PATRICK BOYD, a/k/a "Saifullah," HYSEN SHERIFI, and ZAKARIYA BOYD, a/k/a "Zak," practiced military tactics and the use of weapons on private property in Caswell County, North Carolina.

45.    On July 7, 2009, defendants DANIEL PATRICK BOYD, a/k/a "Saifullah," HYSEN SHERIFI, and ZAKARIYA BOYD, a/k/a "Zak," practiced military tactics and the use of weapons on private property    in    Caswell    County,    North    Carolina.

All in violation of Title 18, United States Code, Section 2339A.

9

COUNT TWO
(Conspiracy to murder, kidnap, maim and injure persons)
18 U.S.C. § 956(a)

46.  The Grand Jury realleges and incorporates by reference the General Allegations of this Indictment contained in paragraphs 1 through 9 of this Indictment, and the overt acts listed in paragraphs 13 through 44 of Count One of this Indictment, and further alleges that:

47.  Beginning on a date unknown but no later than November 9, 2006, and continuing through at least July, 2009, within the Eastern District of North Carolina and elsewhere, the defendants DANIEL PATRICK BOYD, a/k/a "Saifullah," HYSEN SHERIFI, ANES SUBASIC, ZAKARIYA BOYD, a/k/a "Zak," DYLAN BOYD, a/k/a "Mohammed," JUDE KENAN MOHAMMAD, MOHAMMAD OMAR ALY HASSAN, and ZIYAD YAGHI, at least one of whom having been within the jurisdiction of the United States, did knowingly, willfully, and unlawfully conspire with one another and others known and unknown to the grand jury, to commit outside the United States an act that would constitute murder, that is, the unlawful killing of human beings with malice aforethought, kidnapping, maiming, and injuring if committed in the special maritime and territorial jurisdiction of the United States, and in so doing, committed an act within the jurisdiction of the United States to effect any object of the conspiracy, to wit, on June 13, 2007, defendants MOHAMMAD OMAR ALY HASSAN and ZIYAD YAGHI departed Raleigh for Tel Aviv, Israel, on or about October 3, 2008,

10

defendant JUDE KENAN MOHAMMAD departed the United States to travel to Pakistan, and on June 10, 2009, defendants DANIEL PATRICK BOYD, a/k/a "Saifullah," HYSEN SHERIFI, ZAKARIYA BOYD, a/k/a "Zak," practiced military tactics and the use of weapons on private property in Caswell County, North Carolina.

All in violation of Title 18, United States Code, Section 956(a).

### COUNT THREE
(Receiving firearm through interstate commerce)
18 U.S.C. §924(b)

48. The Grand Jury realleges and incorporates by reference the General Allegations of this Indictment contained in paragraphs 1 through 9 of this Indictment, and the overt acts listed in paragraphs 13 through 44 of Count One of this Indictment, and further alleges that:

49. On or about November 6, 2006, in the Eastern District of North Carolina, defendant DANIEL PATRICK BOYD, a/k/a "Saifullah," with knowledge and reasonable cause to believe that offenses punishable by imprisonment for a term exceeding one year were to be committed therewith, to wit, conspiracy to provide material support to terrorists and conspiracy to murder, as set forth in Counts 1 and 2 of this indictment, did receive a firearm and ammunition in interstate commerce, to wit: a Bushmaster M4A3.

In violation of Title 18, United States Code, Section 924(b).

11

COUNT FOUR
(Possession of firearm in furtherance of crime of violence)
18 U.S.C. § 924(c)

50.   The Grand Jury realleges and incorporates by reference
the General Allegations contained in paragraphs 1 through 9 of this
Indictment, and the overt acts listed in paragraphs 13 through 44
of Count One of this Indictment, and further alleges that:

51.   On or about June 10, 2009, in the Eastern District of
North Carolina, defendants DANIEL PATRICK BOYD, a/k/a "Saifullah,"
HYSEN SHERIFI, and ZAKARIYA BOYD, a/k/a "Zak," did knowingly use
and carry firearms, during and in relation to a crime of violence
for which they may be prosecuted in a court of the United States,
that is, conspiracy to murder, as set forth in Count 2 of this
indictment, and did possess said firearms in furtherance of such
crime.

All in violation of Title 18, United States Code, Section 924(c).

COUNT FIVE
(knowing sale of firearm to convicted felon)
18 U.S.C. § 922(d) (1)

52.   On or about February 6, 2009, in the Eastern District of
North Carolina, defendants DANIEL PATRICK BOYD, a/k/a "Saifullah,"
and DYLAN BOYD, a/k/a "Mohammed," aiding and abetting each other,
did knowingly sell or otherwise dispose of a firearm, that is, a
Beretta 9 mm handgun and ammunition, to a person known to the grand
jury, knowing and having reasonable cause to believe such person

12

had been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of Title 18, United States Code, Sections 922(d)(1) and 924, and 2.

## COUNT SIX
### (False statement)
### 18 U.S.C. § 1001

53.   On or about July 18, 2007, in the Eastern District of North Carolina, in a matter within the jurisdiction of the Department of Homeland Security, an agency of the executive branch of the United States government, in a matter involving international terrorism, defendant DANIEL PATRICK BOYD, a/k/a "Saifullah," did knowingly and willfully make a false, fraudulent, and fictitious material statement and representation; to wit, that when he traveled to Israel in June 2007, he had no plan to meet up with anyone other than his son, who had also then traveled to Israel, when in fact a meeting with others had been planned.

All in violation of Title 18, United States Code, Section 1001(a)(2).

## COUNT SEVEN
### (False statement)
### 18 U.S.C. § 1001

On or about August 9, 2007, in the Eastern District of North Carolina, in a matter within the jurisdiction of the Department of Justice, an agency of the executive branch of the United States government, in a matter involving international terrorism, defendant DANIEL PATRICK BOYD, a/k/a "Saifullah," did

13

knowingly and willfully make a false, fraudulent, and fictitious material statement and representation; to wit, that when he traveled to Israel in June 2007, he had no plan to meet up with defendants ZIYAD YAGHI and MOHAMMAD OMAR ALY HASSAN who also had then traveled to Israel, when in fact such meeting had been planned.

All in violation of Title 18, United States Code, Section 1001(a)(2).

