# APPENDIX – INDICTMENTS IN CASES
# CITED IN GOVERNMENT'S RESPONSE

## TABLE OF CONTENTS

1.  United States v. Awan,

     No. 06-154(S-2) (CPS) (E.D.N.Y.)……………………………002

2.  United States v. Hassan,

     No. 5:09cr216 (E.D.N.C.)………………………………………...009

3.  United States v. Hassoun,

     No. 0:04-cr-60001-MHC (S.D.Fla.)…………………………..023

4.  United States v. Mehanna,

     No. 1:09-cr-10017-GAO (D.Mass.)…………………………..054

5.  **United States v. Satter and Stewart**,

     No. 02 Cr. 395 (S.D.N.Y.)…………………………………......094

APRENDIX 94

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA             :

       -v.-                         :        INDICTMENT

AHMED ABDEL SATTAR,                  :        S1 02 Cr. 395 (JGK)
   a/k/a "Abu Omar,"
   a/k/a "Dr. Ahmed,"                :
LYNNE STEWART, and
MOHAMMED YOUSRY,                     :

       Defendants.              :

- - - - - - - - - - - - - - - - - -X

## INTRODUCTION

    The Grand Jury charges:

### Sheikh Omar Abdel Rahman

    1.   From at least the early 1990's until in or about
April 2002, Omar Ahmad Ali Abdel Rahman, a/k/a "the Sheikh,"
a/k/a "Sheikh Omar" (hereinafter, "Abdel Rahman"), who is a co-
conspirator not named as a defendant herein, was an influential
and high-ranking member of terrorist organizations based in Egypt
and elsewhere.   Abdel Rahman considered nations, governments,
institutions, and individuals that did not share his radical
interpretation of Islamic law to be "infidels" and interpreted
the concept of "jihad" ("struggle") to compel the waging of
opposition against such infidels by whatever means necessary,
including force and violence.

    2.   According to Abdel Rahman's public remarks in
1990, "jihad is jihad . . . there is no such thing as commerce,

industry and science in jihad.  This is calling things . . . other than by its own names.  If God . . . says do jihad, it means do jihad with the sword, with the cannon, with the grenades and with the missile; this is jihad.  Jihad against God's enemies for God's cause and His word."

3.   Abdel Rahman supported and advocated jihad to, among other things:  (1) overthrow the Egyptian government and replace it with an Islamic state; (2) destroy the nation of Israel and give the land to the Palestinians; and (3) oppose those governments, nations, institutions, and individuals, including the United States and its citizens, whom he perceived as enemies of Islam and supporters of Egypt and Israel.

4.   Abdel Rahman endorsed terrorism to accomplish his goals.  In a speech he gave prior to May 2, 1994, Abdel Rahman said:  "Why do we fear the word 'terrorist'?  If the terrorist is the person who defends his right, so we are terrorists.  And if the terrorist is the one who struggles for the sake of God, then we are terrorists.  We . . . have been ordered with terrorism because we must prepare what power we can to terrorize the enemy of God and yours.  The Quran [the Islamic holy book] mentioned the word 'to strike terror,' therefore we don't fear to be described with 'terrorism' . . . . They may say 'he is a terrorist, he uses violence, he uses force.'  Let them say that.

2

We are ordered to prepare whatever we can of power to terrorize the enemies of Islam."

5.   Abdel Rahman exercised leadership while subordinates carried out the details of specific terrorist operations.  Abdel Rahman, who was viewed by his followers and associates as a religious scholar, provided necessary guidance regarding whether particular terrorist activities were permissible or forbidden under his extremist interpretation of Islamic law, and at times provided strategic advice concerning whether such activities would be an effective means of achieving their goals.  Abdel Rahman also solicited persons to commit violent terrorist actions.  Additionally, Abdel Rahman served as a mediator of disputes among his followers and associates.

6.   On or about July 2, 1993, Abdel Rahman was arrested in the United States.  In October 1995, a jury sitting in the United States District Court for the Southern District of New York convicted Abdel Rahman of engaging in a seditious conspiracy to wage a war of urban terrorism against the United States, which included the 1993 bombing of the World Trade Center and a plot to bomb New York City landmarks, including the United Nations, the FBI building in New York, and the Lincoln and Holland tunnels.  The jury also found Abdel Rahman guilty of soliciting crimes of violence against the United States military and Egyptian President Hosni Mubarak.  In January 1996, Abdel

3

Rahman was sentenced to life imprisonment.  On August 16, 1999, Abdel Rahman's conviction was upheld by the United States Court of Appeals for the Second Circuit and, on January 10, 2000, the United States Supreme Court refused to hear his case and his conviction thus became final.  Since in or about 1997, Abdel Rahman has been incarcerated in various facilities operated by the United States Bureau of Prisons, including the Federal Medical Center in Rochester, Minnesota.

        7.    Following his arrest, Abdel Rahman urged his followers to wage jihad to obtain his release from custody.  For instance, in a message to his followers recorded while he was in prison, Abdel Rahman stated that it was the duty of all Muslims to set free any imprisoned fellow Muslims, and that "[t]he Sheikh is calling on you, morning and evening.  Oh Muslims!  Oh Muslims!  And he finds no respondents.  It is a duty upon all the Muslims around the world to come to free the Sheikh, and to rescue him from his jail."  Referring to the United States, Abdel Rahman implored, "Muslims everywhere, dismember their nation, tear them apart, ruin their economy, provoke their corporations, destroy their embassies, attack their interests, sink their ships, and shoot down their planes, kill them on land, at sea, and in the air.  Kill them wherever you find them."

