**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 12-cr-00033-JLK

UNITED STATES OF AMERICA,
    Plaintiff,
v.

2. BAKHTIYOR JUMAEV,                    **<u>RESTRICTED LEVEL 1</u>**
    Defendant.

---

**BAKHTIYOR JUMAEV'S SENTENCING STATEMENT AND
MOTION FOR VARIANT SENTENCE**

---

Mr. Jumaev, through his counsel and pursuant to D.C.COLO. LCrR 32.1(a)(2) and (c), submits his Sentencing Statement ("Statement") and Motion for Variant Sentence:

## I. INTRODUCTION

Bakhtiyor Jumaev, a simple man beloved by his family, who has spent more than 76 months in custody since his arrest, will soon stand before the Court for sentencing. The issue before the Court is how many more months of imprisonment will serve the goals of sentencing of a man who never participated in or planned any act of violence, and who has no political or religious affiliation or connection to the organization to which he has been convicted of providing material support.

Mr. Jumaev believes that the appropriate sentence for him under the facts and circumstances of this case should be the time he has already served in custody, namely from his arrest on March 15, 2012 to the sentencing date of July 18, 2018. That period of detention amounts to approximately 6.3 years, or 76 months. With credit for time served, he has essentially served a sentence of approximately 7.5 years or 90 months.[1]

Mr. Jumaev disagrees with the Government's recommendation of a sentence of 180 months (15 years), believing it is too harsh, greater than necessary to comply with the factors and purposes set forth in 18 U.S.C. 3553(a), fails to take into account the factors described in 18 U.S.C. §3661, and is not tailored to the specific facts of this case and Mr. Jumaev personally. *See Government's Amended Sentencing Statement* ("Gvt SS") (Doc. 1884). Although the Presentence Investigation Report ("PSR") (Doc. 1885) addresses more of the foregoing issues in a much more measured and reasonable manner, the PSR nevertheless relies too heavily in certain instances on the Gvt SS, including, but not limited to: **The Offense Conduct, ¶¶** 7-25; the **Adjustment for Obstruction of Justice,** at ¶¶ 27-28; the **Offense Level Computation,** at ¶¶ 34-43; and the **Criminal History Computation,** at ¶ 48.

---

1 Federal prisoners who earn good time credit generally serve 85 percent of a sentence of over one year. *See* 18 U.S.C. § 3624(b)(1). *See also* BOP Program Statement P5100.08, Inmate Security Designation and Custody Classification (Sept. 12, 2006), *available at* *https://www.bop.gov/policy/progstat/5100_008.pdf*.

The PSR, however, at ¶¶ 106 and 107, does recognize factors that warrant a downward departure and a variant sentence outside the advisory guideline range. Its sentencing recommendation of a concurrent sentence of 108 months, although more in keeping with the mandate of 18 USC §3553(a) than the Gvt SS, is still greater than necessary.

## II. RELEVANT FACTS

### A. The Government's Recitation of Facts Repeated in the PSR

During more than six years of pretrial litigation, the trial testimony from Mr. Jumaev and others, and the PSR, the Court has become familiar with Mr. Jumaev's familial, education, social, and employment history, relevant background information, and personal characteristics. Unless noted otherwise in any objections filed to the PSR, Mr. Jumaev incorporates herein the PSR's recitation of his history and background at ¶¶ 53 to 87, and further refers the Court to the trial testimonies of himself, Zavkibeg Ashurov (aka Abduvahob), Mansur Niyazov, Ilkhom Sobirov (aks Zafar), Karim Pulatov, and Davlat Jumaev, as they also relate to the foregoing subjects. Additional facts not sufficiently discussed in any of the above-sources will be provided below.

In particular, the Government's Section II, "Facts of Conviction," provided in Doc. 1884 at 2-9, is misleading since it presumes to know what the jury considered in reaching its verdicts, particularly in light of the various alternative legal theories that subjected Mr. Jumaev to verdicts of guilty. For example, the

Court's instruction No. 19 enabled the jury to convict Mr. Jumaev as an aider and abettor, finding that he both intended to pay his debt, while at the same time knowing that the money was intended for the IJU.  It is thus equally speculative for Mr. Jumaev to opine what was in the jury's mind as it is for the Government to play the same role of mind reader.  The Government's recitation of "facts" viewed from its narrow lens is admittedly repeated verbatim in the PSR. ¶¶ 7-25.

### B. Repayment of Debt, Support of the IJU, or Both?

For nearly a year after Mr. Jumaev's release from immigration detention in April 2010, he and Mr. Muhtorov fostered a friendship and communicated frequently over the phone. Tr. 4/10/18 at 1166-1169. It took a while for Mr. Jumaev to find work again, but after he did, he continued with the simple lifestyle to which he had become accustomed. Trial Stipulation, ¶¶ 1-2.   Omnipresent in that lifestyle were his financial obligations: support of his family, debt to his landlord, debts to his bond contributors, fees owed his immigration lawyer, and his personal necessities. *Id.*, *see also* trial Exhibit 660A.   At the time, Mr. Muhtorov was also living paycheck by paycheck to support his wife and children. *Id.*

