

EXHIBIT A

SUMMARY OF MATERIAL SUPPORT CASES NOT LISTED BY THE GOVERNMENT OR IN THE PSR

| No. | Name, Outcome, & District | Description | Conviction(s) | Sentencing Date | Sentence (Months) | Alleged Affiliation Or Plot Name |
|---|---|---|---|---|---|---|
| 1 | Amina Esse Pleaded guilty in DMIN | Esse delivered money repeatedly to her co-conspirators knowing that money was destined for, and received by, al Shabaab Esse participated in dozens of discussions with others about al Shabaab's activities, the success or failure of various al Shabaab" violent attacks and operations, the success or failure of Somali government and AMISOM actions in Somalia, and the status of affairs in Somalia regarding the Somali government, and was well-versed about al Shabaab and their operations in Somalia. | | 04/27/2017 | Probation | Al Shabaab |
| 2 | Ana Isabel Pena Arevalo Pleaded guilty in DDC | Pena Arevalo served in the logistical support and supply network as radio call center operators, patching through high frequency radio calls from Revolutionary Armed Forces of Colombia (FARC) leaders operating in the jungle to co-conspirators in urban areas responsible for obtaining materials and supplies for the FARC guerillas. | Material support to a designated FTO | 06/22/2010 | 31 | Revolutionary Armed Forces of Colombia (FARC) |
| 3 | Diego Alberto Ruiz Arroyave Pleaded guilty in SDTX | Attempted to acquire anti-aircraft missiles, grenade launchers and other powerful weapons in exchange for $25 million worth of cocaine | Material support to a designated FTO | 06/01/2009 | 90 | United Self-Defense Forces of Colombia (AUC) |
| 4 | Dylan Boyd Pleaded guilty in EDNC | Boyd was arrested in connection with his father Daniel's homegrown terrorism cell. He allegedly traveled with his father and brother Zakariya to Israel in an unsuccessful attempt to engage in jihad. | Conspiracy to provide material support for terrorists | 12/20/2011 | 96 | North Carolina Taliban |
| 5 | Juanito Cordoba-Bermudez Pleaded guilty in SDNY | The indictment recounts multiple discussions among various co defendants, including CORDOBA-BERMUDEZ, regarding FARC logistics, | Material support to a designated FTO | 06/01/2011 | 180 | Revolutionary Armed Forces of Colombia |

SUMMARY OF MATERIAL SUPPORT CASES NOT LISTED BY THE GOVERNMENT OR IN THE PSR

| No. | Name, Outcome, & District | Description | Conviction(s) | Sentencing Date | Sentence (Months) | Alleged Affiliation Or Plot Name |
|---|---|---|---|---|---|---|
| | | supplies and weapons, as well as the seizures by authorities of a variety of weapons and materiel in 2008. These discussions occurred in the aftermath of a February 22, 2008, attack by five FARC guerillas on a Panamanian police patrol boat, and their subsequent capture in possession of substantial FARC weaponry and material. | | | | (FARC) |
| 6 | Luz Mary Gutierrez Vergara Pleaded guilty In DDC | Conde Rubio was the leader of the FARC's 1st Front logistical support network. The 1st Front commander and Conde Rubio directed other members of the logistical support network to obtain and transport materials and supplies. Gutierrez Vergara and Pena Arevalo served in the logistical support and supply network as radio call center operators, patching through high frequency radio calls from FARC leaders operating in the jungle to co-conspirators in urban areas responsible for obtaining materials and supplies for the FARC guerillas. | Material support to a designated FTO | 6/22/2010 | 31 | Revolutionary Armed Forces of Colombia (FARC) |
| 7 | Jorge Abel Ibarguen-Palacio Pleaded guilty In SDNY | On the morning of February 22, 2008, the PNP approached a boat off the coast of Jaque, Panama that appeared in need of assistance. IBARGUEN-PALACIO, Ba-ol-Ramos, and others were on deck dressed in civilian clothing. While the Panamanian police officers were towing the boat to shore, IBARGUEN-PALACIO and other FA RC members pointed weapons at the police. Other police boats arrived to render assistance and rescue the officers who were being held captive. After an exchange of gunfire, which wounded at least one officer, IBARGUEN-PALACIO and his co- | Material support to a designated FTO | 2/07/2011 | 130 | Revolutionary Armed Forces of Colombia (FARC) |