A TRUE BILL:

FOREPERSON OF THE GRAND JURY

DATE

GEORGE E. B. HOLDING
United States Attorney
Eastern District of North Carolina

BARBARA D. KOCHER
Assistant United States Attorney
Eastern District of North Carolina

JASON KELLHOFER
Trial Attorney
Department of Justice
National Security Division
Counterterrorism Section

14

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 23 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 1 of 40
APPENDIX 23

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. <u>04-60001-CR-COOKE</u> (s) (s) (s) (s) (s)

18 U.S.C. § 956(a)(1)
18 U.S.C. § 371
18 U.S.C. § 2339A
18 U.S.C. § 922(g)(5)(B)
18 U.S.C. § 1001(a)
18 U.S.C. § 1621(1)
18 U.S.C. § 1505
18 U.S.C. § 924(d)(1)
18 U.S.C. § 2
21 U.S.C. § 853

**UNITED STATES OF AMERICA**

**v.**

**ADHAM AMIN HASSOUN,**
    a/k/a "Abu Sayyaf,"
**MOHAMED HESHAM YOUSSEF,**
    a/k/a "Abu Turab,"
**KIFAH WAEL JAYYOUSI,**
    a/k/a "Abu Mohamed,"
**KASSEM DAHER,**
    a/k/a "Abu Zurr," and
**JOSE PADILLA,**
    a/k/a "Ibrahim,"
    a/k/a "Abu Abdullah the Puerto Rican,"
    a/k/a "Abu Abdullah Al Mujahir,"



FILED by _____ D.C.
MAG. SEC.

NOV 1 7 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

        **Defendants.**

_____/

## SUPERSEDING INDICTMENT

The Grand Jury charges that:

## INTRODUCTION

At times material to this Superseding Indictment:

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 24 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 2 of 40
APPENDIX 24

1.  There existed a radical Islamic fundamentalist movement dedicated to the establishment of a pure Islamic state ("Caliphate") governed by strict Islamic law ("Sharia"). Followers and supporters of this movement adhered to a radical Salafist ideology that encouraged and promoted "violent jihad" to be waged by "mujahideen" using physical force and violence to oppose governments, institutions, and individuals that did not share their view of Islam.

2.  As used in this Superseding Indictment, the terms "violent jihad" or "jihad" include planning, preparing for, and engaging in, acts of physical violence, including murder, maiming, kidnapping, and hostage-taking.  The term "mujahideen" means warriors engaged in violent jihad.

## VIOLENT JIHAD GROUPS

3.  Groups espousing this radical Salafist ideology included the Islamic Group of Egypt, a/k/a "Gama'a al-Islamiyya," a/k/a "IG," a/k/a "AGAI;" the Egyptian Islamic Jihad, a/k/a "Islamic Jihad," a/k/a "al-Jihad," a/k/a "EIJ;" al-Qaeda; and violent jihad groups in other countries, including Afghanistan, Algeria, Bosnia, Chechnya, Lebanon, Libya, and Somalia. These groups engaged in acts of physical violence, including murder, maiming, kidnapping, and hostage-taking in waging violent jihad.

## VIOLENT JIHAD SUPPORT CELLS

4.  The physical violence committed by these jihad groups was supported and facilitated by a network of smaller groups or cells operating within the United States and in other countries, including Canada, Austria, Denmark, Italy, and the United Kingdom.  These support cells engaged in, among other things, propaganda, fund-raising, recruiting personnel, and providing other physical assets necessary to wage violent jihad.

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 25 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 3 of 40
APPENDIX 25

## NORTH AMERICAN SUPPORT CELL

5.  The defendants, along with other individuals, operated and participated in a North American support cell that sent money, physical assets, and mujahideen recruits to overseas conflicts for the purpose of fighting violent jihad. This North American support cell supported and coordinated with other support networks and mujahideen groups waging violent jihad. The defendants followed and supported Sheikh Omar Abdel Rahman, an influential and high-ranking member of certain violent jihad groups.

6.  Mohamed Zaky, a/k/a "Abu Omar" (hereinafter "Zaky"), an unindicted coconspirator, was also a follower and supporter of Sheikh Omar Abdel Rahman. In the early 1990's, Zaky founded and operated within the United States, and elsewhere, at least three Islamic organizations, the Islamic Center of the Americas, Save Bosnia Now, and the American Worldwide Relief Organization. Until his death in 1995, Zaky used these organizations to promote violent jihad.

7.  **KIFAH WAEL JAYYOUSI, a/k/a "Abu Mohamed"** (hereinafter "JAYYOUSI"), while a resident of San Diego, California, founded the American Islamic Group, and after Zaky died, operated the American Worldwide Relief Organization. Through the American Islamic Group, **JAYYOUSI** published The Islam Report, a newsletter that promoted violent jihad as a religious obligation, delivered information on violence committed by mujahideen, and solicited donations to support mujahideen operations and mujahideen families. **JAYYOUSI** actively recruited mujahideen fighters and raised funds for violent jihad.

8.  **ADHAM AMIN HASSOUN a/k/a "Abu Sayyaf"** (hereinafter "HASSOUN"), a resident of Broward County, Florida, was the East Coast representative of the American Islamic Group and the American Worldwide Relief Organization. **HASSOUN** assisted in distributing

3

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 26 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 4 of 40
APPENDIX 26

The Islam Report and fund-raising for violent jihad on behalf of the American Worldwide Relief Organization. **HASSOUN** also served as the North American distributor of Nida'ul Islam, an Islamic magazine promoting violent jihad. **HASSOUN** worked with **JAYYOUSI** and others in actively recruiting mujahideen fighters and raising funds for violent jihad.

9. **KASSEM DAHER, a/k/a "Abu Zurr"** (hereinafter "DAHER"), resided in LeDuc, Canada. **DAHER** was affiliated with the Canadian Islamic Association, and communicated and coordinated with mujahideen field commanders and violent jihad leaders overseas. **DAHER** worked with **JAYYOUSI, HASSOUN**, and others in actively recruiting mujahideen fighters and raising funds for violent jihad.