        8.    Both prior to and after his arrest and imprisonment, Abdel Rahman was a spiritual leader of an

4

international terrorist group based in Egypt and known as the Islamic Group, a/k/a "Gama'a al-Islamiyya," a/k/a "IG," a/k/a "al-Gama'at," a/k/a "Islamic Gama'at," a/k/a "Egyptian al-Gama'at al-Islamiyya" (hereinafter, the "Islamic Group"). Abdel Rahman played a key role in defining and articulating the goals, policies, and tactics of the Islamic Group.

9. According to Abdel Rahman's public remarks in 1990, Egyptian youths in the 1970's "established what is called Al Gama'a al-Islamiy[y]a . . . . reviving jihad for the sake of Allah. . . . The Islamic group . . . started simple, few, little, then it spread and now has mosques and has presence in the governorates of Egypt. . . . [M]any of them were killed for the cause of God as they had sacrificed their own souls; they carried out many jihad operations against those tyrants. The most famous and the most successful operation was fighting the atheist, the oppressor and the profligate by killing him, Anwar Al-Sadat [the Egyptian president who was assassinated in 1981] . . . and now, it is hoping for another operation, God willing."

10. Abdel Rahman's followers, including those associated with the Islamic Group, shared his views about the reasons for jihad, including the goal of obtaining Abdel Rahman's release from United States custody.

<u>Efforts to Secure Abdel Rahman's Release</u>

11.   After Abdel Rahman's arrest, a coalition of terrorists, supporters, and followers, including leaders and associates of the Islamic Group, al Qaeda, the Egyptian Islamic <u>Jihad</u>, and the Abu Sayyaf terrorist group in the Philippines threatened and committed acts of terrorism directed at obtaining the release of Abdel Rahman from prison.

12.   On or about July 4, 1993, the defendant, AHMED ABDEL SATTAR, a/k/a "Abu Omar," a/k/a "Dr. Ahmed," spoke to the media regarding Abdel Rahman's arrest and stated that "we haven't decided the time or place, but our Muslim community will definitely demonstrate its outrage at the arrest of the Sheikh," and that, "if anything happens to the Sheikh, we will hold the American administration responsible . . . . Something very bad could happen."

13.   On or about January 21, 1996, a statement, issued in the name of the Islamic Group, responded to the sentence of life imprisonment imposed on Abdel Rahman by threatening, "All American interests will be legitimate targets for our struggle until the release of Sheikh Omar Abdel Rahman and his brothers. As the American Government has opted for open confrontation with the Islamic movement and the Islamic symbols of struggle, al-Gama[']a al-Islamiy[y]a swears by God to its irreversible vow to take an eye for an eye."

14.   On or about April 21, 1996, an Islamic Group leader, who is a co-conspirator not named as a defendant herein ("CC-1"), stated during an interview that "the question of kidnapping Americans as a ransom for [Abdel Rahman] is in the cards, not ruled out, and under consideration."

15.   On or about February 12, 1997, a statement issued in the name of the Islamic Group threatened, "The Islamic Group declares all American interests legitimate targets to its legitimate jihad until the release of all prisoners, on top of whom" is Abdel Rahman.

16.   On or about May 5, 1997, a statement issued in the name of the Islamic Group threatened, "If any harm comes to the [S]heik[h] . . . al-Gama['］a al-Islamiy[y]a will target . . . all of those Americans who participated in subjecting his life to danger."  The statement also said that "Al-Gama['］a al-Islamiy[y]a considers every American official, starting with the American president to the despicable jailer . . . partners in endangering the [S]heik[h]'s life," and that the Islamic Group would do "everything in its power" to free Abdel Rahman.  This statement by the Islamic Group followed a statement released to the media on May 2, 1997, by one of Abdel Rahman's attorneys that "[i]t sounds like the [S]heik[h]'s condition is deteriorating and obviously could be life-threatening."

7

17.  On or about November 17, 1997, six assassins shot and stabbed a group of tourists visiting an archeological site in Luxor, Egypt.  Fifty-eight foreign tourists were killed along with four Egyptians, some of whom were police officers.  Before making their exit, the terrorists scattered leaflets espousing their support for the Islamic Group and calling for release of Abdel Rahman.  Also, the torso of one victim was slit by the terrorists and a leaflet calling for Abdel Rahman's release was inserted.

18.  On or about November 18, 1997, a statement issued in the name of the Islamic Group said, "A Gama'a unit tried to take prisoner the largest number of foreign tourists possible . . . with the aim of securing the release of the general emir (commander) of the Gama'a al-Islamiy[y]a, Dr. Abdel-Rahman."  The statement continued, "But the rash behavior and irresponsibility of government security forces with regard to tourist and civilian lives led to the high number of fatalities."  The statement also warned that the Islamic Group "will continue its military operations as long as the regime does not respond to our demands."  The statement listed the most important demands as "the establishment of God's law, cutting relations with the Zionist entity (Israel) . . . and the return of our sheik[h] and emir to his land."