During the early part of 2011, Mr. Muhtorov began talking about his financial woes to Mr. Jumaev. Tr. 4/10/18 at 1170.  Mr. Jumaev interpreted those comments as Mr. Muhtorov's hinting that he wanted to get repaid his $500 but too embarrassed to directly ask for his money back. *Id.*   This manner of indirect

4

communication was culturally classic Uzbek. *Id.* at 1171. As a result and having $300 available to send Mr. Muhtorov as partial payment of that debt, Mr. Jumaev during early March of 2011, informed his close friend Ilkhom Sobirov (aka Zafar) that he, Mr. Jumaev, was going to send Mr. Muhtorov $300 in cash as partial payment of the debt. *Id.* Zafar cautioned Mr. Jumaev about sending cash in the mail and suggested the alternative of, in exchange for Mr. Jumaev's $300 cash, Zafar's writing a check on his account for that sum payable to Mr. Muhtorov and Mr. Jumaev sending that check in the mail to Mr. Muhtorov. *Id.* at 1171-72. That was the check dated March 10, 2011 in the amount of $300. *Id.* at 1173-74; Trial Exh. 777.

The check was received in the mail by Mr. Muhtorov's wife, Nargiza, who informed her husband of its receipt and asked what she should do with it. Tr. 4/16/18 at 1486-87. Mr. Muhtorov told his wife to deposit the check in her personal checking account and to use the money for family expenses; that's what she did. *Id.*; Trial Exh. 736.

The Government argued that certain calls concerned Mr. Jumaev sending the money for the support of the IJU while Mr. Jumaev insisted the money was sent for repayment of his debt. Tr. 4/10/18 at 1174. The Government's theory was purportedly supported by evidence of (1) Mr. Jumaev's interest, support, and praise of a designated foreign terrorist organization ("DFTO"), such as the IMU and one of its founders Tohir Yuldashev; (2) the Opera Web History found on his

computer; (3) comments he made on his You Tube account after viewing certain videos on that site; and (4) inculpatory admissions he made during his post-arrest interrogation of March 15, 2012. *See, e.g.*, Tr. 4/3/18 at 910-13; and Doc. 1884 at 5-9.

Conversely, Mr. Jumaev contended his Opera Web History showed a user roaming from one site to another for minimal periods of a minute or less, that his praise of Yuldashev emanated from the latter's courage and criticisms of the Karimov regime before Yuldashev became a co-founder of the IMU, and that his You Tube comments characterizing his three sons as muhjahid were identifying them as carrying the word of Allah in a peaceful way as opposed to a violent jihadist manner. Tr. 4/10/18 at 1202-05; 1216-18. According to Dr. Marc Sageman, Mr. Jumaev's terrorism expert, Mr. Jumaev did not even satisfy the first essential criteria of the pathway to political violence, namely, the acquisition of a politicized social identity, which would lead to identifying with a political protest community, such as the IJU. Tr. 4/24/18 at 2116-2120, 2125-2126.

As the jury was instructed, Mr. Jumaev could be convicted as a member of the conspiracy even though he played a minor part in it. *See* Instruction No. 16. He further could be convicted also of Count 2 even if did not personally provide or attempt to provide at least $300 to the IJU but if he helped Mr. Muhtorov to commit the crime, *i.e.*, if he aided or abetted Mr. Muhtorov . *See* Instruction No. 18. The jury was further permitted to find Mr. Jumaev guilty of Count 2 even if it

6

was determined that he did not actually commit or personally aid and abet in the commission of that offense. *See* Instruction No. 19. Thus, Mr. Jumaev could have intended to repay a portion of the debt he owed Mr. Muhtorov by mailing the $300, while at the same time, knowing Mr. Muhtorov was planning to send that money to the IJU and encouraging him to do so.

### III. LAW REGARDING APPLICATION OF THE SENTENCING GUIDELINES

Since the Supreme Court in *United States v. Booker*, 543 U.S. 220, 264-65 (2005) ruled that the Sentencing Guidelines were merely advisory, judges are permitted to consider arguments that the applicable guidelines fail to properly reflect § 3553(a) considerations, reflect an unsound judgment, do not treat defendant characteristics in the proper way, or that a different sentence is appropriate regardless. *Rita v. United States*, 551 U.S. 338, 357 (2007). In addition, judges "may vary [from Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). Under § 3553(a), district courts will need only to "consider" the guideline range as one of many factors in the determination of the appropriate sentence. *Booker*, 543 U.S. at 234.

In determining a sufficient sentence, this Court may not presume that the recommended guidelines sentence is the correct one. *Rita*, 551 U.S. at 351. Rather, after accurately calculating the advisory range so that it "can derive whatever insight the guidelines have to offer, [the district court] must sentence

based on 18 U.S.C. § 3553(a) without any thumb on the scale favoring a guidelines sentence." *United States v. Sachsennaier*, 491 F.3d 680, 685 (7th Cir. 2007).