SUMMARY OF MATERIAL SUPPORT CASES NOT LISTED BY THE GOVERNMENT OR IN THE PSR

| No. | Name, Outcome, & District | Description | Conviction(s) | Sentencing Date | Sentence (Months) | Alleged Affiliation Or Plot Name |
|---|---|---|---|---|---|---|
| | | conspirators were arrested and taken into custody by the Panamanian police. | | | | |
| 8 | Basaaly Saeed Moalin Found guilty in SDCA | | Conspiring to provide material support to a designated foreign terrorist organization | | | al-Shabaab |
| 9 | Nancy Conde Rubio Pleaded guilty in DDC | Rubio was the fourth highest-ranking member of the Revolutionary Armed Forces of Colombia (FARC). She oversaw the left-wing guerilla group's logistics and communications network. After three American hostages were rescued from the FARC in 2003, Conde Rubio was arrested and extradited to the United States. She was sentenced to more than 11 years in prison. | Material support to a designated FTO | 06/15/2010 | 138 | Revolutionary Armed Forces of Colombia (FARC) |
| 10 | Victor Daniel Salamanca Pleaded guilty in SDFL | Salamanca, along with Edizon Gamboa, Bernardo Londono, Julio Lopez, Jalal Moheisen, Luis Morales, Carmen Ponton Caro, and Jalal Romero, was caught as part of an Immigration and Customs Enforcement sting. Salamanca helped informants posing as FARC operatives get fake IDs and passports so they could travel to the United States. He also offered to introduce them to a money launderer, and introduce them to a doctor who could disguise a person's fingerprints. He was sentenced to nearly six years in prison and deportation. | Material support to a designated FTO | 02/29/2008 | 70 | Revolutionary Armed Forces of Colombia (FARC) Operation Pipeline |
| 11 | Osman Jose Tobias-Rodriguez Pleaded guilty in SDFL | From at least as early as in or about November 2009, and continuing until on or about March 2, 2010, this defendant and co- conspirators, unlawfully and knowingly | Material support for a designated FTO; Cocaine distribution | 10/01/2010 | 135 | Al Qaeda |

SUMMARY OF MATERIAL SUPPORT CASES NOT LISTED BY THE GOVERNMENT OR IN THE PSR

| No. | Name, Outcome, & District | Description | Conviction(s) | Sentencing Date | Sentence (Months) | Alleged Affiliation Or Plot Name |
|---|---|---|---|---|---|---|
| | | did combine, conspire, confederate and agree with each other and others, to provide material support or resources to Al Qaeda, namely, logistical assistance and secure transportation for illegal aliens and weapons from Peru into the United States. Al Qaeda has been designated as a foreign terrorist organization. Further, the government would prove that this defendant and his co- conspirators conspired to manufacture and distribute 200 kilograms cocaine, knowing that the cocaine would be imported into the United States. | | | | |
| 12 | Mauricio Santoyo Velasco Pleaded guilty in EDVA | Santoyo held several high-level positions in Colombian law enforcement, including the head of the Colombian National PoliceOs anti-kidnapping unit. Privy to sensitive information about law enforcement activities targeting groups that engaged in kidnappings, such as AUC, he accepted bribes in exchange for information and assistance that allowed AUC members and allies to carry out their illegal activities. He informed AUC members and allies about arrest operations and ongoing wiretaps, which included information about operations involving the DEA. This assistance allowed AUC members to evade detection and arrest | Providing material support to a designated terrorist organization | 12/14/2012 | 156 | United Self- Defense Forces of Colombia (AUC) |
| 13 | Idriss Abdelrahman Pleaded guilty in SDNY | From September 2009 through December 2009, ABDELRAHMAN and others agreed to provide the FARC with services, including logistical assistance and securing transportation for a shipment of cocaine across Africa, false identification documents, and other material support and | Material support for terrorists | 11/16/2012 | 46 | Al Qaeda; Revolutionary Armed Forces of Colombia (FARC) |