10. **MOHAMED HESHAM YOUSSEF, a/k/a "Abu Turab"** (hereinafter "YOUSSEF"), resided in Broward County, Florida, and elsewhere. **YOUSSEF** was recruited by the North American support cell to participate in violent jihad, and traveled overseas for that purpose.

11. **JOSE PADILLA, a/k/a "Ibrahim," a/k/a "Abu Abdullah the Puerto Rican," a/k/a "Abu Abdullah Al Mujahir"** (hereinafter "PADILLA"), resided in Broward County, Florida, and elsewhere. **PADILLA** was recruited by the North American support cell to participate in violent jihad, and traveled overseas for that purpose.

## COUNT 1

### (Conspiracy to Murder, Kidnap, and Maim Persons in a Foreign Country)

Paragraphs 1 through 11 of this Superseding Indictment are realleged and incorporated herein by reference.

4

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 27 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 5 of 40
APPENDIX 27

12.  Beginning at a time uncertain, but no later than in or about October 1993, and continuing until on or about November 1, 2001, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**ADHAM AMIN HASSOUN,**
a/k/a "Abu Sayyaf,"
**MOHAMED HESHAM YOUSSEF,**
a/k/a "Abu Turab,"
**KIFAH WAEL JAYYOUSI,**
a/k/a "Abu Mohamed,"
**KASSEM DAHER,**
a/k/a "Abu Zurr," and
**JOSE PADILLA,**
a/k/a "Ibrahim,"
a/k/a "Abu Abdullah the Puerto Rican,"
a/k/a "Abu Abdullah Al Mujahir,"

at least one of whom having been within the jurisdiction of the United States, did knowingly and willfully combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit at any place outside the United States, acts that would constitute murder, that is, the unlawful killing of human beings with malice aforethought, kidnapping, and maiming if committed in the special maritime and territorial jurisdiction of the United States, and did commit one or more acts within the jurisdiction of the United States, to effect the purpose and object of the conspiracy.

## PURPOSE AND OBJECT OF THE CONSPIRACY

13.  It was a purpose and object of the conspiracy to advance violent jihad, including supporting, and participating in, armed confrontations in specific locations outside the United States, and committing acts of murder, kidnapping, and maiming, for the purpose of opposing existing governments and civilian factions and establishing Islamic states under Sharia.

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 28 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 6 of 40
APPENDIX 28

## MANNER AND MEANS OF THE CONSPIRACY

14.  The manner and means by which the defendants and their coconspirators sought to accomplish the purpose and object of the conspiracy included the following:

a.  Members of the conspiracy would and did recruit, and attempt to recruit, mujahideen warriors who would engage in violent jihad.

b.  Members of the conspiracy would and did solicit and raise monies to support and train mujahideen warriors who would engage in violent jihad.

c.  Members of the conspiracy would and did transfer monies from places inside the United States to places outside the United States to support violent jihad.

d.  Members of the conspiracy would and did provide communications equipment and other physical assets to individuals and groups engaged in violent jihad.

e.  Members of the conspiracy would and did publish statements advocating violent jihad to encourage, induce, and persuade others to support and engage in violent jihad.

f.  Members of the conspiracy would and did seek support and training to serve as mujahideen warriors who would engage in violent jihad.

g.  Members of the conspiracy would and did use humanitarian, educational, and other non-governmental organizations to cover, conceal, and disguise their support of violent jihad.

h.  Members of the conspiracy would and did utilize codes and other techniques to cover, conceal, and disguise their true identities and activities.

Case 1:12-cr-00033-JLK  Document 1175  Filed 11/28/16  USDC Colorado  Page 29 of 53
Case 0:04-cr-60001-MGC  Document 141  Entered on FLSD Docket 11/22/2005  Page 7 of 40
APPENDIX 29

## OVERT ACTS

In furtherance of the conspiracy and to effect its purpose and object, at least one of the coconspirators committed, or caused to be committed, at least one of the following overt acts within the United States, in the Southern District of Florida, and elsewhere:

15.  In or about October 1993, **JAYYOUSI** opened a bank account in the name of the "Islamic Group."

16.  On or about June 13, 1994, **HASSOUN** caused to be issued a $1,000 check to **JAYYOUSI** with the memo line stating, "support for the person."

17.  On or about February 4, 1995, **JAYYOUSI** and **DAHER** discussed setting up a for-profit business to fund jihad, "[T]his business, the profit generated from this business will be for the brothers, I mean we have to support the mujahideen brother," and **DAHER** then described his organization, the Canadian Islamic Association, as a "cover, I mean it's very good."

18.  On or about March 21, 1995, **HASSOUN** participated in a coded conversation with **JAYYOUSI** and **DAHER**, in which **HASSOUN** stressed that "we have a number of people active in the field," and then stated, "All of us are in a chain, if one link of the chain is separated, the movement will not function," and that this concept is particularly important in the field of "tourism."

19.  On or about June 25, 1995, **DAHER** participated in a coded conversation with **HASSOUN** and **JAYYOUSI**, in which **DAHER** reported, "Our friend in the first region . . . Has opened up a football court over there . . . because there are matches . . . he wants only to give training for the game."

20.  On or about July 25, 1995, **HASSOUN** caused to be issued an $8,000 check to the Canadian Islamic Association with the memo line stating, "for tourism."

7

Case 1:12-cr-00033-JLK    Document 1175    Filed 11/28/16    USDC Colorado    Page 30 of 53
Case 0:04-cr-60001-MGC    Document 141    Entered on FLSD Docket 11/22/2005    Page 8 of 40
APPENDIX 30

21.   On or about August 2, 1995, **HASSOUN** caused to be issued a $5,000 check to the American Worldwide Relief Organization with the memo line stating, "for brothers."

22.   On or about August 31, 1995, **HASSOUN** caused to be issued a $3,000 check to the "Canadian I. Association" with the memo line stating, "for tourism and tourist."

23.   On or about January 16, 1996, **HASSOUN** participated in a coded conversation with **YOUSSEF**, in which **YOUSSEF** indicated that he was looking for "work" in "an area that was a little active."

24.   On or about February 16, 1996, **HASSOUN** caused to be issued a $600 check to **JAYYOUSI** with the memo line stating, "Chechnya."