19.  On or about October 13, 1999, a statement in the name of Islamic Group leader Rifa'i Ahmad Taha Musa, a/k/a "Abu Yasir" (hereinafter, "Taha"), who is a co-conspirator not named as a defendant herein, vowed to rescue Abdel Rahman and said that the United States' "hostile strategy to the Islamic movement" would drive it to "unify its efforts to confront America's piracy."

20.  In or about March 2000, individuals claiming association with the Abu Sayyaf terrorist group kidnapped approximately 29 hostages in the Philippines, demanded the release from prison of Abdel Rahman and two other convicted terrorists in exchange for the release of those hostages, and threatened to behead hostages if their demands were not met. Philippine authorities later found two decomposed, beheaded bodies in an area where the hostages had been held, and four hostages were unaccounted for.

21.  On or about September 21, 2000, an Arabic television station, Al Jazeera, televised a meeting of Usama Bin Laden (leader of the al Qaeda terrorist organization), Ayman Al-Zawahiri (former leader of the Egyptian Islamic Jihad organization and one of Bin Laden's top lieutenants), and Taha. Sitting under a banner which read, "Convention to Support Honorable Omar Abdel Rahman," the three terrorist leaders pledged jihad to free Abdel Rahman from incarceration in the United

9

States.   During the meeting, Mohammed Abdel Rahman, a/k/a "Asadallah," who is a son of Abdel Rahman, was heard encouraging others to "avenge your Sheikh" and "go to the spilling of blood."

<u>Other Relevant Events</u>

22.   At various times starting in or about July 1997, certain Islamic Group leaders and factions called for an "initiative" (or cease-fire) in which the Islamic Group would suspend terrorist operations in Egypt in a tactical effort to persuade the Egyptian government to release Islamic Group leaders, members, and associates who were in prison in Egypt.

23.   In or about February 1998, Usama Bin Laden and Taha, among others, issued a <u>fatwah</u> (a legal ruling issued by an Islamic scholar) that stated, among other things, "We, in the name of God, call on every Muslim who believes in God and desires to be rewarded, to follow God's order to kill Americans and plunder their wealth wherever and whenever they find it."

24.   On or about October 12, 2000, in Aden Harbor, Yemen, two terrorists piloted a bomb-laden boat alongside the United States Navy vessel the <u>U.S.S. Cole</u> and detonated a bomb that ripped a hole in the side of the <u>U.S.S. Cole</u> approximately 40 feet in diameter, murdering seventeen crew members, and wounding at least forty other crew members.

The Special Administrative Measures Imposed on Abdel Rahman

25.  Beginning in or about April 1997, United States authorities, in order to protect the national security, limited certain of Abdel Rahman's privileges in prison, including his access to the mail, the media, the telephone, and visitors.  At that time, the Bureau of Prisons (at the direction of the Attorney General) imposed Special Administrative Measures ("SAMs") upon Abdel Rahman, pursuant to a federal regulation (28 C.F.R. § 501.3).  The stated purpose of the SAMs was to protect "persons against the risk of death or serious bodily injury" that could result if Abdel Rahman were free "to communicate (send or receive) terrorist information."  Under the SAMs, Abdel Rahman could only call his wife or his attorneys and their translator, could only be visited by his immediate family members or his attorneys and their translator, and could only receive mail after it was screened by federal authorities.  In addition, the SAMs prohibited communication with any member or representative of the news media.  More specifically, as of April 7, 1999, the SAMs provided that "[t]he inmate will not be permitted to talk with, meet with, correspond with, or otherwise communicate with any member, or representative, of the news media, in person, by telephone, by furnishing a recorded message, through the mails, through his attorney(s), or otherwise."

11

26.   The SAMs specifically provided that attorneys for
Abdel Rahman were obliged to sign an affirmation, acknowledging
that they and their staff would abide fully by the SAMs, before
being allowed access to Abdel Rahman.   The attorneys agreed in
these affirmations, among other things, to "only be accompanied
by translators for the purpose of communicating with inmate Abdel
Rahman concerning legal matters."   Moreover, since at least in or
about May 1998, the attorneys also agreed not to "use [their]
meetings, correspondence, or phone calls with Abdel Rahman to
pass messages between third parties (including, but not limited
to, the media) and Abdel Rahman."

<u>The Defendants</u>

27.   Defendant AHMED ABDEL SATTAR, a/k/a "Abu Omar,"
a/k/a "Dr. Ahmed," is a longtime associate of and surrogate for
Abdel Rahman.   SATTAR negotiated Abdel Rahman's surrender and was
present at Abdel Rahman's arrest on July 2, 1993.   Upon Abdel
Rahman's arrest, and continuing through his conviction,
sentencing, and the imposition of the SAMs, SATTAR coordinated
efforts to keep Abdel Rahman in contact with his co-conspirators
and followers.   Defendant LYNNE STEWART was one of Abdel Rahman's
attorneys during his 1995 criminal trial in New York and,
following his conviction, continued to act as one of his
attorneys.   Notwithstanding the SAMs and her agreement to abide
by their provisions, STEWART, through her continued access to

12

Abdel Rahman, enabled him to remain in contact with his co-conspirators and followers.  Defendant MOHAMMED YOUSRY testified as a defense witness at Abdel Rahman's 1995 criminal trial and, starting in or about 1997, acted as an Arabic interpreter for communications between Abdel Rahman and his attorneys. Notwithstanding the SAMs and YOUSRY's knowledge of their provisions, YOUSRY, through his continued access to Abdel Rahman and facilitated by STEWART, enabled Abdel Rahman to remain in contact with his co-conspirators and followers.