While the Guidelines are the starting point in a sentencing determination, there is "no longer a limit [previously applicable to departures] on the variances from guidelines ranges that a district court may find justified under the sentencing factors set forth in [section 3553(a)]." *Irizzarry v. United States*, 553 U.S. 708, 715 (2008). Moreover "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661; *see also United States v. Magallanez,* 408 F.3d 672, 684 (10th Cir. 2005). Furthermore, a factor's disfavor by the Guidelines no longer excludes it from consideration under §3553(a). *See United States v. Munoz-Nava,* 524 F. 3d 1137, 1146, 1148 n. 6 (10th Cir. 2008) (approving district court's emphasis on defendant's family ties and responsibilities, notwithstanding U.S.S.G. §5H1.6 provides that such factors are not ordinarily relevant in determining whether a departure may be warranted). Thus, "[d]istrict courts are granted wide discretion in choosing which factors to rely on in determining whether a variance is justified under §3553(a), and may choose to rely on factors disfavored by the Sentencing Commission. *United States v. Sayad*, 589 F.3d 1110, 1118 n. 4 (10th Cir. 2009).

## IV. THE UPWARD ADJUSTMENTS PROPOSED BY THE GOVERNMENT DO NOT APPLY

### A. The Terrorism Adjustment, USSG § 3A1.4, is Inapplicable

In the Gvt SS at 10-11, the Government argues, without any analysis, the applicability of the so-called "terrorism enhancement," USSG § 3A1.4. Mr. Jumaev disagrees that 3A1.4 applies to his case. That guideline states:

> (a)   If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.

> (b)   In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

Thus, § 3A1.4 is satisfied if the offense is felonious conduct that: 1) "involved" a crime of terrorism, or 2) was "intended to promote" a crime of terrorism. *See United States v. Awan*, 607 F.3d 306, 311 (2d Cir. 2010); *see also United States v. Fidse*, 862 F.3d 516, 522 (5th Cir. 2017) (stating that courts "have recognized that the structure of § 3A1.4 establishes two bases for applying the enhancement).

Application Note 1 to § 3A1.4 states that a "federal crime of terrorism" has the meaning given that term in 18 U.S.C. § 2332b(g)(5), which in turn defines a "federal crime of terrorism" as "an offense that (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of [the enumerated statutes]."

18 U.S.C. § 2339B, providing material support to a terrorist organization, is one of the enumerated statutes.

### 1. The "Involved" Component of § 3A1.4

#### a. Legal Standard

Under the "involved" alternative of § 3A1.4, the Government must prove by a preponderance of the evidence that Mr. Jumaev's conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" under 18 U.S.C. § 2332b(g)(5)(A). *Awan*, 607 F.3d at 316.  The defendant in *Awan* was convicted of violating 18 U.S.C. § 2229A (providing material support to terrorists) and related offenses after using bank accounts to transfer money to a terrorist organization (the "KCF," whose leader was Singh Panjwar) responsible for carrying out murders and bombings in India. *Awan*, 607 F.3d at 310. After the district court refused to apply the § 3A1.4 terrorism enhancement at sentencing, the Second Circuit explicated the enhancement. The court remanded for resentencing without taking a position about whether the enhancement was applicable.

Considering § 3A1.4's "involved" prong, the court in *Awan* reasoned that:

> whatever Awan's motive might have been in committing the crimes for which he was convicted, commission of crimes listed in § 2332b(g)(5)(B) satisfies the "involved" prong of the terrorism enhancement so long as the government shows by a preponderance of the evidence that Awan had the "specific intent" to commit an offense that was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

608 F.3d at 317 (internal citation to *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009) omitted). The court clarified that even though "there is little doubt that Awan (1) knew that the objective of Panjwar and the KCF was to influence the Indian government through violence, and (2) knew that the money he provided to the KCF would be used toward that end," the government still must prove by a preponderance of evidence "that Awan's offenses themselves were 'calculated to influence . . . the conduct of government . . .' even if he lacked a specific political motive for committing them." *Id. See also United States v. Fawzi Mustapha Assi*, 428 F. App'x 570, 572 (6th Cir. 2011) ("The Terrorism Enhancement, § 3A1.4, only applies to violations of 18 U.S.C. § 2339B where the evidence shows that the defendant provided support to a foreign terrorist organization with the intent to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'" (quoting 18 U.S.C. § 2332b(g)(5)(A)). There the court recognized:

> [I]t is possible to be guilty of providing material support to a foreign terrorist organization but not qualify for the Terrorism Enhancement. This scenario would arise if the material support was not intended to influence or affect a government's conduct by intimidation or coercion.

*Fawzi Mustapha Assi*, 428 F. App'x at 572.

Further, in *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), a case that involved three defendants who were convicted on charges related to conspiracies to kill persons in foreign countries to defraud the United States, the

11

district court declined to apply the terrorism enhancement to co-defendant Yousry, explaining:

> This is a motivational requirement and focuses on the defendant's purpose. The government has conceded the lack of motivation or purpose and has failed to show that the defendant's offenses were calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government action.

*Id.* at 138. The Second Circuit affirmed the district court's decision. *Id.* at 138-39.

Finally, in *United States v. Chandia*, 514 F.3d 365 (4th Cir. 2008), the court remanded for resentencing after the district court applied the §3A1.4 adjustment without making necessary findings. The circuit court stated:

> Chandia's PSR stated that the terrorism enhancement applied but gave no explanation for this conclusion. Chandia's convictions under the material support statutes clearly satisfied the first element of the enhancement. However, the PSR did not contain any factual assertions and the district court did not make any factual findings related to the intent element. Instead, both appeared to assume (erroneously) that the enhancement automatically applies to a material support conviction.