SUMMARY OF MATERIAL SUPPORT CASES NOT LISTED BY THE GOVERNMENT OR IN THE PSR

| No. | Name, Outcome, & District | Description | Conviction(s) | Sentencing Date | Sentence (Months) | Alleged Affiliation Or Plot Name |
|---|---|---|---|---|---|---|
| | | resources. The defendants knew that the FARC was engaged in terrorist activity. | | | | |
| 14 | Nuradin M. Abdi Pleaded guilty In SDOH | Abdi conspired with Iyman Faris and Christopher Paul to destroy the Brooklyn Bridge and blow up an Ohio shopping mall. He admitted to attending terrorist training camps and having ties with Somali Islamists. | Material support for terrorists | 07/31/2007 | 120 | Al Qaeda Columbus Shopping Mall Bomb Plot |
| 15 | Syed Haris Ahmed Found guilty In NDGA | Ahmed and Ehsanul Sadequee allegedly engaged in military training, went to Canada to meet with other supporters of "violent jihad," and made videos of potential targets. The pair traveled to Pakistan to train with Lashkar-e-Taiba, but it is unclear if they made contact with the group. Ahmed was sentenced to 13 years in prison. | Material support for terrorists | 12/14/2009 | 156 | Lashkar-e-Taiba |
| 16 | Mohamud Abdi Yusuf Pleaded guilty In EDMO | According to the indictment, St. Louis resident Mohamud Abdi Yusuf and another defendant, Duwayne Mohamed Diriye, a resident of Kenya and Somalia, were involved in a conspiracy to provide funds to al Shabaab, which was designated by the U.S. Department of State as a foreign terrorist organization in February 2008. Minneapolis resident, Abdi Mahdi Hussein, was also indicted  and arrested on a charge of conspiracy to structure    financial transactions. | Conspiracy to provide material support to a designated FTO (2 counts); Providing material support to a designated FTO (2 counts) | 06/19/2012 | 140 | al-Shabaab |
| 17 | Nima Ali Yusuf Pleaded guilty In SDCA | Yusuf sent $1,450 to al-Shabaab fighters from Minneapolis and lied to the FBI about it. | Material support to a designated FTO | 12/11/2012 | 96 | al-Shabaab |

AO 245C (Rev. 06/01)(NYED) Amended Judgment in a Criminal Case     Document 259     Filed 04/13/12   Page 1 of 14 PageID #: 1912
Sheet 1

# UNITED STATES DISTRICT COURT

| EASTERN | District of | NEW YORK |
|---|---|---|

| UNITED STATES OF AMERICA | **AMENDED JUDGMENT IN A CRIMINAL CASE** |
|---|---|
| **V.** | |
| KHALID AWAN | Case Number:  CR-06-154( ARR) |
| | USM Number: 50959-054 |
| **Date of Original Judgment:** _10/1/2007_ | SEAN M. MAHER, ESQ |
| (Or Date of Last Amended Judgment) | Defendant's Attorney |

**Reason for Amendment:**

☑ Correction of Sentence on Remand (18 U.S.C. 3742(f)(1) and (2))
☐ Reduction of Sentence for Changed Circumstances (Fed. R. Crim. P. 35(b))
☐ Correction of Sentence by Sentencing Court (Fed. R. Crim. P. 35(a))
☐ Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36)

☐ Modification of Supervision Conditions (18 U.S.C. §§ 3563(c) or 3583(e))
☐ Modification of Imposed Term of Imprisonment for Extraordinary and Compelling Reasons (18 U.S.C. § 3582(c)(1))
☐ Modification of Imposed Term of Imprisonment for Retroactive Amendment(s) to the Sentencing Guidelines (18 U.S.C. § 3582(c)(2))
☐ Direct Motion to District Court Pursuant ☐ 28 U.S.C. § 2255 or ☐ 18 U.S.C. § 3559(c)(7)
☐ Modification of Restitution Order (18 U.S.C. § 3664)

**THE DEFENDANT:**

☐ pleaded guilty to count(s) _____
☐ pleaded nolo contendere to count(s) _____ which was accepted by the court.
☑ was found guilty on count(s) _one, two and three of the superseding indictment._ after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section** | **Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|---|
| 18 USC 2339A | CONSPIRACY TO PROVIDE MATERIAL SUPPORT TO TERRORISTS. | 3/16/2006 | ONE |
| 18 USC 2339A( 2001 ) | PROVIDING MATERIAL SUPPORT TO TERRORISTS. | 3/16/2006 | TWO |

The defendant is sentenced as provided in pages 2 through ___10___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____
☑ Count(s) _remaining counts_ ☐ is ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

_4/2/2012_
Date of Imposition of Judgment

/s/(ARR)

Signature of Judge

ALLYNE R. ROSS, U.S.D.J.