25.   On or about February 17, 1996, **YOUSSEF** departed the United States for Egypt.

26.   On or about April 17, 1996, **PADILLA** obtained his United States passport in Miami, Florida.

27.   On or about May 23, 1996, **HASSOUN** participated in a coded conversation with Unindicted Coconspirator #1, who was in Lebanon, in which **HASSOUN** asked if Unindicted Coconspirator #1 had a way to "get something over to the soccer team in Chechnya or Bosnia."

28.   On or about May 30, 1996, **HASSOUN** and **YOUSSEF**, who was in Egypt, discussed their intention to "prepare" **PADILLA** and send him to Egypt.

29.   On or about June 2, 1996, **HASSOUN** participated in a conversation with an individual about **HASSOUN's** plans to deliver a sermon on Chechnya for the purpose of raising funds for Chechnya.

30.   On or about June 8, 1996, **HASSOUN** participated in a coded conversation with **DAHER**, who was in Canada, about Afghanistan, in which they discussed "the ones who want to go out and smell the air."

8

Case 1:12-cr-00033-JLK  Document 1175  Filed 11/28/16  USDC Colorado  Page 31 of 53
Case 0:04-cr-60001-MGC  Document 141  Entered on FLSD Docket 11/22/2005  Page 9 of 40
APPENDIX 31

31.  On or about June 11, 1996, **HASSOUN** participated in a coded conversation with **JAYYOUSI** about **YOUSSEF** being someone who wants to "get some fresh air . . . and find a route for himself."

32.  On or about June 16, 1996, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, and told him the "deal" would be completed within the month, and **YOUSSEF** responded, "[B]y God, I am ready."

33.  On or about June 30, 1996,  **YOUSSEF**, who was in Egypt, participated in a coded conversation with **HASSOUN**, and told **HASSOUN** that while he (**YOUSSEF**) was busy studying the Koran, this study was not his purpose and that he was waiting for the "trade" to take its "natural" course.

34.  On or about September 1, 1996, **YOUSSEF**, who was in Egypt, told **HASSOUN** that he was "ready for the . . . uh . . . the trade immediately," and **HASSOUN** responded, "By Allah, there is . . . there is trade in . . . uh . . . in Somalia. . . . [G]et ready, get organized, and go down there . . . to see. . . . [W]e'll open up a market over there."

35.  On or about September 2, 1996, **HASSOUN** participated in a conversation with **JAYYOUSI**, who asked **HASSOUN** to look for an "opportunity for us to come and visit . . . for Chechnya."

36.  On or about September 30, 1996, **HASSOUN** caused to be issued a $2,000 check to **DAHER** with the memo line stating, "one for Bosnia one for Libya."

37.  On or about October 23, 1996, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, in which he told **YOUSSEF** to go to Ogaden to "smell fresh air."

38.  On or about October 25, 1996, **HASSOUN** told **YOUSSEF**, who was in Egypt, to "go to the area that I told you about . . . brothers have arrived there . . . and God willing, you will

9

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 32 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 10 of 40
APPENDIX 32

go uh . . . start a company with them. . . . And forget about the worldly brides and the worldly home, okay?"

39. On or about November 30, 1996, Unindicted Coconspirator #1, calling from Turkey, participated in a conversation with an individual in the United States, and told the individual to instruct **HASSOUN** not to talk over the phone about these matters, "not even in code . . . tourism and such."

40. On or about December 31, 1996, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, in which **HASSOUN** reported that "56 brothers got married" in Somalia, and asked **YOUSSEF** to get news about Somalia.

41. On or about January 26, 1997, **HASSOUN** participated in a conversation with Unindicted Coconspirator #1 about jihad in Ogaden, Ethiopia, in which **HASSOUN** reported that "58 brothers died . . . the attack was repelled but the Americans used their airplanes . . . and were bombarding them . . . so the situation was very harmful to the brothers, but thanks to God, they will be repaid two-fold," and that, with regard to fund-raising, "whatever, we collect we will be sending over there . . . a few emirs have called specifically concerning the subject . . . emirs of certain war fronts ask for such."

42. On or about January 26, 1997, **HASSOUN** participated in a coded conversation with **DAHER** and another individual, in which **HASSOUN** reported, "Because they are playing football in Somalia. . . . it's heating up a lot, so we're sending . . . uh . . . uniforms . . . and . . . uh . . . sneakers for football over there."

43. On or about January 31, 1997, **HASSOUN** caused to be issued a $2,000 check to **DAHER** with the memo line stating, "Somalia."

10

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 33 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 11 of 40
APPENDIX 33

44.  On or about April 6, 1997, **YOUSSEF**, who was in Egypt, left a coded message for **HASSOUN**, indicating that **YOUSSEF** needed to confirm things before "we go on the picnic, God willing."

45.  On or about April 6, 1997, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, and discussed another "brother" who was "going on a picnic," and when **HASSOUN** asked if **YOUSSEF** would be going with this "brother," **YOUSSEF** responded that he planned to join a group of possibly ten others who were going "to smell fresh air and to eat cheese."

46.  On or about June 7, 1997, **HASSOUN** participated in a coded conversation with **DAHER** regarding the "brothers" in Lebanon, in which **DAHER** confirmed that they had bought "the zucchini and such," and that after the "wedding" there would be "very good things."

47.  On or about July 9, 1997, **HASSOUN** participated in a coded conversation with **DAHER** and another individual regarding Lebanon, in which **DAHER** advised **HASSOUN** that "green goods" were "needed urgently."

48.  On or about July 28, 1997, **HASSOUN** participated in a conversation with **PADILLA** and asked **PADILLA** if he was "ready," and **PADILLA** replied that "it's gonna happen soon."

49.  On or about February 10, 1998, **HASSOUN** participated in a coded conversation with **DAHER**, in which they discussed that the $3,500 that they had sent to Lebanon was used to buy "zucchini."

50.  On or about June 17, 1998, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, about **HASSOUN** sending $5,000 to fund the travel for five "partners."

11

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 34 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 12 of 40
APPENDIX 34

51.  On or about June 21, 1998, **HASSOUN** participated in a coded conversation with **YOUSSEF**, who was in Egypt, about 20 "other partners" and **HASSOUN** wiring **YOUSSEF** money via the Thomas Cooke wire transfer company in Cairo.