## COUNT ONE

(Conspiracy to Defraud the United States)

The Grand Jury further charges:

28.  The allegations in Paragraphs 1 through 27 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

29.  From in or about June 1997 through in or about April 2002, in the Southern District of New York and elsewhere, AHMED ABDEL SATTAR, a/k/a "Abu Omar," a/k/a "Dr. Ahmed," LYNNE STEWART, and MOHAMMED YOUSRY, the defendants, Abdel Rahman, and Taha, together with others known and unknown, unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together and with each other to defraud the United States and an agency thereof, to wit, to hamper, hinder, impede, and obstruct by trickery, deceit, and dishonest means, the lawful and

13

legitimate functions of the United States Department of Justice and its agency, the Bureau of Prisons, in the administration and enforcement of the Special Administrative Measures for inmate Abdel Rahman.

Overt Acts

30.  In furtherance of the conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.  On or about January 26, 1999, SATTAR spoke by telephone with CC-1, an Islamic Group leader, and discussed getting messages to Abdel Rahman in prison.  SATTAR stated that they had to be careful in passing messages to Abdel Rahman because the Government could stop even his attorney visits and calls if "the attorney said that [Abdel Rahman] said so and so." SATTAR stated that there was a very small window that was opened to Abdel Rahman and that he did not want to close it, because "it would take years to reopen."

The March 1999 Prison Visit and Abdel Rahman's March 1999 Message
Regarding the Islamic Group's Initiative

b.  On or about March 1 and 2, 1999, STEWART and YOUSRY visited Abdel Rahman in prison.

c.  On or about March 9, 1999, following the prison visit to Abdel Rahman by STEWART and YOUSRY, SATTAR disseminated to CC-1, an Islamic Group leader, a statement issued by Abdel

14

Rahman and directed to Islamic Group leader Taha.  In that statement, Abdel Rahman instructed Taha to adhere to the initiative and directed, "No new charter, and nothing should happen or be done without consulting me, or informing me."

Abdel Rahman's March 1999 Message Regarding the Formation of a Political Party

        d.  On or about March 9, 1999, following the prison visit to Abdel Rahman by STEWART and YOUSRY, SATTAR disseminated to CC-1, an Islamic Group leader, a statement issued by Abdel Rahman and directed to Islamic Group members.  In that statement, Abdel Rahman rejected a proposal that the Islamic Group form a political party in Egypt.

Abdel Rahman's September 1999 Statement Calling for an End to the Initiative

        e.  On or about September 20, 1999, following a prison visit to Abdel Rahman by YOUSRY and another of Abdel Rahman's attorneys, SATTAR told Taha that Abdel Rahman had issued a statement from jail calling for an end to the initiative in response to reports that a raid in Egypt, by Egyptian law enforcement on or about September 7, 1999, resulted in four Islamic Group members being killed.  SATTAR told Taha that Abdel Rahman stated, "The Islamic Group has committed itself to the suspension-of-military-operations Initiative which was launched two years ago by the Brothers from their jails, in spite of the Egyptian government's continued killing of the innocent people

15

and conducting unjust military trials." SATTAR further stated that Abdel Rahman "demand[ed] that [his] brothers, the sons of the Islamic Group, do a comprehensive review of the Initiative and its results. [He] also demand[ed] that they consider themselves absolved from it."

       f.   On or about September 20, 1999, during a telephone conversation with Taha, SATTAR stated that the initiative should be canceled if necessary to accomplish the Islamic Group's goals.

       g.   On or about November 14, 1999, during a telephone conversation with another individual, SATTAR stated that the initiative was not working because it had not succeeded in obtaining the release of Islamic Group leaders from prison.

The February 2000 Attempted Delivery of a Message to Abdel Rahman

       h.   In or about February 2000, with the assistance of SATTAR, YOUSRY, and others known and unknown, Taha attempted to have a message regarding Islamic Group activities conveyed to Abdel Rahman during a prison visit to Abdel Rahman by one of his attorneys and YOUSRY, but the message was not delivered due to Abdel Rahman's apparent distrust of that attorney.

Stewart's May 16, 2000 Signing of an Agreement to Abide by the Terms of the Special Administrative Measures

       i.   On or about May 16, 2000, STEWART signed an affirmation in which she agreed "to abide by [the] terms" of the SAMs then in effect on Abdel Rahman. In particular, STEWART agreed that she would "only be accompanied by translators for the

purpose of communicating with inmate Abdel Rahman concerning legal matters" and that she would not "use [her] meetings, correspondence, or phone calls with Abdel Rahman to pass messages between third parties (including, but not limited to, the media) and Abdel Rahman."