*Id.* at 376.

### b. Application

The Government failed to prove by a preponderance of evidence that Mr. Jumaev had the specific intent to commit a crime of federal terrorism as defined by 18 U.S.C. § 2332b(g)(5)(A). While Mr. Jumaev was aware of the IJU in a very general sense, he had no knowledge that any IJU member or supporter was planning a politically-motived act of violence. The record is devoid of any credible evidence that Mr. Jumaev knew about any plan to commit a politically-motivated

crime of violence against any government.  Mr. Jumaev had no affiliation with the IJU and was not a part of any of its decision-making structures. Because the Government has failed to meet its burden, the Court should find the "involved" prong inapplicable.

## 2. The "Intended to Promote" Component of § 3A1.4

### a. Legal Standard

The "intended to promote" prong "applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism."  *Awan*, 607 F.3d at 314. "To qualify as a federal crime of terrorism that may serve as a predicate for a § 3A1.4 enhancement, an offense must be listed in 18 U.S.C. § 2332b(g)(5)(B) and, in addition, it must be an 'offense that . . . is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct,' as provided by 18 U.S.C. § 2332b(g)(5)(A)." *Id.*  "Under the 'intended to promote' prong, however, so long as the defendant's offense was intended to encourage, further, or bring about a federal crime of terrorism as statutorily defined, the defendant himself does not have to commit an offense listed in § 2332b(g)(5)(B), and the defendant's offense need not itself be 'calculated' as described in § 2332b(g)(5)(A)."  *Id.* (citations omitted).

Summarizing the standard for applying § 3A1.4, the Second Circuit in *Awan* stated:

> [T]he application of § 3A1.4 . . . does not require a finding that Awan was personally motivated by a desire to influence or affect the conduct of government. Rather, the government need only demonstrate that Awan intended to promote a crime calculated to have such an effect, i.e., that his offenses were intended to promote a federal crime of terrorism as defined in § 2332b(g)(5), whatever Awan's reason for committing them.

Id. at 315-316 (internal citation omitted).

### b. Application

All of the arguments concerning the inapplicability of "involved" prong are reasserted here in relation to the "intended to promote" prong. Furthermore, the Government failed to prove by a preponderance of evidence that the "intended to promote" prong is applicable to Mr. Jumaev.  While there was testimony at trial that the IJU had been involved in past acts of violence, there was no credible evidence that the IJU was involved in any specific acts of murder, kidnapping, maiming, or terroristic activities intended to influence or affect the conduct of the any government by intimidation or coercion, or to retaliate against government conduct, during the time frame the operative indictment alleged Mr. Jumaev conspired and provided material support to the IJU.  Thus, Mr. Jumaev could not have promoted crimes of federal terrorism that did not exist and that were not being planned by the IJU.

While there was evidence that Mr. Jumaev commented on a propaganda video produced by the IMU during an unknown time frame, and that Mr. Muhtorov told Mr. Jumaev that people at the "wedding party" were thankful for a wedding gift, Mr. Jumaev never discussed any act of violence with Mr. Muhtorov. The tape recorded conversations signified nothing more than bluster and puffery by Mr. Jumaev, without Mr. Jumaev promoting any act of violence. During the thousands of hours of intercepted phone calls and listening devices installed in Mr. Jumaev's apartment, there were never any conversations during which Mr. Jumaev promoted any act of violence.

In sum, the Government has failed to prove by a preponderance of evidence that the § 3A1.4 enhancement is applicable under the "involved" prong or under the "intended to promote" prong.  As has been noted, "[t]he sentencing enhancement provided by § 3A1.4 is 'steep.'" *United States v. Fidse*, 862 F.3d at 522 (quoting *United States v. Fidse*, 778 F.3d 477, 481 (5th Cir. 2015)). The severe enhancement should not be applied to Mr. Jumaev.

However, If the Court does find § 3A1.4 applicable, then the Court should grant Mr. Jumaev a substantial downward departure and/or variance under § 4A1.3 or § 3553(a) as set forth more fully below. The PSR is in accord with this approach, and its recommendation of a sentence of 108 months is closer to but nevertheless still some distance from the sentence recommended by Mr. Jumaev. *See* PSR at ¶¶ 106-107 and R-2 thru R-4.

15

**B. The Obstruction of Justice Adjustment, USSG § 3A1.4, Is Inapplicable**

The Gvt SS at 11, and the PSR at ¶¶ 38-39, albeit more tepidly, argue for an upward adjustment of 2 levels for obstruction of justice under USSG §3C1.1. The argument is based on the view that Mr. Jumaev lied during trial when he testified that the $300 he sent Mr. Muhtorov was a partial repayment of the debt he owed the latter for his financial contribution a year earlier towards Mr. Jumaev's immigration bond. The argument posits that the $300 was really intended as a payment for the support of the IJU and that the jury's verdicts reflect their rejection of Mr. Jumaev's testimony; therefore, Mr. Jumaev lied and the adjustment thus applies. This is a sophistical argument since it does not follow that the jury's verdict means Mr. Jumaev committed perjury.