Name of Judge                     Title of Judge

_4/2/2012_
Date

EXHIBIT
B

AO 245C   (Rev. 06/05) Amended Judgment in a Criminal Case
Case 1:06-cr-00154-ARR   Document 259   Filed 04/13/12   Page 2 of 14 PageID #: 1913
Sheet 1A
(NOTE: Identify Changes with Asterisks (*))

DEFENDANT:  KHALID AWAN

CASE NUMBER:  CR-06-154( ARR)

Judgment — Page ___2___ of ___10___

## ADDITIONAL COUNTS OF CONVICTION

| <u>Title & Section</u> | <u>Nature of Offense</u> | <u>Offense Ended</u> | <u>Count</u> |
|---|---|---|---|
| 18 USC 1956(a)(2)(A) | MONEY LAUNDERING | 3/16/2006 | THREE |

AO 245C  (Rev. 06/05) Amended Judgment in a Criminal Case      Document 259   Filed 04/13/12   Page 3 of 14 PageID #: 1914
           Sheet 2 — Imprisonment                                                          (NOTE: Identify Changes with Asterisks (*))

DEFENDANT: KHALID AWAN                                    Judgment — Page __3__ of __10__
CASE NUMBER: CR-06-154( ARR)

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of

168 months, on counts 1 and 3 and 120 months count 2, the sentences to run concurrently.

☑  The court makes the following recommendations to the Bureau of Prisons:

1) That the deft receive treatment for his medical conditions.
2) That he be incarcerated at the facility at Fort Dix, N.J.  or  if that is not possible, a facility as close as possible to the Fort Dix Facility in N.J.

☑  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at  _____  ☐ a.m  ☐ p.m.  on  _____ .

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on  _____ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on  _____  to  _____

at  _____  with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245C (Rev. 06/05) Amended Judgment in a Criminal Case Document 259   Filed 04/13/12   Page 4 of 14 PageID #: 1915
   Sheet 3 — Supervised Release

(NOTE: Identify Changes with Asterisks (*))

| | |
|---|---|
| DEFENDANT: KHALID AWAN | Judgment—Page __4__ of __10__ |
| CASE NUMBER: CR-06-154( ARR) | |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of

THREE (3) YEARS, ON EACH COUNTS, TO RUN CONCURRENTLY.

   The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐  The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

☐  The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

☐  The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐  The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

☐  The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

   If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

   The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

## STANDARD CONDITIONS OF SUPERVISION

1) the defendant shall not leave the judicial district without the permission of the court or probation officer;

2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;

3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4) the defendant shall support his or her dependents and meet other family responsibilities;

5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;

6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment, or if such prior notification is not possible, then within forty eight hours after such change;

7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;

10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;

11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court; and

13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record, personal history, or characteristics and shall permit the probation officer to make such notifications and confirm the defendant's compliance with such notification requirement.

AO 245C (Rev. 08/05) Amended Judgment in a Criminal Case
Case 1:06-cr-00154-ARR-VVP   Document 259   Filed 04/13/12   Page 5 of 14 PageID #: 1916
Sheet 5 - - Criminal Monetary Penalties
(NOTE: Identify Changes with Asterisks (*))

DEFENDANT: KHALID AWAN
CASE NUMBER: CR-06-154( ARR)

Judgment — Page __5__ of __10__

# CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| **TOTALS** | $ 300.00 | $ | $ |

☐☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| **TOTALS** | $ _____ | $ _____ | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

    ☐ the interest requirement is waived for    ☐ fine    [ ] restitution.

    ☐ the interest requirement for      ☐ fine    ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Case 1:06-cr-00154-ARR-VVP  Document 259  Filed 04/13/12  Page 6 of 14 PageID #: 1917

AO 245C   (Rev. 06/05) Amended Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

(NOTE: Identify Changes with Asterisks (*))

DEFENDANT:  KHALID AWAN
CASE NUMBER:  CR-06-154( ARR)

Judgment — Page  6  of  10

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A  ☑  Lump sum payment of $  300.00  due immediately, balance due

    ☐ not later than _____ , or
    ☐ in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

    Defendant and Co-Defendant Names and Case Numbers (including defendant number), Joint and Several Amount, and corresponding payee, if appropriate.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

24

1  may have been charged with a 2339B violation.  But, in any

2  event, he did provide financing for a terrorist group and the

3  government's position is this is a classic terrorist financing

4  case.

5          So, for those reasons, your Honor, the government

6  asks for a sentence at or near the guidelines of 45 years and

7  certainly no less than the 168 months to which Mr. Awan was

8  previously sentenced.

9          Thank you, your Honor.

10         THE COURT:   Well, I have considered the advisory

11 guideline sentence.  That said, I have nonetheless determined

12 that a nonguideline sentence is appropriate in this case.