52.  On or about June 22, 1998, **HASSOUN** caused to be issued a $5,000 check to cash with **YOUSSEF's** name on the memo line, and then used the funds to purchase an official check from Barnett Bank payable to **YOUSSEF**.

53.  On or about June 24, 1998, **HASSOUN** caused to be sent a $5,000 Western Union wire transfer to **YOUSSEF** in Cairo, Egypt.

54.  On or about June 24, 1998, **YOUSSEF**, who was in Egypt, called **HASSOUN**, who reported that the funds were available.

55.  On or about July 7, 1998, **YOUSSEF** called **HASSOUN** from Albania en route "to the inside," and **HASSOUN** promised to wire $5,000 to him.

56.  On or about July 18, 1998, **YOUSSEF** called **HASSOUN** on a satellite telephone, and reported that he had entered Kosovo under bombing from the Serbs, and **HASSOUN** told **YOUSSEF** that he was sending $5,000 with **PADILLA**.

57.  On or about July 18, 1998, **HASSOUN** participated in a coded conversation with an individual, in which he reported that **YOUSSEF** was "playing football yesterday and they had casualties," and **HASSOUN** asked the individual, "[A]re you ready?"

58.  On or about July 28, 1998, **HASSOUN** participated in a coded conversation with an individual, and described **YOUSSEF's** activities in Kosovo as "tourism completely."

59.  On or about July 29, 1998, **HASSOUN** participated in a coded conversation with an individual, in which **HASSOUN** reported that he was "concentrating on the matter of this new area which has opened up" and had "some loved ones that have gone there."

12

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 35 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 13 of 40
APPENDIX 35

60.  On or about August 3, 1998, **HASSOUN** caused to be issued a $1,300 check to cash with the memo line stating, "Kosovo."

61.  On or about August 10, 1998, **YOUSSEF**, who was in Egypt, called **HASSOUN**, and participated in a coded conversation about "the joint venture that they had formed," including the fact that "seventy got completely married," that they all "ran into ambushes, well-organized and well-prepared ambushes," and that "[s]ports equipment" was used "to launch an attack on the other team."

62.  On or about August 17, 1998, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, in which **HASSOUN** agreed to send **PADILLA** to him.

63.  On or about August 18, 1998, **HASSOUN** caused to be issued a $5,000 check to Global Relief Foundation (hereinafter "GRF") with the memo line stating, "Kosovo."

64.  On or about August 28, 1998, **HASSOUN** participated in a conversation with an individual, and attempted to solicit a donation for **PADILLA's** travel, to which the individual agreed, and stated that he had already contributed "to his cause" in the past.

65.  On or about September 5, 1998, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, and advised him that **PADILLA** would be arriving on Sunday, and that **YOUSSEF** should meet **PADILLA** at the airport.

66.  On or about September 5, 1998, **PADILLA** flew from the Southern District of Florida to Cairo, Egypt.

67.  On or about October 20, 1998, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, and inquired about the welfare of **PADILLA**.

68.  On or about February 8, 1999, **HASSOUN** participated in a conversation with an individual, and stated that he provides financial support to **YOUSSEF** and **PADILLA**, and

13

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 36 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 14 of 40
APPENDIX 36

expressed the importance of **YOUSSEF** "[having] cash . . . So he is always comfortable, and [keeping] it on the side until further notice" for the purpose of supporting **PADILLA** and "some brothers who would like . . . to follow Ibrahim's [**PADILLA's**] example as well."

69. On or about February 8, 1999, **HASSOUN** participated in a three-way conversation with **YOUSSEF** and **PADILLA**, who were in Egypt, in which **HASSOUN** asked **PADILLA** about the progress of his studies and if he still had money.

70. On or about April 5, 1999, **HASSOUN** caused to be issued a $3,000 check to GRF with the memo line stating, "Kosovo."

71. On or about April 15, 1999, **HASSOUN** caused to be issued a $600 check to GRF with the memo line stating, "to support Kosovo."

72. On or about July 25, 1999, **HASSOUN** participated in a coded conversation with **PADILLA**, who was in Egypt, in which **PADILLA** reported that he had requested "an army jacket, a book bag, and a sleeping bag" because there "was a rumor here that the door was open somewhere."

73. On or about July 25, 1999, **HASSOUN** participated in a coded conversation with an individual, in which **HASSOUN** discussed a plan to give money to the individual so that the individual's wife can withdraw the money in Egypt to give to **PADILLA**.

74. On or about August 1, 1999, **HASSOUN** caused to be issued a $1,000 check to an individual with **PADILLA's** name on the memo line.

75. On or about August 13, 1999, **HASSOUN** caused to be issued a $4,400 check to an individual with the memo line stating, "50 Dagastan."

76. On or about October 1, 1999, **HASSOUN** caused to be issued a $2,500 check to GRF with the memo line stating, "Tourism, Propaganda, Chechnya."

Case 1:12-cr-00033-JLK Document 1175 Filed 11/28/16 USDC Colorado Page 37 of 53
Case 0:04-cr-60001-MGC Document 141 Entered on FLSD Docket 11/22/2005 Page 15 of 40
APPENDIX 37

77. On or about October 17, 1999, **HASSOUN** participated in a coded conversation with **PADILLA**, who was in Egypt, in which **HASSOUN** told **PADILLA** that he must "prepare [himself] financially" so that **PADILLA** can "move . . . to some close area."

78. On or about October 20, 1999, **HASSOUN** caused to be issued a $2,500 check to GRF with the memo line stating, "from Al Iman in Chechnya."

79. On or about November 15, 1999, **JAYYOUSI** participated in a conversation with Unindicted Coconspirator #2 regarding raising funds for "the brothers," to which **JAYYOUSI** stated that they were transferring some funds through GRF.

80. On or about January 20, 2000, **HASSOUN** caused to be issued a $2,000 check to GRF with the memo line stating, "Chechnya."

81. On or about April 10, 2000, **HASSOUN** participated in a conversation with **PADILLA**, who was in Egypt, in which they discussed the possibility of **PADILLA** traveling to Yemen, but **PADILLA** indicated that he needed "a recommendation to connect [him] with the good brothers, with the right faith."