The May 2000 Prison Visit

      j.  On or about May 19, 2000, during a prison visit to Abdel Rahman by STEWART and YOUSRY, YOUSRY told Abdel Rahman and STEWART about the kidnappings by the Abu Sayyaf terrorist group in the Philippines and Abu Sayyaf's demand to free Abdel Rahman, to which STEWART replied, "Good for them."  STEWART then told Abdel Rahman that she believed he could be released from prison if the government in Egypt were changed.  STEWART also told Abdel Rahman that events like the Abu Sayyaf kidnappings in the Philippines are important, although they "may be futile," because it is "very, very crucial" that Abdel Rahman not be forgotten as a hero of the "Mujahadeen" (jihad warriors).

      k.  On or about May 19, 2000, during a prison visit to Abdel Rahman by STEWART and YOUSRY, YOUSRY read Abdel Rahman an inflammatory statement by Taha that had recently been published in an Egyptian newspaper.

      l.  On or about May 19, 2000, during a prison visit to Abdel Rahman by STEWART and YOUSRY, YOUSRY, at STEWART's urging, read Abdel Rahman a letter from SATTAR.  Among other things,

17

SATTAR's letter informed Abdel Rahman that SATTAR's communications with specified Islamic Group leaders had become "semi-constant" over the past year, and asked Abdel Rahman, "If there is anything, please notify."  In addition, SATTAR's letter asked Abdel Rahman to endorse "the formation of a team that calls for cancellation of the peace initiative or makes threats or escalates things."

       m.   On or about May 19, 2000, during a prison visit to Abdel Rahman by STEWART and YOUSRY, while YOUSRY read Taha's statement and SATTAR's letter to Abdel Rahman, STEWART actively concealed that fact from the prison guards.  At one point, STEWART and YOUSRY explicitly discussed the fact that the guards were patrolling close to the prison conference room and might notice that STEWART was not involved in the conversation between YOUSRY and Abdel Rahman.  To conceal the fact that STEWART was not participating in the meeting, among other things, STEWART instructed YOUSRY to make it look as if STEWART were communicating with Abdel Rahman and YOUSRY were merely translating, by having YOUSRY look periodically at STEWART and Abdel Rahman in turn, even though YOUSRY was in fact reading. STEWART also pretended to be participating in the conversation with Abdel Rahman by making extraneous comments such as "chocolate" and "heart attack."  STEWART contemporaneously observed to YOUSRY that she could "get an award for" her acts of

18

concealment, and YOUSRY agreed that STEWART should "get an award

in acting." Following the comments about STEWART's acting

ability, STEWART, YOUSRY, and Abdel Rahman all laughed.

n. On or about May 19, 2000, during a prison visit to

Abdel Rahman by STEWART and YOUSRY, while YOUSRY read SATTAR's

letter to Abdel Rahman, STEWART and YOUSRY laughed while

acknowledging that if the prison guards discovered that they were

reading Abdel Rahman a letter from SATTAR they would get "in

trouble."

o. On or about May 20, 2000, during the second day of

a prison visit to Abdel Rahman by STEWART and YOUSRY, Abdel

Rahman dictated letters to YOUSRY indicating that he did not

support the cease-fire and calling for the Islamic Group to

reevaluate the cease-fire, while STEWART again actively concealed

the conversation between YOUSRY and Abdel Rahman from the prison

guards. Among other things, STEWART periodically interrupted the

dictation with extraneous comments, and stated explicitly that

she would do so from time to time in order to keep the guards

from realizing that she was not participating in the

conversation.

p. In or about late May 2000, after STEWART and

YOUSRY's visit to Abdel Rahman on May 19 and 20, 2000, SATTAR had

telephone conversations with Islamic Group leaders in which he

stated that Abdel Rahman: (1) did not object to a return to

"work" (terrorist operations); (2) agreed that the Islamic Group should escalate the issues in the media; (3) advised the Islamic Group to avoid division in the Islamic Group's leadership; and (4) instructed the Islamic Group to hint at a military operation even if the Islamic Group was not ready for military action.

Stewart's May 26, 2000 Submission of Her Agreement to Abide by the Terms of the Special Administrative Measures

        q.   On or about May 26, 2000, STEWART submitted to the United States Attorney's Office for the Southern District of New York the affirmation that she signed on May 16, 2000, in which she agreed to abide by the terms of the SAMs then in effect on Abdel Rahman.

The June 2000 Press Release Regarding Abdel Rahman's Withdrawal of Support for the Initiative

        r.   On or about June 14, 2000, STEWART released a statement to the press that quoted Abdel Rahman as stating that he "is withdrawing his support for the cease-fire that currently exists."

        s.   On or about June 15, 2000, during a telephone conversation with another person, STEWART stated her concern that she would not be able to "hide" from the United States Attorney's Office the fact that she had issued the press release.

Abdel Rahman's Second June 2000 Statement Regarding the Initiative

        t.   On or about June 19, 2000, SATTAR spoke by telephone with CC-1, an Islamic Group leader, regarding Abdel

Rahman's withdrawal of support for the initiative and the confusion the statement supposedly caused within the Islamic Group.

u.   On or about June 19, 2000, one of Abdel Rahman's sons, Mohammed Abdel Rahman, spoke by telephone with SATTAR and asked SATTAR to convey to Abdel Rahman the fierceness of the debate within the Islamic Group about the initiative, and said that "even if the other side is right," SATTAR should tell Abdel Rahman to calm the situation by supporting "the general line of the Group."

v.   On or about June 20, 2000, SATTAR spoke by telephone with Mohammed Abdel Rahman and advised him that a conference call had taken place that morning between Abdel Rahman and some of his attorneys and that Abdel Rahman had issued a new statement containing additional points which made clear, among other things, that Abdel Rahman was not unilaterally ending the initiative, but rather, was withdrawing his support for it and stating that it was up to the "brothers" in the Islamic Group now to reconsider the issue.