Application Note 2 to §3C1.1 states, "This provision is not intended to punish a defendant for the exercise of a constitutional right." Mr.Jumaev's denial of guilt and right to testify in his own defense are rights afforded him by the Constitution. The Note further explains, "In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice."   Mr. Jumaev's explanation of the $300 was not concocted for trial but was rather his long-held position from the time he exchanged his cash for Zafar's check in March 2011, to

his re-confirmation of that explanation to Zafar in February 2012, to his consistent explanation to his family members during that month, to his unwavering and consistent explanation to the FBI during his pre-arrest interviews of that month, and during the post-arrest interrogation a month later. The only determination made by the jury's verdicts is their belief that Mr. Jumaev's conduct satisfied one of the many ways in which his guilt could be determined.

## V. COMPARABLE CASES

The Court, after the verdict was announced, requested that counsel research other cases filed under 18 USC § 2339B and their concomitant sentences. The Gvt SS contains a matrix that lists 23 cases where defendants were convicted of violating 18 U.S.C. § 2339B. However, the list only includes cases involving convictions after trial rather than pursuant to plea agreements. *See* Gvt SS, Attachment A.[2]  The PSR also contains a matrix listing 27 such cases, although they do not appear to be limited to trial convictions. *See* PSR, Exhibit B. Interestingly, only 2 of the same cases appear in both matrices.[3] The undersigned has found 17 additional cases not listed in either the Gov SS or the PSR, which are described in a matrix attached hereto as Exhibit A.

---

[2] The Government's selection of only cases where convictions were obtained at trial, rather than by plea agreement, seems to reveal its position that Mr. Jumaev should be required to pay a "trial tax" for exercising his constitutional right to a jury trial. This position is further evinced by the Government's argument that §3C1.1 should be applied.

[3] The two cases listed in both matrices involve the defendants named Amina Garah Ali and Hawo Hassan, who were both codefendants.

Cases like Mr. Jumaev's, however, are scarce and arguably non-existent. As the PSR cogently notes at R-3:

> What is clear from this research is despite a significant range of conduct that can produce a conviction for material support, the sentencing guidelines result in nearly identical guideline range in each case, regardless of the underlying conduct. . . . The difficulty is that under the guidelines, there is no distinction between less and more serious offenses, those in which actual harm occurred and those where it did not.

Undoubtedly, Mr. Jumaev's case falls within the most benign category of material support cases. Mr. Jumaev caused no actual harm, and, regardless of intent, he was not motivated by fanaticism, political ideology, malevolence or the desire to cause harm to any person or government.

A few cases are instructive. *United States v. Esse*, No. 14-cr-000369(1) (MJD), (D. Minn.), is a recent case and apt comparison. Amina Esse pleaded guilty to an information alleging conspiracy to provide material support to a foreign terrorist organization. The facts were described by the prosecution's sentencing statement in *Esse*:

> [T]he defendant provided material support to the foreign terrorist organization al Shabaab when she delivered money repeatedly to her co-conspirators knowing that money was destined for, and received by, al Shabaab. The defendant did so knowing that al Shabaab had been designated as terrorist organization by the United States and her contributions to al Shabaab were unlawful. However, at the time she made these contributions, Ms. Esse was convinced that supporting al Shabaab was not only justifiable, but also an obligation. During the period that encompassed the defendant's criminal conduct, she participated in dozens of discussions with others about al Shabaab's activities, the success or failure of various al Shabaab violent attacks and operations, the

success or failure of Somali government and AMISOM actions in Somalia, and the status of affairs in Somalia regarding the Somali government. The defendant was well-versed about al Shabaab and their operations in Somalia.  At the time, she believed in them.

*Id.*, Doc. 27, at 9-10 (quoting Esse's PSR). Ms. Esse was sentenced on April 27, 2017, to a five-year term of probation. *Id.*, Doc. 33.

That Ms. Esse received the benefit of a USSG § 5K1.1 reduction does not diminish the comparison. Unlike Ms. Esse, Mr. Jumaev had nothing to offer the Government for cooperation. Not only did Mr. Jumaev have no relationship to the IJU, he never knew a single member of that organization. He never communicated with the IJU, nor succeeded in logging onto its propaganda website, sodiqlar.com.

*Awan*, post-appeal, is also instructive. Originally, the district court calculated Awan's Guidelines range without the 3A1.4 terrorism adjustment, resulting in a Guidelines range of 168 to 210 months, and sentenced Awan to 168 months in prison. *Awan,* 607 F.3d at 312. After remanding for resentencing, the district court resentenced Awan to the same 168 month sentence that had originally been imposed while rejecting the government's request on remand of a 45-year sentence. *See* attached Exhibit B,_*Awan* Amended Judgment with transcript of sentencing order).  The government stressed that the trial evidence showed that Awan made international money transfers of between $60,000 to $70,000 to the foreign terrorist organization, recruited another person to travel to

Pakistan to undergo military training, and had a criminal history that included conspiracy for credit card fraud involving over $2,000,000. *Id.*, Tr, at 24-27. The resentencing judge, in focusing rightfully so on Awan the individual, rebuffed the government's request for such a punitive sentence and observed that:

> Just as tellingly, the recounting and recordings of defendant's conversations with Harjit, which were part of the trial record, and his discussions with at least one other prison inmate, which were presented to Judge Sifton but were not part of the trial record, peg him precisely, as Judge Sifton characterized him, as "a boaster, a salesman and a ... terrorist groupie," the latter of which I understand to refer to someone who has sought to align himself with an infamous organization not because he zealously identifies with the ideology of its cause, but rather as a bizarrely misguided, albeit dangerous gesture of self-aggrandizement. Defendant's incessant name-dropping of notorious terrorists and terrorist incidents and his obviously exaggerated boasting at least in some instances  -- of close association with powerful terrorists strongly suggest that although defendant plainly impelled himself to participate in terrorist conduct, he did so for atypical reasons unrelated to the political and religious ideology that generally drives defendants who commit crimes of terrorism.
>
> * * *
>
> I am not, in the case of defendant. considering an offender whose reasons to recidivate derive from political or other ideological fanaticism so strong that it is doubtful that they will ever abate regardless of the length of his incarceration.

*Id.* at 27-28. Mr. Jumaev, who has no criminal record, did not engage in any recruiting activities, and advanced only the modest sum of $300 should be treated even more generously than Mr. Awan.

In *United States v. Benkahla*, 501 F. Supp.2d 748 (E.D. Va. 2007), the district court imposed the terrorism enhancement based upon the defendant's

obstruction of an investigation of a federal crime of terrorism.  The district court then found that a § 4A1.3 downward departure or variance under § 3553(a) was warranted.  As described by the Fourth Circuit in affirming the sentence:

> Benkahla's Guidelines range was thus 210 to 262 months. But the court thought the case called for a downward departure under § 4A1.3 or (in the alternative) a variance under 18 U.S.C. § 3553(a). "Sabri Benkahla is not a terrorist," the court stated. *Benkahla*, 501 F. Supp. 2d at 759. He "has not committed any other criminal acts" and his likelihood of doing so upon release is "infinitesimal." Id. Also, Benkahla's former co-defendants, the other ten members of the Dar al-Arqam paintball group, had received lesser sentences for what were more dangerous and more violent offenses, a disparity the court found "staggering." Id. at 762. The court thus treated Benkahla as having a Category I criminal history and sentenced him to 121 months.

*United States v. Benkahla*, 530 F.3d 300, 305-06 (4th Cir. 2008).

## VI. CALCULATION OF THE ADVISORY GUIDELINES RANGE

As Mr. Jumaev has discussed in Section IV above, the Court should reject §3A1.4 as applicable to the facts of this case and instead focus its analysis with USSG, § 2M5.3.

That guideline carries a base offense level of 26.

USSG § 3D1.2 (a) states that all counts involving substantially the same harm shall be grouped together into a single Group (a) when counts involve the same victim and the same act or transaction.  Since USSG § 3D1.2 does not list § 2M5.3 as a guideline that is covered under the grouping rules, nor specifically excludes it from grouping, a case-by-case determination must be made based

upon the facts of the case and the applicable guidelines. Based upon the facts of this case and Mr. Jumaev's alleged role in it, Counts 1 and 2 should be grouped together and calculated at a base offense level of 26. The PSR agrees at ¶ 32.

USSG § 2M5.3 (b)(1)(E), provides for a two level increase if funds or other material support or resources were used with intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act. Contrary to the Gvt SS at 9 and PSR at ¶ 34, this adjustment does not apply. Specifically, USSG § 2M5.3, comment. (n.2) Departure Provisions states:

> (A). In General - In determining the sentence within the applicable guideline range, the court may consider the degree to which the violation threatened a security interest of the United States, the volume of funds or other material support or resources involved, the extent of planning or sophistication, and whether there were multiple occurrences.   In a case in which such factors are present in an extreme form, a departure from the guidelines may be warranted.

Because Mr. Jumaev's role in the offense was appreciably less than Mr. Muhtorov's,  the offense level should be decreased by 2 to 4 levels pursuant to USSG §3B1.2(a) and (b).  For example, pursuant to App. N. 4, a defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as a minimal participant. *Id.* Contrary to Mr. Muhtorov's activities, Mr. Jumaev had no contact with the IJU or the CHS, was not aware of the plans contemplated by Mr. Muhtorov with either of those sources, and was unaware of Mr. Muhtorov's pledge of loyalty to the IJU. As a result, Mr. Jumaev's offense level should be decreased by at least 3 levels,

22

namely, to offense level 23.

Mr. Jumaev has no criminal history, therefore he falls within Criminal History Category ("CHC") I.

With a total offense level of 23 and CHC I, the advisory guideline range is 46 to 57 months. If a total offense level of 26, his advisory guideline range would be 63 to 78 months. At an offense level of 28, the advisory guideline range would be 78 to 97 months. He has already been detained 76 months, which, with the calculation of good time, means he has already served the equivalent of a sentence of 90 months.

Alternatively, if §3A1.4 is deemed applicable to this case, then the base offense level of 26 is increased by 12, resulting in an adjusted offense level of 38. Pursuant to §3A1.4(b), Mr. Jumaev's CHC would be VI The advisory guideline range from these calculations is 360 months to life, but would be reduced to 180 months, the statutory maximum. In such event, however, he would be eligible for any applicable downward departures and/or a variant sentence in accordance with Chapter 5, Parts H and K of the Guidelines, the sentencing purposes set forth in §3553(a), and characteristics enumerated in § 3661.