13         As to the nature and seriousness of the offenses,

14 the crimes defendant committed are unquestionably serious.  I

15 agree with Judge Sifton that the 60 to 70 thousand dollars

16 I think ultimately a fair estimate based on the record, of the

17 financial support transmitted to the KCF cause in India, was

18 -- as Judge Sifton put it  -- perhaps not as substantial as

19 the financial support issue in other cases.  Nonetheless,

20 defendant's efforts to recruit Harjit to travel to Pakistan to

21 undergo military training, evidently with a view toward his

22 participation in terrorist activities in India, underscores

23 the dangerousness of the conduct in which defendant engaged, a

24 factor warranting substantial severity in sentence.

25         Having reviewed the record, I also concur with Judge

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

25

1   Sifton that defendant's role in the overall offenses was of a
2   lesser magnitude than not only that of others actively engaged
3   in terrorist conduct in India, but also the government's two
4   cooperating witnesses who testified at trial and have been
5   sentenced by the court.  Although clearly in frequent contact
6   with KCF leader Panjwar and zealously aspiring to be of
7   assistance to him, defendant was a Muslim who was apparently
8   not himself a member of the KCF or any affiliated
9   organization.  By contrast, both government cooperators,
10  Gurbax and Baljinder, were Sikhs and active members of the KCF
11  or its affiliates.  Gurbax assisted a KCF predecessor
12  terrorist organization by hiding its fighters and weapons in
13  his home in India, and he participated in the kidnapping,
14  torture, and murder of a KCF member who became an informant
15  for the Indian police.  After entering the United States in
16  1990, he maintained frequent contact with Panjwar, and over
17  the four years from 1999 to 2002, during the approximate
18  period when defendant transmitted to the KCF, Gurbax hosted
19  fund-raisers for the KCF at some of which Panjwar addressed
20  the gathering and Gurbax also founded the Khalistan Federation
21  as a vehicle for raising monies in the United States for the
22  KCF cause in India.  Government witness Baljinder was also
23  active in the Khalistan movement, raising funds for the KCF
24  by, among other means, organized meetings held at his home at
25  which he read statements provided by Panjwar.  Baljinder

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

26

1     additionally functioned as president of the Khalistan

2     Federation, dedicated to fund-raising in support of the

3     Khalistan terrorist cause in India. The roles played by these

4     others by no means detract from the seriousness of defendant's

5     crimes. But they are of some relevance in placing defendant's

6     participation in the overall crimes in perspective, especially

7     given the absence of any evidence that defendant himself

8     committed an act of violence.

9         As to the history and characteristics of the

10    defendant, during defendant's first sentencing proceeding,

11    Judge Sifton observed that "it has taken everybody some time

12    to recognize... the rather odd picture of why Mr. Awan got

13    involved in this offense." Upon reviewing the record,

14    including the trial record and the many other matters brought

15    to the court's attention over a six-year period bearing on the

16    character and motivations of the defendant, I have been able

17    to flesh out for myself and, I believe, have come to

18    understand just what Judge Sifton meant by that observation.

19    More importantly for the current proceeding, I find that I am

20    in complete agreement with how Judge Sifton ultimately

21    reconciled and understood defendant's perplexing makeup and

22    seemingly bizarre conduct and motives.

23         I note first that the defendant's criminal history,

24    and specifically his conviction for a conspiracy between 1999

25    and 2002 to commit credit card fraud involving over

27

1   $2 million, which was perpetrated by means of a complex and

2   sophisticated scheme.  As Judge Sifton noted, defendant's

3   crime resulting in that conviction, like the international

4   money transfers involved in the instance offenses, demonstrate

5   that he is  "a skillful perpetrator of fraud, a fixer."

6           Just as tellingly, the recounting and recordings of

7   defendant's conversations with Harjit, which were part of the

8   trial record, and his discussions with at least one other

9   prison inmate, which were presented to Judge Sifton but were

10  not part of the trial record, peg him precisely, as Judge

11  Sifton characterized him, as  "a boaster, a salesman and a...

12  terrorist groupie,"   the latter of which I understand to

13  refer to someone who has sought to align himself with an

14  infamous organization not because he zealously identifies with

15  the ideology of its cause, but rather as a bizarrely

16  misguided, albeit dangerous gesture of self-aggrandizement.