82. On or about May 6, 2000, **JAYYOUSI** participated in a conversation with Unindicted Coconspirator #2, in which **JAYYOUSI** said that he would try to wire Unindicted Coconspirator #2 more money, and that Unindicted Coconspirator #2 should use $3,000 for travel.

83. On or about July 24, 2000, **PADILLA** filled out a "Mujahideen Data Form" in preparation for violent jihad training in Afghanistan.

84. On or about September 3, 2000, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, who indicated that he would be traveling "there at Usama's and .

15

Case 1:12-cr-00033-JLK Document 1175 Filed 11/28/16 USDC Colorado Page 38 of 53
Case 0:04-cr-60001-MGC Document 141 Entered on FLSD Docket 11/22/2005 Page 16 of 40
APPENDIX 38

. . Khattab's company," and that **PADILLA** "is a little farther south by . . . he is supposed to be at Usama's . . . to go to Kh . . . to go a little farther north."

85.   On or about September 3, 2000, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, and **YOUSSEF** stated that **PADILLA** "entered into the area of Usama."

86.   On or about September 3, 2000, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Egypt, about sending people to Baku, Azerbaijan.

87.   On or about September 12, 2000, **JAYYOUSI** participated in a conversation with Unindicted Coconspirator #3 about finding a new domain name on the Internet for the purpose of reestablishing The Islam Report.

88.   On or about October 9, 2000, **YOUSSEF**, who was in Saudi Arabia, called **HASSOUN**, and gave him a telephone number in the Republic of Georgia, at which **YOUSSEF** could be reached in a few days.

89.   On or about October 15, 2000, **HASSOUN** participated in a conversation with unknown coconspirators in the Republic of Georgia, who told **HASSOUN** that **YOUSSEF** is still in "Baku," and that **PADILLA** is "currently in Afghanistan," and **HASSOUN** responded, "I would like to come over by you to smell some fresh air."

90. On or about October 15, 2000, **HASSOUN** participated in a conversation with **YOUSSEF**, who was in Baku, Azerbaijan, in which **HASSOUN** told **YOUSSEF** to join **PADILLA**, and **YOUSSEF** responded, "I have already reached the front line, why should I return?  And also, considering I have previous experience, you see?  Should I go there to get the experience I've already acquired?"

16

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 39 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 17 of 40
APPENDIX 39

91.   On or about May 16, 2001, **HASSOUN** caused to be issued a $700 check to GRF with the memo line stating, "tourism and travel."

92.   On or about November 1, 2001, **HASSOUN** caused to be issued a $2,000 check for GRF with the memo line stating, "Afghan relief."

All in violation of Title 18, United States Code, Sections 956(a)(1) and 2.

## COUNT 2

### (Conspiracy to Provide Material Support for Terrorists)

Paragraphs 1 through 11 and 13 through 92 of this Superseding Indictment are realleged and incorporated herein by reference.

Beginning at a time uncertain, but no later than in or about October1993, and continuing until on or about November 1, 2001, in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**
**MOHAMED HESHAM YOUSSEF,**
**a/k/a "Abu Turab,"**
**KIFAH WAEL JAYYOUSI,**
**a/k/a "Abu Mohamed,"**
**KASSEM DAHER,**
**a/k/a "Abu Zurr," and**
**JOSE PADILLA,**
**a/k/a "Ibrahim,"**
**a/k/a "Abu Abdullah the Puerto Rican,"**
**a/k/a "Abu Abdullah Al Mujahir,"**

within the United States, did knowingly and willfully combine, conspire, confederate, and agree with others, known and unknown to the Grand Jury, to commit offenses against the United States, that is, providing material support and resources, as defined in Title 18, United States Code, Section 2339A(b), and concealing and disguising the nature, location, source, and

17

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 40 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 18 of 40
APPENDIX 40

ownership of material support and resources, knowing and intending that they be used in

preparation for and carrying out a violation of Title 18, United States Code, Section 956(a)(1),

that is, a conspiracy to murder, kidnap, and maim persons in a foreign country; and did commit

one or more acts to effect the purpose and object of the conspiracy; all in violation of Title 18,

United States Code, Sections 371 and 2339A(a).

## COUNT 3

### (Material Support for Terrorists)

Paragraphs 1 through 11 and 15 through 92 of this Superseding Indictment are realleged

and incorporated herein by reference.

Beginning in or about October 1993, and continuing until on or about November 1, 2001,

in Broward County, in the Southern District of Florida, and elsewhere, the defendants,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**
**MOHAMED HESHAM YOUSSEF,**
**a/k/a "Abu Turab,"**
**KIFAH WAEL JAYYOUSI,**
**a/k/a "Abu Mohamed,"**
**KASSEM DAHER,**
**a/k/a "Abu Zurr," and**
**JOSE PADILLA,**
**a/k/a "Ibrahim,"**
**a/k/a "Abu Abdullah the Puerto Rican,"**
**a/k/a "Abu Abdullah Al Mujahir,"**

within the United States, did provide material support and resources, as defined in Title 18,

United States Code, Section 2339A(b), and did conceal and disguise the nature, location, source,

and ownership of material support and resources, knowing and intending that they be used in

preparation for, and in carrying out, a violation of Title 18, United States Code, Section

18

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 41 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 19 of 40
APPENDIX 41

956(a)(1), that is, a conspiracy to murder, kidnap, and maim persons in a foreign country; all in violation of Title 18, United States Code, Sections 2339A(a) and 2.

## COUNT 4

### (Unlawful Possession of Firearm)

On or about June 12, 2002, in Broward County, in the Southern District of Florida, the defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

being an alien admitted to the United States under a nonimmigrant visa, did knowingly possess a firearm in and affecting interstate and foreign commerce, that is, a Smith & Wesson 9 millimeter pistol, in violation of Title 18, United States Code, Section 922(g)(5)(B).