The October 2000 Fatwah

w.   On or about October 3, 2000, Taha called SATTAR and discussed a fatwah Taha had written under Abdel Rahman's name in response to recent events in the Middle East, to which SATTAR had made revisions.

x.   On or about October 4, 2000, SATTAR called Yassir Al-Sirri, a co-conspirator not named as a defendant herein, and read to him a <u>fatwah</u> to be issued under Abdel Rahman's name entitled, "<u>Fatwah</u> Mandating the Killing of Israelis Everywhere," which Al-Sirri agreed to revise and disseminate.

y.   On or about October 5, 2000, the <u>fatwah</u> appeared on the web-site operated by Al-Sirri.  The <u>fatwah</u> called on "brother scholars everywhere in the Muslim world to do their part and issue a unanimous <u>fatwah</u> that urges the Muslim nation to fight the Jews and to kill them wherever they are."  The <u>fatwah</u> further urged "the Muslim nation" to "fight the Jews by all possible means of <u>Jihad</u>, either by killing them as individuals or by targeting their interests, and the interests of those who support them, as much as they can."

z.   On or about October 11, 2000, during a telephone conversation, YOUSRY told STEWART that Abdel Rahman did not want his attorneys to deny that he had issued the <u>fatwah</u> urging the killing of Jews around the world and the targeting of the interests of those who support them.

aa.   On or about October 11, 2000, during a telephone conversation, STEWART told YOUSRY that she could not deny that she had issued the press release in June 2000, and that her position was that Abdel Rahman "is going to get his message out no matter what."

bb.  On or about October 20, 2000, during an attorney telephone call to Abdel Rahman, YOUSRY was told by Abdel Rahman that he did not personally issue the <u>fatwah</u>, but did not want anyone to deny he had made it because "it is good."

<u>The Bombing of the U.S.S. Cole and the Conspiracy to Threaten</u>
<u>Similar Acts Unless Abdel Rahman is Freed</u>

cc.  On or about October 25, 2000, SATTAR spoke by telephone to Taha, and Taha told SATTAR that "an Egyptian male" was involved in the bombing of the <u>U.S.S. Cole</u> and that SATTAR should assist in delivering a message to the United States government suggesting that similar attacks would occur unless Abdel Rahman were freed from prison.

<u>Stewart's May 7, 2001 Signing and Submission of an Agreement</u>
<u>to Abide by the Terms of the Special Administrative Measures</u>

dd.  On or about May 7, 2001, STEWART signed and faxed to the United States Attorney's Office for the Southern District of New York an affirmation in which she agreed "to abide by [the] terms" of the SAMs then in effect on Abdel Rahman.  In particular, STEWART agreed that, during any visits to Abdel Rahman, she would "only be accompanied by translators for the purpose of communicating with inmate Abdel Rahman concerning legal matters," that she would only allow such meetings "to be used for legal discussion between Abdel Rahman and [her]," and that she would not "use [her] meetings, correspondence, or phone

23

calls with Abdel Rahman to pass messages between third parties (including, but not limited to, the media) and Abdel Rahman."

The July 2001 Prison Visit and the Conspiracy to Threaten Acts Similar to the Bombing of the U.S.S. Cole Unless Abdel Rahman is Freed

ee.  On or about July 13, 2001, during a prison visit to Abdel Rahman in Minnesota by STEWART and YOUSRY, YOUSRY told Abdel Rahman that SATTAR had been informed that the U.S.S. Cole was bombed on Abdel Rahman's behalf and that SATTAR was asked to convey to the United States government that more terrorist acts would follow if the United States government did not free Abdel Rahman.  While YOUSRY was informing Abdel Rahman about this scheme, STEWART actively concealed the conversation between YOUSRY and Abdel Rahman from the prison guards by, among other things, shaking a water jar and tapping on the table while stating that she was "just doing covering noise."

ff.  On or about July 14, 2001, during the second day of a prison visit to Abdel Rahman in Minnesota by STEWART and YOUSRY, YOUSRY read Abdel Rahman letters and Abdel Rahman dictated responsive letters to YOUSRY.

Dissemination of a False Claim Regarding Abdel Rahman's Prison Conditions

gg.  On or about January 8, 2001, SATTAR spoke by telephone with STEWART.  During this call, SATTAR informed

STEWART that the prison administrator where Abdel Rahman was
incarcerated had pleaded with Abdel Rahman's wife to tell Abdel
Rahman to take insulin for his diabetes.  Although SATTAR and
STEWART knew that Abdel Rahman was voluntarily refusing to take
insulin for his diabetes, they agreed that SATTAR should issue a
public statement falsely claiming that the Bureau of Prisons was
denying medical treatment to Abdel Rahman.  STEWART expressed the
opinion that this misrepresentation was "safe" because no one on
the "outside" would know the truth.

hh.  On or about January 8, 2001, SATTAR spoke by
telephone with Al-Sirri and together they wrote a statement
regarding Abdel Rahman's prison conditions, which included, among
other things, a false claim that Abdel Rahman was being denied
insulin by the United States government.  Al-Sirri instructed
SATTAR to send the statement to Reuters and any other news
agencies he could contact.

ii.  Between on or about January 8, 2001, and on or
about January 10, 2001, SATTAR and Al-Sirri disseminated to
several news organizations and on a website the false claim that
United States authorities were withholding insulin from Abdel
Rahman.