## VII. DEPARTURES AND OTHER 3553(a) SENTENCING FACTORS

### A. A Variant Sentence is Appropriate

If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's

criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted. §4A1.3(b). Here, except for the enhancements contained in §3A1.4, which have nothing to do with the calculations customarily attributed to an individual's criminal history category, Mr. Jumaev would fall within CHC I since zero points would have been assigned to him. The PSR at ¶ 106 is in accord.

It is well established that "courts can and should engage in a holistic inquiry of the § 3553(a) factors." *United States v. Barnes*, 890 F.3d 910, 916 (10th Cir. 2018) (internal quotation marks omitted) (trial court's decision affirmed of variant sentences of 12 months and 6 months imprisonment, respectively, to two prison administrators who physically abused prisoners in a variety of ways and whose advisory guidelines range calculated to 70 to 87 months). It is well established that a "variance can be imposed without compliance with the rigorous requirements for departures." *United States v. DeRusse*, 859 F.3d 1232, 1237 (10th Cir. 2017) (quoting *United States v. Gantt*, 679 F.3d 1240, 1247 (10th Cir. 2012). Under 18 U.S.C. §§ 3553(a) and 3661, a variant sentence is warranted.

Mr. Jumaev believes a sentence to time served is a sufficient but not greater sentence than necessary to comply with the purposes set forth in paragraph 2 of the subsection and takes into account the factors set forth in paragraphs 1 through 7. *See, e.g., DeRusse,* 859 F.3d at 1337 (upholding

variance from a 108-135 months guidelines range down to 70 days already served).

While the PSR and previous sections of this Statement address the nature and circumstances of the offense, the background, history, and characteristics of Mr. Jumaev, the kinds of sentences and guideline range for his category of offense, what should also be considered by the Court is just how much punishment of Mr. Jumaev is enough in order to reflect the seriousness of his crime, promote respect for the law, to afford adequate deterrence, and to protect the public from further crimes. The Government wants more retribution. Mr. Jumaev disagrees and believes the PSR at R-2 thru R-4 provide a sound framework for an analysis under 3553(a) and a concomitant variant sentence.

In addition to the PSR's analysis, the Court knows from hearing the testimony during trial that the alleged offenses were non-violent in nature. The funds were supposedly earmarked for a DFTO comprised of about ten people camped in the mountains of North Waziristan, Pakistan. Many of this small group had fled the dictatorship of Uzbekistan, whose claim to fame since its independence has been its bottom world ranking for its persecution of religious observance and nearly all other basic human rights.

As noted previously, Mr. Jumaev has served the equivalent of a sentence of 90 months for having allegedly conspired and attempted to provide $300 of material support to the IJU. His confinement at a pretrial detention facility

represents real "hard time" – harder and more punitive than if he had been sentenced to a federal prison. It appears that federal prisons have greater recourses than pretrial detention facilities, such as rehabilitation programs, education, exercise, participation in crafts and hobbies, access to better medical attention, mental health counseling, and access to participation in group religious practices.

In addition to his period of detention, Mr. Jumaev during that time has not seen any members of his immediate family except for the ten minutes or so in the courtroom that the Court compassionately accorded Mr. Jumaev and his middle son, Davlat, after the latter testified remotely via video feed from Europe during the trial. On the occasions when Mr. Jumaev was able to speak to his wife and/or sons during his detention, those calls were monitored and obviously lacked any privacy.  Mr. Jumaev was moreover limited to the number of times he was able to speak to his family by virtue of his impecunious situation. Were it not for the benevolence of a few friends, Mr. Jumaev would not have been able to speak to his family at all.

Although Mr. Jumaev performed his familial roles as head of household, primary breadwinner, adviser, and confidant from the time he arrived in this country in April 2000 until his arrest on March 15, 2012, he suffered the humiliation and embarrassment of having lost those roles once he was arrested. During trial, the Government made a point to emphasize that emasculation when

it suggested that Mr. Jumaev played a *de minimus* role in the upbringing of his children while living in this country.

Now that Mr. Jumaev's case has concluded in the trial court, once his detention ends in this case, the immigration court will resume its removal case against him. As a result of his conviction, he will no longer be entitled to request asylum in this country. His only avenue of relief is to carry his burden of showing he will likely be tortured by the Uzbek authorities, if he is removed to that country. If he fails in his burden and is removed to Uzbekistan he has been warned that he will likely face dire consequences as soon as he arrives there, notwithstanding the current regime and successor to President Karimov has showed some signs of improving the lot of Uzbeks in that country. That improvement will unlikely be accorded someone convicted of terrorism-related offenses.

Conversely, if Mr. Jumaev prevails in his burden, the United States has a period of time to try to find another country that will take Mr. Jumaev. That seems an unlikely prospect. Mr. Jumaev will thus remain here for however long it takes to find him another country, but it could be never. In such event, his family would not likely be granted visas or other entry into this country, as evidenced by the roadblocks they incurred when trying to travel to this country to testify during Mr. Jumaev's trial.   *See* attached Exhibit C an opinion letter from Mr. Jumaev's immigration expert, Jeff Joseph, Esq., discussing many if the above-described immigration consequences.