17  Defendant's incessant name-dropping of notorious terrorists

18  and terrorist incidents and his obviously exaggerated boasting

19  -- at least in some instances  -- of close association with

20  powerful terrorists strongly suggest that although defendant

21  plainly impelled himself to participate in terrorist conduct,

22  he did so for atypical reasons unrelated to the political and

23  religious ideology that generally drives defendants who commit

24  crimes of terrorism.

25          Such observations provide no excuse for the serious

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

1  crimes defendant has committed, which fully warrant just and

2  substantial punishment. -- involving a lengthy period of

3  incarceration -- as effective deterrence against future

4  criminality.  But they do bear on whether a sentence at or

5  tantamount to life imprisonment is necessary in this case to

6  deter future recidivism and adequately protect the public.

7  Here again, I find myself in agreement with Judge Sifton that

8  defendant's criminality necessitates lengthy incarceration to

9  insure that defendant learn from this experience.  But because

10  his criminal motives fall within the more typical ones that we

11  generally consider amenable to deterrence if the length of

12  incarceration is of sufficient severity, I am not, in the case

13  of defendant, considering an offender whose reasons to

14  recidivate derive from political or other ideological

15  fanaticism so strong that it is doubtful that they will ever

16  abate regardless of the length of his incarceration.  I note

17  also that defendant is now almost or at 50 years old, another

18  factor, albeit of lesser significance, bearing on the

19  likelihood of his recidivism at the time of his release.

20          Although Judge Sifton found a far lower guidelines

21  range than I have calculated, he concluded, based not only on

22  the advisory guidelines but on a thorough discussion of all of

23  the other sentencing factors under 3553(a), that a sentence of

24  168 months imprisonment, at the bottom of the guidelines as he

25  had calculated them, was sufficient but not unduly severe to

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

29

1   accomplish the goals of sentencing.  In the circumstances of

2   this case and for the reasons noted, as well as defendant's

3   strides during incarceration and the lengthy sentence

4   defendant served before commencing this sentence, I too find

5   that a sentence of 16 years incarceration, an undeniably

6   severe punishment, ample to serve the essential goals of

7   sentencing, and in particular just punishment, deterrence, and

8   protection of the public.

9         Finally, as to the goal of avoiding undue sentencing

10   disparity, it is true that, as with respect to all crimes,

11   each terrorism case is individual, and comparability of

12   sentences is generally assessed by considering sentences on a

13   nationwide basis rather than those meted out to defendants who

14   are part of the same criminal episode as the defendant.  I

15   nonetheless believe that the sentences Judge Sifton imposed on

16   government cooperators Gurbax and Baljinder confirm the

17   fairness of a 16 year incarceratory term for defendant.  As

18   the government points out, Gurbax and Baljinder not only chose

19   to forego a trial, resulting in a considerable saving of time

20   and resources for the government, but they also offered

21   substantial assistance to the government in connection with

22   the prosecution of the defendant.  As I found, however, with

23   respect to the instant overall offenses, the cooperators'

24   culpability was at least as great as that of the defendant

25   and, in the case of Gurbax, he was involved not only in

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

30

1  in violent terrorist activity involving murder.  After

2  considering the cooperators' backgrounds, crimes and the

3  extent of their cooperation, Judge Sifton sentenced each of

4  them to three years imprisonment for their involvement in the

5  offenses for which defendant was prosecuted.  Thus, the

6  cooperators against the defendant each received prison terms

7  of less than 20 percent of the term that I intend to impose on

8  the defendant, reflecting a more than 80 percent discount for

9  guilty pleas and cooperation.  That discount, in my

10 experience, is well within -- if not greater than -- such

11 discounts generally given by judges.

12          For all of the foregoing reasons, I sentence the

13 defendant to the custody of the attorney general for a period

14 of 168 months on counts one and three and to a concurrent

15 sentence of 120 months on count 2.  This is to be followed by

16 a three-year period of supervised release on each count to run

17 concurrently.  I make the finding that the defendant is unable

18 to pay a fine.  But I will impose the mandatory 300 dollar

19 special assessment.

20          Yes.

21          THE PROBATION OFFICER:  Judge, I want to be cleared.

22 You had said 16 years custody, which would be 192 months.

23 Then you had stated 168 months.  168 months would be 14 years.

24          THE COURT:  14.  I'm sorry.  14 years.  I appreciate

25 that.

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

31

1          Anything else?

2          MR. KAZEMI:   Just that there are underlying

3    indictments; the government moves to dismiss the indictments

4    at this time.