## COUNT 5

### (False Statement)

On or about June 12, 2002, in Broward County, in the Southern District of Florida, the defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

in a matter within the jurisdiction of the executive branch of the Government of the United States, that is, the DHS and the FBI, did knowingly and willfully make a materially false, fraudulent, and fictitious statement and representation, in that **HASSOUN** stated to a Special Agent of the DHS and to a Special Agent of the FBI that:

(1) he neither encouraged nor assisted an individual named Mohamed Youssef regarding travel to any foreign country, when in truth and in fact, and as the defendant then and there well

Case 1:12-cr-00033-JLK  Document 1175  Filed 11/28/16  USDC Colorado  Page 42 of 53
Case 0:04-cr-60001-MGC  Document 141  Entered on FLSD Docket 11/22/2005  Page 20 of 40
APPENDIX 42

knew, he encouraged and assisted Youssef regarding travel to a foreign country for the purpose of fighting in a violent jihad; and

(2) he was not aware of Mohamed Youssef visiting a foreign country other than Egypt, when in truth and in fact, and as the defendant then and there well knew, Youssef had traveled to a foreign country other than Egypt for the purpose of fighting in a violent jihad.

All in violation of Title 18, United States Code, Section 1001(a).

## COUNT 6

### (Perjury)

On or about July 22, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

### ADHAM AMIN HASSOUN,
### a/k/a "Abu Sayyaf,"

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge, in a case in which a law of the United States authorizes an oath to be administered, that is, an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly, willfully, and contrary to such oath, state and subscribe material matters which he did not believe to be true, concerning his recruitment of Mohamed Youssef to fight in a violent jihad and discussions about violent jihad over the telephone with Mohamed Youssef, as herein set forth below:

Q. And was he one of your recruits as has been said in the affidavit?

A. I never recruited him.

Q. And how - what's your phone contacts with Mr. Yousef?

A. At that time after he left to Egypt?

20

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 43 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 21 of 40
APPENDIX 43

Q. Yes.

A. When he left to Egypt he kept in touch and he used to call to ask about how the community is doing over here and how the family is doing and that was it.

The aforementioned testimony by **HASSOUN** as he then and there believed, was a false material statement, in that **HASSOUN** did recruit Mohamed Youssef to fight in a violent jihad and did discuss violent jihad over the telephone with Mohamed Youssef.

All in violation of Title 18, United States Code, Section 1621(1).

## COUNT 7

### (Perjury)

On or about July 22, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge, in a case in which a law of the United States authorizes an oath to be administered, that is, an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly, willfully, and contrary to such oath, state and subscribe material matters which he did not believe to be true, concerning his purpose for providing financial assistance to Mohamed Youssef, as herein set forth below:

Q. And did you ever provide anything - any monetary financial assistance to him?

A. At one point he wanted money to prepare a land that he has, this is what he said, and that land, I believe, is close to the Suez canal, somewhere like that. And he asked if the community can help him to fix the land and the community responded and we helped him.

21

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 44 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 22 of 40
APPENDIX 44

Q.  Okay.  And was there any other purpose other than the land that you owned there?

A.  This is what he asked and this is what we respond.

* * * *

Q.  Right. And you said the money was for what?

A.  To fix his land, fix his house.

The aforementioned testimony by **HASSOUN**, as he then and there believed, was a false material statement, in that **HASSOUN** did provide financial assistance to Mohamed Youssef for the purpose of fighting in a violent jihad.

All in violation of Title 18, United States Code, Section 1621(1).

## COUNT 8

### (Perjury)

On or about July 22, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

### ADHAM AMIN HASSOUN,
### a/k/a "Abu Sayyaf,"

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge, in a case in which a law of the United States authorizes an oath to be administered, that is, an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly, willfully, and contrary to such oath, state and subscribe material matters which he did not believe to be true, concerning his use of coded language with other individuals, including Mohamed Youssef, when discussing violent jihad activities, as herein set forth below:

Q.  Did you speak with him in code language?

A.  Never.

22

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 45 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 23 of 40
APPENDIX 45

Q. Do you have any code languages with any –

A. No, I don't.

* * * *

Q. And in 1998 it's alleged that you have a conversation, you talk about you have soccer equipment. Did you recall any conversation like that?

A. No. I know he wanted - he wanted to open a business, you know, and he wants to get something from here, buy equipment and stuff like that.

Q. Do you recall what equipment he was talking about?

A. Soccer maybe, or football, something like that. But I asked him to come over here and pick up whatever he wants.

* * * *

Q. Sir, in your - you talked about this in direct examination, but in your - one of your telephone conversations in 1998 with Mr. Yousef you discussed soccer equipment?

A. He discussed, yes.

Q. Okay. Well –

A. Yes, go ahead.

Q. - he discussed it with you?

A. Uh-huh.

Q. Right. And your assertion is that he was directly speaking just of soccer equipment?

A. Yes, he gave me the impression that he wants to open a business and he wants to do some trade. In my - you want to hear my (unintelligible).

23

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 46 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 24 of 40
APPENDIX 46

Q. No. Sir, isn't it true that during that conversation you also asked, even though you were speaking about soccer equipment, you asked him if he had enough to launch an attack on the enemy?

A. What enemy?

Q. Did you say those words or something close to those words?

A. Not that I recall.

Q. Do you recall discussing with him an attack?

A. Where was he, in Egypt?

Q. Yes.

A. What enemy?

Q. Well I'm asking you, sir.

A. No.

Q. Did you discuss with him having enough equipment to engage an enemy?

A. I don't recall that.

Q. But you may have?

A. I don't recall that.

Q. Well –

A. I'm trying to put where you're going. If I may –

Q. Well, it's a very specific question, sir.

A. Go ahead.

Q. The question is: In your conversation in 1998 with Mr. Yousef in which he discussed soccer equipment did you or did you not talk to him about having enough equipment to engage an enemy?

24

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 47 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 25 of 40
APPENDIX 47

A. No.

Q. You did not?

Q. Did you discuss with him anti-armor tools?

A. I don't recall.

Q. But you might have?

A. What is that again?

Q. Anti-armor tools. Did you discuss tools with him?

A. I don't recall what we spoke. I know that we spoke that he wants to trade and he wants to have a soccer team and stuff like that. Other than that, I don't recall. I know that part.

The aforementioned testimony by **HASSOUN**, as he then and there believed, was a false material statement, in that **HASSOUN** did speak in coded language with other individuals, including Mohamed Youssef, when discussing violent jihad activities.

All in violation of Title 18, United States Code, Section 1621(1).