(Title 18, United States Code, Section 371.)

## COUNT TWO

(Conspiracy to Kill and Kidnap Persons in a Foreign Country)

The Grand Jury further charges:

31.   The allegations in Paragraphs 1 through 27 and 30(a) through 30(ii) of this Indictment are realleged and incorporated by reference as though fully set forth herein.

32.   From in or about September 1999 through in or about April 2002, within the jurisdiction of the United States, in the Southern District of New York and elsewhere, AHMED ABDEL SATTAR, a/k/a "Abu Omar," a/k/a "Dr. Ahmed," the defendant, Abdel Rahman, and Taha, together with others known and unknown, unlawfully, willfully, and knowingly combined, conspired, confederated, and agreed together and with each other to murder and kidnap persons in a foreign country.

33.   In furtherance of the conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   The allegations in Paragraphs 19, 21, 23, 30(e) through 30(h), 30(p), 30(t) through 30(y), 30(bb), 30(cc), and 30(ff) through 30(ii) of this Indictment are realleged and incorporated by reference as though fully set forth herein.

<u>Communications between Islamic Group Terrorists Relating to</u>
<u>a Possible Islamic Group Terrorist Action In Egypt</u>

b.   In or about September and October 2000, SATTAR
participated in several telephone calls in an effort to
facilitate a meeting in Egypt between Taha and Alaa Abdul Raziq
Atia ("Atia"), an Islamic Group member who was wanted in
connection with the 1997 Luxor terrorist attack in Egypt and who
was a fugitive.

c.   On or about September 4, 2000, in a telephone call
that SATTAR arranged and listened to, Taha told Atia's associate
("CC-2"), who is a co-conspirator not named as a defendant
herein, that the Islamic Group's use of military action was
"subject to capability, nothing else."  When CC-2 hung up, SATTAR
said, "I'm happy this call was made."  Taha asked SATTAR, "What
do you think of what was said?"  SATTAR replied, "Good, thank
God, good, good."

d.   On or about September 18, 2000, SATTAR arranged
and listened to a telephone call between Taha and CC-2 during
which, in connection with a discussion of <u>jihad</u> and prior
military actions, CC-2 stated that Atia wanted to meet secretly
with Taha "for the best interest of the work."  When CC-2 hung
up, Taha asked SATTAR, "What do you think about what you have
heard?"  SATTAR replied, "I hope it will be for the best."

e.   On or about October 5, 2000, SATTAR arranged, and stayed on the phone during, a telephone call between Taha and CC-2 to discuss Taha's upcoming meeting with Atia, during which CC-2 acknowledged his understanding that there would be "action," but requested that it be delayed until Taha met with Atia.

f.   On or about October 9, 2000, during a telephone conversation, Taha told SATTAR that SATTAR should inform CC-2 that Abdel Rahman had issued a <u>fatwah</u> and to tell CC-2 to instruct his associates that they "are supposed to go by it." SATTAR replied, "Yes."

g.   On or about October 11, 2000, during a telephone conversation, SATTAR told Taha that he had spoken with Atia and believed that Atia was eager, ready and able "to do things," and that he had to warn Atia repeatedly during their telephone call that his telephone was "not safe."

h.   On or about November 2, 2000, during a telephone conversation, Taha told SATTAR that he was afraid that Atia had been killed during a raid by Egyptian law enforcement on October 19, 2000, and noted that he had asked Atia about his "capacity" and discussed with Atia whether they would have a chance to "do something."

 (Title 18, United States Code, Section 956(a)(1) and (a)(2)(A).)

28

## COUNT THREE

(Solicitation of Crimes of Violence)

The Grand Jury further charges:

34.  The allegations in Paragraphs 1 through 27, 30(a) through 30(ii), and 33(b) through 33(h) of this Indictment are realleged and incorporated by reference as though fully set forth herein.

35.  From in or about September 1999 through in or about April 2002, in the Southern District of New York and elsewhere, AHMED ABDEL SATTAR, a/k/a "Abu Omar," a/k/a "Dr. Ahmed," the defendant, and others known and unknown, with the intent that other persons engage in conduct constituting a felony that has as an element the use, attempted use, and threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicited, commanded, induced, and otherwise endeavored to persuade such other persons to engage in such conduct, to wit, AHMED ABDEL SATTAR solicited, commanded, induced, and otherwise endeavored to persuade other persons to engage in violent terrorist operations worldwide to achieve the Islamic Group's objectives, in violation of Title 18, United States Code, Sections 956, 2332, and 2332b.

(Title 18, United States Code, Section 373.)

## COUNT FOUR

(Conspiracy to Provide and Conceal
Material Support to Terrorist Activity)

The Grand Jury further charges:

36.   The allegations in Paragraphs 1 through 27, 30(a)
through 30(ii), and 33(b) through 33(h) of this Indictment are
realleged and incorporated by reference as though fully set forth
herein.