## B. A Downward Variance is Warranted if § 3A1.4 is Applied

A court may depart downward if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life. §5K2.20. This case was Mr. Jumaev's first experience with the criminal justice system. According to the Government's evidence, Mr. Jumaev did not participate in any of the planning of the alleged culpable conduct. And, it apparently took place during a couple of phone calls in March of 2011.

Further, as noted above, *Kimbrough v. United States* allows courts to avoid a rigorous application of a particular guideline to the offense at hand and in the process to disagree with the policy considerations behind that guideline. No more guideline is apt for such a critical analysis than §3A1.4, since its broad scope permits its application to the most violent kinds of material support and in like manner to the most benign. Thus, a person, who is moved by the plight of young children living in the camp of a DFTO and elects to contribute a few hundred dollars to the DTO in order to assist in the feeding and clothing of those children, is subject to the same enhancement under 3A1.4 as the individual, who provides explosive devices, personnel in the form of himself and others, and raises of thousands of dollars for and travels to and trains at a DFTO. Similarly, an individual who has been convicted of contributing a small sum of money to a

28

DFTO whose membership has dwindled down from its heyday of more than a couple hundred members to less than a dozen members, *i.e.,* an essentially "spent" organization, at the time of the contribution and which, in addition, hadn't carried out a terrorist activity in several years, is subject to the same enhancement as so called "martyrs" for ISIS, which deploys soldiers throughout Europe and the international globe to wreck its horror. The policy considerations for applying the same enhancement to such disparate conduct are flawed and should not apply to the benign, non-violent, and aberrant conduct involved in this case.

An instructive article regarding the deconstruction of §3A1.4 is James P. McLoughlin, Jr*., Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations***,** 28 Law & Ineq. 51 (2010), available at: http://scholarship.law.umn.edu/lawineq/vol28/iss1/2. There, the author explains that prior to the events of September 11, 2001, there were no base offense Guidelines for federal crimes of terrorism, but when Congress passed the USA PATRIOT Act in the wake of September 11, the Sentencing Commission enacted §3A1.4. *Id.,* at 52-53.

§3A1.4, enacted to punish hard-core terrorists, does not fit Mr. Jumaev's behavior.  McLoughlin aptly explained that:

> U.S.S.G. section 3A1.4 represents bad anti-terrorism policy for several reasons. First, the Guideline increases a defendant's

Criminal History Category to a level VI-the most culpable.  The shift to Criminal History Category VI ensures that a defendant will be sentenced as if he or she were a career criminal, with no empirical evidence that this is true or fair (under the considerations contemplated in 18 U.S.C. § 3553). Second, the Guideline automatically and uniformly increases a defendant's offense level, ensuring a defendant will be sentenced as if his or her offenses are among the most serious offenses addressed by the Sentencing Guidelines, regardless of where the offense level fits on the spectrum of "material support." For example, U.S.S.G.Section 3A1.4 punishes the defendant who sends $500 to the social services arm of a DFTO, such as Hezbollah or Hamas, the same as the defendant who attempts to bomb the United Nations, or who provides weapons of mass destruction to al Qaeda. As a result, the sentences under U.S.S.G. section 3A1.4 are often disproportionate to the conduct of conviction.

Finally, the crushing increases in prison time under U.S.S.G. section 3A1.4 can be imposed based upon a judge's finding under a preponderance of the evidence standard, rather than jury findings under a beyond a reasonable doubt standard, giving rise to constitutional concerns and questions of fundamental fairness in our justice system. When comparing U.S.S.G. section 3A1.4 with the statutory maximum penalties for terrorism-related offenses-which should reflect Congressional judgment about the sentences appropriate to deter and punish those offenses-and when contrasting its impact with that of other Sentencing Guidelines addressing terrorism, U.S.S.G. section 3A1.4's flaws become apparent.

*Id.* at 57-58.

The balance of Mr. McLoughlin's well-considered article then addresses the concerns § 3A1.4 raises by focusing on cases involving material support in violation of 18 U.S.C.§ 2339B, the basic statute that criminalizes providing material support for a DFTO and the statute under which Mr. Jumaev has been convicted.

30

## VII. CONCLUSION

The court in *Barnes* thoughtfully recognized that "[s]entencing is both art and science, and it may be the hardest job our district judges undertake." 890 F.3d at 921. And, "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007).

How much punishment is sufficient for Mr. Jumaev taking into account all of the factors under 3553(a)? Based on the arguments advanced by him, he is entitled to a variant sentence of time served.

Dated this 28th day of June, 2018.

Respectfully submitted,

/s/ David Barry Savitz
David Barry Savitz
Law Office of David B. Savitz
1512 Larimer Street, Suite 600
Denver, CO  80202
Telephone: (303) 825-3109
savmaster@aol.com

/s/ Mitchell Baker
Mitchell Baker
Attorney at Law
1543 Champa Street, #400
Denver, CO 80202
Telephone: (303) 592-7353
mitchbaker@estreet.com
*Attorneys for Bakhtiyor Jumaev*

31

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel of record.

/s/ Pat Austin
Pat Austin