5          THE COURT:   The motion is granted.

6          Mr. Awan, as you know, you may appeal the sentence.

7    A notice of appeal must be filed within fourteen days.

8    Undoubtedly your lawyer would continue to represent you on

9    appeal.

10          THE DEFENDANT:   Thank you.

11          MR. KAZEMI:   Thank you, your Honor.

12          MR. MAHER:   Thank you, your Honor.

13                    ooooooOoooooo

14

15

16

17

18

19

20

21

22

23

24

25

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER



**Joseph** Law Firm pc
Immigration Law Specialists

12203 East Second Avenue
Aurora, CO 80011
303.297.9171

963 East Colorado Avenue
Colorado Springs, CO 80903
719.434.5660

97 Main Street, Suite W206
Edwards, CO 81632
970.446.7884

www.immigrationissues.com

June 25, 2018

David Savitz
Writer Square
1512 Larimer Street, Ste. 600
Denver, CO 80202

**Re:**   **Immigration Status for Mr. Jumaev Following Conviction**

Dear David:

I'm providing this opinion letter as you have requested for you to include in the materials that you will include for the court's consideration at Mr. Jumaev's upcoming sentencing hearing. Below please see an explanation of the immigration proceedings that Mr. Jumaev is currently in, and the likely outcomes that he may experience. I have explained the basic procedure for both the proceedings Mr. Jumaev is currently in as well as another type of proceeding he may be subject to. I have also explained why he is only eligible for deferral of removal under the Convention Against Torture, and what his immigration detention will look like in both the event of him being granted deferral of removal and him being denied deferral of removal.

### Removal Proceedings under INA §240

Mr. Jumaev is currently in removal proceedings under INA §240. These are the standard removal proceedings that include full court hearings in front of an immigration judge. He may be represented by counsel at his own expense, present evidence, cross examine witnesses, etc. The judge is the impartial adjudicator who will hear arguments on Mr. Jumaev's applications for relief, review the evidence submitted, and make a decision as to whether Mr. Jumaev qualifies for the relief he is seeking. These proceedings can take a significant amount of time, with many cases currently taking years to complete. As discussed below, for the entirety of Mr. Jumaev's immigration proceedings he will remain detained.

### Removal Proceedings under INA §238(a)

Although it is unlikely that the government will conduct his proceedings under this section, Mr. Jumaev's convictions may cause him to be subject to expedited removal proceedings under INA

EXHIBIT
tables'
*C*



§238(a). In general, §238(a) allows removal proceedings to be initiated, and possibly completed, while a criminal nonimmigrant is still incarcerated. It essentially allows for immigration proceedings to be completed without the need for additional detention at an immigration detention facility.

It is, however, unlikely that the government will elect to pursue removal proceedings under this section. In order to conduct removal proceedings while Mr. Jumaev is incarcerated, the government will have to deal with significant logistical issues. For Mr. Jumaev to appear at his hearings, the government would either be required to transport Mr. Jumaev to immigration court, or create a method of video conferencing for Mr. Jumaev to appear telephonically at his hearings. He would still have the opportunity to apply for relief, and so he will be able to apply for protection under the Convention Against Torture, as discussed below. If §238(a) proceedings are brought and Mr. Jumaev is unsuccessful in his claim under the Convention Against Torture, he will serve the entirety of his sentence, and then be removed at the conclusion of his incarceration.

### Ineligibility for Asylum and Withholding of Removal

Due to Mr. Jumaev's fear of returning to Uzbekistan he would normally be able to apply for asylum, withholding of removal, and protection under the Convention Against Torture. Unfortunately, due to the nature of his conviction he will be ineligible for asylum and withholding of removal, and only eligible for deferral of removal under the Convention Against Torture.

Generally to qualify for asylum or withholding of removal, an individual must show that their life or freedom would be threatened on account of their race, religion, nationality, membership in a particular social group, or political opinions. *See* INA § 241(b)(3). There are, however, several bars to both asylum and withholding of removal. Most importantly for Mr. Jumaev is the bar under INA § 208(b)(2)(A)(ii), for asylum, and INA § 241(b)(3)(B)(ii), for withholding of removal. These sections render an individual ineligible for relief where "the alien, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States."

Providing material support to a terrorist organization is likely to be considered a particularly serious crime, and therefore, Mr. Jumaev will not be eligible for either asylum or withholding of removal.