## COUNT 9

### (Perjury)

On or about July 22, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration Judge, in a case in which a law of the United States authorizes an oath to be administered, that is, an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did knowingly, willfully, and contrary to such oath, state and subscribe material matters which he

25

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 48 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 26 of 40
APPENDIX 48

did not believe to be true, concerning his conversations with Mohamed Youssef about the experience of fighting in a violent jihad conflict, as herein set forth below:

Q. Sir, have you ever discussed with Yousef in any phone call his experiences on the front lines?

A. What front lines?

Q. Front lines of any battle.

A. What battle?

Q. Any battle, any armed conflict.

A. He never spoke to me about any armed conflict.

Q. So you've never discussed with him his activities on the front lines in any armed struggle or conflict?

A. I don't recall any of that happening.

Q. But it could have?

A. Not really. No.

The aforementioned testimony by **HASSOUN**, as he then and there believed, was a false material statement, in that **HASSOUN** did participate in conversations with Mohamed Youssef about the experience of fighting in a violent jihad conflict.

All in violation of Title 18, United States Code, Section 1621(1).

## COUNT 10

### (Perjury)

Beginning on or about July 22, 2002, and continuing until on or about August 1, 2002, in Miami-Dade County, in the Southern District of Florida, the defendant,

### ADHAM AMIN HASSOUN,

26

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 49 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 27 of 40
APPENDIX 49

a/k/a "Abu Sayyaf,"

having taken an oath before a competent tribunal, officer, and person, that is, an Immigration

Judge, in a case in which a law of the United States authorizes an oath to be administered, that is,

an Immigration Court proceeding, that he will testify, declare, depose, and certify truly, did

knowingly, willfully, and contrary to such oath, state and subscribe material matters which he

did not believe to be true, concerning his participation in conversations about killing a woman in

Lebanon, as herein set forth below:

Q.  Now you have read the allegations in the affidavit provided by the Government written by Officer Arena -

A.  Yes, I did.

Q.  - FBI Agent.  I'm going to direct your attention to that affidavit.  First, we're going to go to Paragraph 17 where it has the allegation that sometime in August, 1997, you had a conversation with someone identified as an associate concerning a female, the way I understood, was stuck in Lebanon, and the Government, in cooperation with CIA and State Department, was trying to bring her here.  And you made some comments.  Do you recall any of those comments?

A.  No.

Q.  Do you recall any female stuck in Lebanon -

A.  No, I don't.

Q.  - In 1997?

A.  No.

Q.  Do you recall you ordering the assassination of that female?

A.  Never.

27

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 50 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 28 of 40
APPENDIX 50

Q. I remind you are under oath.

A. I am under oath.

Q. And I want you to - five, six, years ago, which incident has been explained here, and do you recall saying that "I have to speak with brothers in Lebanon to take care of her."

A. Never.

Q. Do you recall any conversation?

A. Never.  Never happened.

* * * *

Q. Do you recall any of this, which is said in paragraph 17, if it ever happened?

A. Never happened.  I read it many times through the weekend, through the whole week since I had this, none of that happened.

* * * *

Q. And, sir, do you still claim that at no time you had a conversation about a female who had traveled from the United States to the Middle East, that conversation discussing the issue of having her killed?

A. Do I what?

Q. Did you ever have a conversation with somebody about killing a woman?

A. No, no, never.

* * * *

Q. Hassoun, you know that there's a - someone named "associate" mentioned in - in paragraph 17 of Agent Arena's declaration.  Do you know who that person is?

A. No.

28

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 51 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 29 of 40
APPENDIX 51

Q. Have you ever spoken to anyone who can say I overheard you saying that you want to kill someone, plot to kill someone?

A. No.

Q. Did you ever have in your mind ill - will against anyone?

A. Never.

Q. Do you know this female mentioned in paragraph 17?

A. I have no idea.

Q. So it's an absolute denial?

A. Absolute denial.

Q. You under oath.

A. I am under oath.

The aforementioned testimony by **HASSOUN**, as he then and there believed, was a false material statement, in that **HASSOUN** did participate in conversations about killing a woman in Lebanon.

All in violation of Title 18, United States Code, Section 1621(1).

## COUNT 11

### (Obstruction of Proceedings)

Beginning on or about June 12, 2002, and continuing until on or about September 30, 2002, in Broward and Miami-Dade Counties, in the Southern District of Florida, the defendant,

**ADHAM AMIN HASSOUN,**
**a/k/a "Abu Sayyaf,"**

did knowingly and willfully corruptly endeavor to influence, obstruct, and impede the due and proper administration of law under which a pending proceeding, that is, an Immigration Court

29

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 52 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 30 of 40
APPENDIX 52

proceeding, was being had before a department and agency of the United States, in violation of Title 18, United States Code, Section 1505.

## FORFEITURE

1.      The allegations in Count 4 of this Superseding Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeitures to the United States of America of property in which the defendant has an interest, pursuant to the provisions of Title 18, United States Code, Section 924(d)(1), as incorporated by Title 28, United States Code, Section 2461(c), and the procedures outlined in Title 21, United States Code, Section 853.

2.      Upon the conviction of any knowing violation of Title 18, United States Code, Section 922(g)(5)(B), the defendant shall forfeit to the United States any firearm involved in or used in the commission of said violation.

3.      The property subject to forfeiture includes, but is not limited to, a Smith & Wesson 9 millimeter pistol seized from the defendant on June 12, 2002.

Case 1:12-cr-00033-JLK   Document 1175   Filed 11/28/16   USDC Colorado   Page 53 of 53
Case 0:04-cr-60001-MGC   Document 141   Entered on FLSD Docket 11/22/2005   Page 31 of 40
APPENDIX 53

All pursuant to Title 18, United States Code, Section 924(d)(1), as incorporated

by Title 28, United States Code, Section 2461(c), and the procedures outlined in Title 21,

United States Code, Section 853.

A TRUE BILL

FOREPERSON

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

RUSSELL R. KILLINGER
ASSISTANT UNITED STATES ATTORNEY

STEPHANIE K. PELL, TRIAL ATTORNEY
COUNTERTERRORISM SECTION
UNITED STATES DEPARTMENT OF JUSTICE

JULIA A. PAYLOR
ASSISTANT UNITED STATES ATTORNEY

BRIAN K. FRAZIER
ASSISTANT UNITED STATES ATTORNEY