37.   From in or about September 1999 through in or
about April 2002, in the Southern District of New York and
elsewhere, LYNNE STEWART and MOHAMMED YOUSRY, the defendants,
together with others known and unknown, unlawfully, willfully,
and knowingly combined, conspired, confederated, and agreed
together and with each other to violate Section 2339A of
Title 18, United States Code.

38.   It was a part and an object of said conspiracy
that LYNNE STEWART and MOHAMMED YOUSRY, the defendants, and
others known and unknown, within the United States, would and did
provide material support and resources, to wit, would and did
provide personnel by making Abdel Rahman available as a co-
conspirator, and would and did conceal and disguise the nature,
location, source, and ownership of material support and
resources, to wit, would and did conceal and disguise the nature,
location, source, and ownership of personnel by concealing and
disguising that Abdel Rahman was a co-conspirator, knowing and

30

intending that such material support and resources were to be used in preparation for, and in carrying out, a violation of Section 956 of Title 18, United States Code, to wit, the conspiracy charged in Count Two of this Indictment, and in preparation for, and in carrying out, the concealment of such violation.

39.   In furtherance of the material-support conspiracy, and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   The allegations in Paragraphs 30(h) through 30(o), 30(q) through 30(s), 30(z) through 30(bb), and 30(dd) through 30(ff) of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(Title 18, United States Code, Section 371).

### COUNT FIVE

(Providing and Concealing Material Support to Terrorist Activity)

The Grand Jury further charges:

40.   The allegations in Paragraphs 1 through 27, 30(a) through 30(ii), and 33(b) through 33(h) of this Indictment are realleged and incorporated by reference as though fully set forth herein.

41.   From in or about September 1999 through in or about April 2002, in the Southern District of New York and

elsewhere, LYNNE STEWART and MOHAMMED YOUSRY, the defendants, together with others known and unknown, within the United States, provided material support and resources, to wit, provided personnel by making Abdel Rahman available as a co-conspirator, and concealed and disguised the nature, location, source, and ownership of material support and resources, to wit, concealed and disguised the nature, location, source, and ownership of personnel by concealing and disguising that Abdel Rahman was a co-conspirator, knowing and intending that such material support and resources were to be used in preparation for, and in carrying out, a violation of Section 956 of Title 18, United States Code, to wit, the conspiracy charged in Count Two of this Indictment, and in preparation for, and in carrying out, the concealment of such violation.

(Title 18, United States Code, Sections 2339A and 2.)

## COUNT SIX

(False Statements)

The Grand Jury further charges:

42.   The allegations in Paragraphs 1 through 27, 30(a) through 30(ii), and 33(b) through 33(h) of this Indictment are realleged and incorporated by reference as though fully set forth herein.

43.   In or about May 2000, in the Southern District of New York and elsewhere, LYNNE STEWART, the defendant, in a matter

32

within the jurisdiction of the executive branch of government, to wit, the United States Department of Justice and its agency, the Bureau of Prisons, unlawfully, willfully, and knowingly made materially false, fictitious, and fraudulent statements and representations, and made and used a false writing and document knowing the same to contain materially false, fictitious, and fraudulent statements and entries, to wit, STEWART submitted an affirmation to the United States Attorney's Office for the Southern District of New York falsely stating, among other things, the following:  (1) that STEWART "agree[s] to abide by [the] terms" of the Special Administrative Measures applicable to Abdel Rahman; (2) that STEWART "shall only be accompanied by translators for the purpose of communicating with inmate Abdel Rahman concerning legal matters"; and (3) that STEWART shall not "use [her] meetings, correspondence, or phone calls with Abdel Rahman to pass messages between third parties (including, but not limited to, the media) and Abdel Rahman."

(Title 18, United States Code, Section 1001.).

### COUNT SEVEN

(False Statements)

The Grand Jury further charges:

44.   The allegations in Paragraphs 1 through 27, 30(a) through 30(ii), and 33(b) through 33(h) of this Indictment are

realleged and incorporated by reference as though fully set forth herein.

45.   In or about May 2001, in the Southern District of New York and elsewhere, LYNNE STEWART, the defendant, in a matter within the jurisdiction of the executive branch of government, to wit, the United States Department of Justice and its agency, the Bureau of Prisons, unlawfully, willfully, and knowingly made materially false, fictitious, and fraudulent statements and representations, and made and used a false writing and document knowing the same to contain materially false, fictitious, and fraudulent statements and entries, to wit, STEWART submitted an affirmation to the United States Attorney's Office for the Southern District of New York falsely stating, among other things, the following:  (1) that STEWART "agree[s] to abide by [the] terms" of the Special Administrative Measures applicable to Abdel Rahman; (2) that STEWART "shall only be accompanied by translators for the purpose of communicating with inmate Abdel Rahman concerning legal matters"; (3) that STEWART "will only allow the meetings to be used for legal discussion between Abdel Rahman and [her]"; and (4) that STEWART shall not "use [her] meetings, correspondence, or phone calls with Abdel Rahman to

pass messages between third parties (including, but not limited

to, the media) and Abdel Rahman."

(Title 18, United States Code, Section 1001.).


_____
FOREPERSON                                    JAMES B. COMEY
                                              United States Attorney