### Eligibility for Relief under the Convention Against Torture



Mr. Jumaev is still eligible for deferral of removal under the Convention Against Torture. There are two types of relief available under CAT - withholding of removal under 8 C.F.R. § 208.16(c) and deferral of removal under 8 C.F.R. § 208.17. In both cases the individual must show that it is more likely than not that they would be tortured in the proposed country of removal. As 8 C.F.R. § 208.16(c)(4) states:

> In considering an application for withholding of removal under the Convention Against Torture, the immigration judge shall first determine whether the alien is more likely than not to be tortured in the country of removal. If the immigration judge determines that the alien is more likely than not to be tortured in the country of removal, the alien is entitled to protection under the Convention Against Torture. Protection under the Convention Against Torture will be granted either in the form of withholding of removal or in the form of deferral of removal. An alien entitled to such protection shall be granted withholding of removal unless the alien is subject to mandatory denial of withholding of removal under paragraphs (d)(2) or (d)(3) of this section. If an alien entitled to such protection is subject to mandatory denial of withholding of removal under paragraphs (d)(2) or (d)(3) of this section, the alien's removal shall be deferred under § 208.17(a).

One of these stated mandatory denials is for a conviction of a particularly serious crime. Therefore, even if Mr. Jumaev is able to show that it is more likely than not that he will be tortured upon his removal to Uzbekistan, he will only be given deferral of removal. A final order of removal will be issued for him, but its execution will be simply deferred, and Mr. Jumaev will be permitted to remain in the United States. As such, he would not be able to travel outside of the United States, as if he does he will be seen to have self-deported and will not be permitted to re-enter the United States.

It is important to note that deferral can be terminated. Under the regulations, DHS can file a motion for termination to schedule a hearing before an IJ to consider whether a person's deferral status should be terminated. This motion is not subject to normal rules for motions to reopen and "shall be granted if it is accompanied by evidence that is relevant to the possibility that the alien would be tortured in the country to which removal has been deferred and that was not presented at the previous hearing." 8 CFR § 208.17(d)(1). The regulations do not require the government to show that the evidence is new or was unavailable at prior hearings. An individual has only ten days to respond by submitting supplementary information that shows that they continue to face the likelihood of torture upon removal. The immigration judge then makes a new decision on whether the individual would be more likely than not to be tortured on a return to the country of removal. The burden of proof is on the individual during that hearing. If they do not meet their burden, deferral is terminated and an appeal can go to the BIA, or if no appeal is taken, they will be removed.



### Detention and Removal

At the completion of Mr. Jumaev's criminal sentence he will be placed immediately in immigration detention. As an individual with a conviction for providing material support to a terrorist organization, Mr. Jumaev will be subject to mandatory detention under INA § 236(c)(1)(D), and therefore will be ineligible for bond. For the entirety of his immigration proceedings he will remain detained, and if he loses his case he will be detained until he is removed or it is found that there is no reasonable possibility of his removal in the near future. As stated above, this process may take a significant amount of time. For many, the resolution of their immigration cases may take several years.

Even if Mr. Jumaev is successful in his claim and is granted deferral of removal under CAT, he will likely still remain detained. DHS is explicitly authorized to detain individuals granted deferral of removal under CAT. 8 C.F.R. § 208.17(c). After six months, however, he will have the opportunity for an immigration judge to review his detention and potentially be released from custody. There is no guarantee that he will be released, but it is standard practice that after six months an individual is able to leave detention.

If Mr. Jumaev is unsuccessful with his CAT claim, he will be ordered removed, and will remain detained while DHS makes the arrangements for his deportation. They will have to acquire a travel document for Mr. Jumaev to Uzbekistan, and Uzbekistan will have to accept him back into the country. If DHS is unable to acquire a travel document to Uzbekistan because Uzbekistan refuses to accept Mr. Jumaev back into the country, Mr. Jumaev will continue to remain detained while DHS attempts to locate a different country to remove him to. It is unlikely that any other country would accept Mr. Jumaev, and so he would simply remain detained for an indefinite period of time. If after 90 days from the date of his order of removal he is still in ICE custody he will have the opportunity to have his custody reviewed by a deportation officer to determine whether there is a chance that he will be removed from the United States. As a practical matter, very few people are released after 90 days. After six months from the date of his final order of removal he will have another chance to have his custody reviewed. If at this time it is determined that there is not a reasonable possibility that he will be removed in the near future, he would likely be released from detention on an order of supervision.

Please let me know if you have any questions or if the court needs any further information.

Sincerely,

Jeff D. Joseph