1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO
2
Criminal Action No. 12-cr-00033-JLK-2
3
UNITED STATES OF AMERICA,
4
     Plaintiff,
5
vs.
6
BAKHTIYOR JUMAEV,
7
     Defendant.
8
_____
9
                    **REPORTER'S TRANSCRIPT**
10                        SENTENCING
_____
11
12          Proceedings before the HONORABLE JOHN L. KANE, JR.,

13   Senior Judge, United States District Court for the District of

14   Colorado, commencing at 10:01 a.m., on the 18th day of July,

15   2018, in Courtroom A802, United States Courthouse, Denver,

16   Colorado.

17

18

19

20

21

22

23
                  THERESE LINDBLOM, Official Reporter
24            901 19th Street, Denver, Colorado 80294
              Proceedings Reported by Mechanical Stenography
25             Transcription Produced via Computer

1            **A P P E A R A N C E S**

2            GREGORY HOLLOWAY and JULIA MARTINEZ, Assistant U.S.

3    Attorneys, 1801 California Street, Suite 1600, Denver, Colorado

4    80202, appearing for the Government.

5            DAVID SAVITZ, Attorney at Law, 1512 Larimer Street,

6    Suite 600, Denver, Colorado 80202, appearing for Defendant

7    Jumaev.

8            MITCHELL BAKER, Attorney at Law, 1543 Champa Street,

9    Suite 400, Denver, Colorado 80202, appearing for Defendant

10   Jumaev.

11

12           **P R O C E E D I N G S**

13           (In open court at 10:01 a.m.)

14           *THE COURT:*  Thank you.  Good morning, and please be

15   seated.

16           We need to swear in the interpreters.

17           Thank you for being here.

18           (Interpreters sworn.)

19           *THE COURT:*  This is United States of America v.

20   Bakhtiyor Jumaev, 12-cr-33.  And the cause comes on for

21   sentencing.

22           Is there any reason why we may not proceed today?

23           *MR. HOLLOWAY:*  None from the government, Your Honor.

24   Thank you.

25           *THE COURT:*  The defendant?

1          *MR. SAVITZ:*  None on behalf of the defendant.

2          *THE COURT:*  I'm going to proceed in a somewhat unusual

3     manner from most sentencings, and that's because I have written

4     a sentencing opinion, which I will include in the proceedings

5     today in their entirety, but I haven't finished them yet

6     because I haven't listened to the final statements of counsel.

7     And if Mr. Jumaev cares to make an additional statement, I want

8     to hear from him, as well.  I did receive his letter, and I

9     read it a number of times.

10          *MR. SAVITZ:*  Thank you, Your Honor.

11          *THE COURT:*  I consider that an allocution.  If he

12    wants to say something more, he can.

13          *MR. SAVITZ:*  He may, Your Honor.

14          *THE COURT:*  I've got a few things I want to take care

15    of first, so these will be included in my written opinion.  But

16    for purposes of today, I think it's important that you

17    understand that this is not going to be a guideline sentence.

18    And so I'm going to read some of the opinion, but not all of

19    it.  And I will obviously need to make some additions or

20    changes after I hear from the people here today.  But this

21    is -- this part will not require, I don't think any amendments.

22          The background is this:  Mr. Jumaev is a

23    51-year-old -- if I go too fast, please tell me.

24          Mr. Jumaev is a 51-year-old Muslim immigrant.  He was

25    born in 1966 in Samarkand, Uzbekistan.  At that time,

1   Uzbekistan was part of the Soviet Union and subject to

2   oppressive Soviet policies that basically outlawed religion,

3   including Islam, the majority religion in Uzbekistan.  In that

4   environment, Mr. Jumaev attended grade school, obtained

5   vocational training in cooking and trading in goods, served as

6   a cook in Ukraine in the Soviet Army, and worked in his

7   relatives' tombstone business.  He also married and started a

8   family.

9         Then in 1991, Uzbekistan became a sovereign state,

10   with Islam Karimov as its president.  During Karimov's 25-year

11   reign, repressive policies and government controls took on new

12   forms.  Individuals were permitted to practice Islam, but only

13   as the regime saw fit.  Religious figures were persecuted by

14   the government for not adhering to its specifications.  Access

15   to information and freedom of the press were greatly restricted

16   as well.  In fact, Freedom House, a non-partisan think tank in

17   Washington, D.C., consistently gave Uzbekistan some of the

18   lowest possible ratings for the existence of democratic

19   freedoms.

20         I'm going to eliminate from my reciting the sources

21   within the record, but I can tell you that each one of these

22   things comes from the record.  And as an example, Freedom

23   House, is in electronic case file No. 1832, the trial

24   transcript at page 1007, 2 through 25.  I'll continue, then,

25   without the further reference to footnotes or sources.

1          In the -- is this -- am I going too fast?

2          *INTERPRETER:*  Fine.  Thank you.

3          *THE COURT:*  In the mid to late 1990s, the economy in

4    Uzbekistan suffered, and a large segment of the population

5    began to migrate to other places in search of employment.

6    Mr. Jumaev, likewise, suffered from the economic situation and

7    ultimately left his family in Uzbekistan to work in Israel for

8    two and a half years to support them.

9          After he returned to Uzbekistan in 1999, Mr. Jumaev

10   was found by the Uzbek security service, known as the SNB, to

11   be in possession of cassette tapes of religious leaders who

12   were disfavored by the government.  As a result, he was jailed,

13   interrogated, and beaten.

14         These circumstances prompted Mr. Jumaev to travel to

15   the United States the following year on a temporary visa.  He

16   first came to New York City, but settled in I think it's called

17   Lehighton, Pennsylvania, and then Philadelphia.  Soon after

18   arriving, he was struck by a car when riding a bicycle and was

19   severely injured.  He could not work, depended on others for

20   support, and was unable to send money to his family in

21   Uzbekistan during his year-long convalescence.

22         Over the following decade, Mr. Jumaev found steady

23   employment as a gas station attendant and a custodian, living a

24   meager lifestyle so he could consistently send money to his

25   wife and three sons.  He frequently worked night shifts and

traveled hours to and from his jobs.  Still, he talked to his family on almost a daily basis until his arrest in this case.

Mr. Jumaev met his codefendant, Jamshid Muhtorov, in December 2009 when one of his roommates arranged for Mr. Muhtorov to stay in their apartment for a month while Mr. Muhtorov obtained his commercial driver's license. Mr. Muhtorov was also from Uzbekistan, and he and his family had moved as refugees to Denver in 2006.  He had similarly experienced brutality at the hands of the Uzbek authorities and was exploring his Muslim faith in the United States.

Over the months that passed, Mr. Jumaev and Mr. Muhtorov developed a long-distance friendship in which they discussed a wide variety of topics, such as their families, Islam, current events, and the immigrant experience in the United States.  They also conversed about the Islamic Jihad Union and the Islamic movement of Uzbekistan, the IMU, the history of the two foreign terrorist organizations, and related propaganda videos they found online.  In speaking about these organizations, Mr. Jumaev and Mr. Muhtorov often used ambiguous code words like "wedding," "resort," "Switzerland," "alpinist," and "sportsmen."  It is clear from their communications, though, that they both sympathized with the principal goal of the two organizations, to overthrow the regime of Islam Karimov.

According to Dr. Guido Steinberg a renowned expert in

terrorism, the Islamic Jihad Union spun off from its older sister, the Islamic Movement of Uzbekistan, around 2001 or 2002 to focus their efforts globally and not just on Uzbekistan.  In its heyday, from 2006 to 2009, the IJU had at most 100 to 200 members; but many considered it to be mostly obsolete by 2009, as its numbers dwindled to around a dozen.  According to Dr. Steinberg, the organization has been affiliated with al-Qaeda and the Afghan Taliban and has fought U.S. and Coalition forces in Afghanistan.

In February of 2010, Mr. Jumaev was detained by U.S. Immigration and Customs Enforcement for overstaying his visa, and his bond was set at $3,000.  In order to be released and to return to work, Mr. Jumaev borrowed various amounts from friends and acquaintances, including $500 from Mr. Muhtorov. Mr. Jumaev struggled to manage his and his family's debts after his arrest, so he did not pay Mr. Muhtorov back for many months.

Mr. Muhtorov routinely hinted to Mr. Jumaev that he was having financial difficulties.  And, eventually, in March 2011, Mr. Muhtorov relayed that the IJU, with which he had been communicating over the internet, was in dire need of financial support.  Mr. Jumaev gathered $300 and used a friend's check to send the money to Mr. Muhtorov.  A few days later, Mr. Jumaev asked Mr. Muhtorov if he had received the "wedding gift."  The check was later delivered and used by

1    Mr. Muhtorov's wife for their family expenses.  The

2    conversation went as follows:

3          Mr. Jumaev:  "Has the wedding gift arrived?  The

4    wedding gift?"

5          Mr. Muhtorov:  "No, it hasn't yet."

6          Mr. Jumaev:  "It still hasn't made it there?"

7          Mr. Muhtorov:  "No."

8          Mr. Jumaev:  "Glory be to Allah, but I've sent it out

9    last week."

10          Mr. Muhtorov:  "We haven't checked the mail yet.

11    We'll check the mail."  To someone in the background, "Have you

12    by any chance checked the mail recently?  A check should be

13    coming."

14          Mr. Jumaev:  "God willing it will.  Hmmm.

15          Mr. Muhtorov:  "It hasn't come yet.  It will, God

16    willing."

17          Mr. Muhtorov bragged to Mr. Jumaev and others for

18    months about his scheme to go to Turkey to study and then to

19    travel to the wedding.  Mr. Jumaev encouraged Mr. Muhtorov and

20    even stated that he was envious.

21          In January 2012, Mr. Muhtorov put his plans into

22    action.  He purchased a one-way ticket to Turkey and discussed

23    with his wife the possibility of him not returning.  Before

24    boarding the plane, though, Mr. Muhtorov was arrested.  He was

25    carrying $2,865 in cash, two new iPhones, and a new iPad.

1          After Mr. Muhtorov's arrest, FBI agents interviewed

2   Mr. Jumaev twice at his house.  Mr. Jumaev was not fully

3   forthright with the agents during those interviews,

4   specifically as to his use of code words with Mr. Muhtorov, the

5   full scope of their discussions, and his internet activity.  On

6   March 15, 2012, Mr. Jumaev was arrested and was interrogated by

7   FBI agents for three and a half hours.  He has been in

8   detention since that date.

9          Regrettably, the complexities of the evidence and the

10  nature of the charges delayed the commencement of Mr. Jumaev's

11  trial until March 12, 2018.  The trial was extensive, lasting

12  seven weeks and involving hundreds of exhibits and tens of

13  witnesses.  The resources expended -- to bring foreign

14  witnesses and experts here, to depose witnesses abroad, to

15  ensure accurate translations, to sift through mountains of

16  evidence, and to exhaustively litigate the relevant issues --

17  were great.  But Mr. Jumaev was entitled to a fair trial and

18  put forward the type of legitimate defenses that necessitated a

19  trial.  He argued that he was only repaying his debt to

20  Mr. Muhtorov, a duty that in his culture was incredibly

21  important.  He claimed he was oblique about the debt repayment

22  because in his shared culture with Mr. Muhtorov, it would have

23  been inappropriate and even offensive to even discuss the debt

24  repayment.  Additionally, he presented Mr. Muhtorov as an

25  exaggerator who he thought was full of hot air.  And Mr. Jumaev

1   sought to demonstrate that any admissions he made during his

2   post-arrest interrogation were involuntary, equivocal, and

3   inconsistent.

4        The jury deliberated over 15 hours and recessed for a

5   weekend before returning the verdicts.  The jurors undoubtedly

6   took their responsibilities seriously and returned the verdicts

7   only after careful consideration of the evidence presented and

8   the law given.

9        Post-verdict, I have received and reviewed the initial

10  and final presentence investigation reports, Mr. Jumaev's

11  objections, and the addendum to the presentence report, the

12  government's amended sentencing statement, Mr. Jumaev's

13  sentencing statement and motion for a variant sentence, and

14  Mr. Jumaev's supplement thereto.  Mr. Jumaev additionally

15  submitted a letter he authored to the Court, in which he stands

16  on his innocence and iterates that he has been denied his right

17  to a speedy trial and other arguments as to why he believes he

18  was denied a fair trial.  I have considered all of the

19  submissions, including the contents of Mr. Jumaev's letter.

20       And I want Mr. Jumaev to know that I have read it a

21  number of times, and I commend him for his candor.

22       I have previously notified the parties that I find the

23  U.S. Sentencing Guidelines to be illogical and inadequate for

24  sentencing Mr. Jumaev.  I elaborate in my conclusion in my

25  written order which will follow this hearing and will be

1    incorporated fully in today's proceedings.  I will calculate

2    the applicable guideline range as required under *Gall v. United*

3    *States*.  If the calculation is in error, however, it has no

4    impact on the eventual sentence.

5         And for that I suggest the parties see *U.S. v.*

6    *Sabillon-Umana*, at 772 F.3d 1328, at 1334, decided in 2014.

7    Apart from these rulings on the applicable sentencing guideline

8    provisions, no finding is necessary concerning Mr. Jumaev's

9    remaining objections or clarifications to the presentence

10   investigation report because the controverted matters have

11   either been addressed through revisions to the report or will

12   not be taken into account in imposing the sentence or will not

13   affect the sentence.  The factual statements in the report are

14   otherwise adopted.

15        I reject the guidelines in this case -- in summary,

16   I'll tell you about that -- and instead find it appropriate to

17   sentence Mr. Jumaev pursuant to the factors set forth in

18   Title 18 United States Code Section 3553(a).  My reasons for

19   doing so are multitudinous.  Principally, I have concluded this

20   case presents circumstances not adequately taken into

21   consideration by the Sentencing Commission.  It seems I am not

22   alone in my conclusions.  Sentencing commission statistics

23   inform that, of 16 defendants from 2013 to 2017 for which

24   Section 2339B is the only count of conviction, 62.5 percent, or

25   ten defendants, received sentences that were below the

1   guideline range that were not sponsored by the government.  The

2   average reduction for non-government sponsored below-range

3   sentences was 41.1 percent, or 79 months.

4        These points are detailed in the following section,

5   but include Mr. Jumaev's owing of the debt, his extended period

6   of pretrial detention, his prolonged absence from his family,

7   his immigration situation, and the lack of rehabilitation

8   programs for him.

9        I have two principal objections to the so-called

10  terrorism enhancement.  First, it is not backed by any

11  empirical evidence at all; and, second, treating all terrorists

12  alike is impermissible under our sentencing paradigm and has

13  significant ripple effects.

14       While the U.S. Sentencing Guideline Section 2M5.3 has

15  an "internal enhancement mechanism" to calibrate the severity

16  of the sentence to the culpability of the conduct and the harm,

17  as shown in a number of Law Review articles and studies, that

18  distinction is lost with the terrorism enhancement, which

19  frequently results in guideline ranges that equal the maximum

20  statutory sentence and fail to differentiate between various

21  levels of conduct.

22       This effect was artfully described by the probation

23  officer who authored the presentence report in this case.  And

24  I quote, "What is clear from my research is, despite a

25  significant range of conduct that can produce a conviction for

1  material support, the sentencing guidelines result in a nearly

2  identical guideline range in each case, regardless of the

3  underlying conduct.  Material support can involve financial

4  support -- as it did in the defendant's case -- or traveling

5  with the purpose of fighting jihad personally -- as it did with

6  his codefendant.  Other examples include securing and providing

7  weapons for terrorist organizations, providing the location of

8  military and government employees to terrorist organizations

9  through hacking activities, and plots to attack military bases

10  in the United States and around the world.  The difficulty is

11  that under the guidelines, there is no distinction between less

12  and more serious offenses, those in which actual harm occurred

13  and those where it did not," end of quote.

14          In rejecting and varying from the sentencing

15  guidelines, I am intent on crafting a sentence for Mr. Jumaev

16  that is "sufficient but not greater than necessary," A, to

17  reflect the seriousness of the offense, to promote respect for

18  the law, and to provide just punishment for the offense; B, to

19  afford adequate deterrence to criminal conduct; C, to protect

20  the public from further crimes of the defendant; and, D, to

21  provide the defendant with needed educational or vocational

22  training, medical care, or other correctional treatment in the

23  most effective manner.  Those are the criteria under Title 18

24  United States Code Section 3553(a)(2).  I am also concerned

25  with the nature and circumstances of the offense and the

1    history and characteristics of Mr. Jumaev, as well as the kinds

2    of sentences available and the need to avoid unwarranted

3    sentencing disparities.

4           I will now listen to counsel and to Mr. Jumaev, if he

5    wishes to make an additional statement.  After hearing, I will

6    take a 30-minute recess and return to impose sentence.

7           Are you ready to proceed?

8           *MR. HOLLOWAY:*  I am, Your Honor.

9           *THE COURT:*  Go ahead, please.

10          *MR. HOLLOWAY:*  Good morning, Your Honor.

11          *THE COURT:*  Good morning.

12          *MR. HOLLOWAY:*  I will, given the Court's recitation

13   this morning, skip any argument as it relates to any guideline

14   enhancements; but I will, instead, turn immediately to

15   consideration of the factors under 3553(a).

16          What I think is important to consider in its analysis

17   is the defendant's trajectory of his time here in the United

18   States.  It's important to look at.  And, indeed, there are a

19   large number of mitigating factors; and those mitigating

20   factors were presented at trial by the defendant and his

21   attorneys.  But I do want the Court to understand from the

22   government's perspective why the trajectory of the defendant's

23   behavior here in the United States is important.

24          The defendant came here on a tourist visa, and

25   immediately he got a job, and he broke the law.  And as much as

1   we may sympathize with conditions as he indicates may exist in

2   Uzbekistan, it -- it is still not a valid excuse to come here

3   and immediately break the law.

4         And, indeed, as the trial progressed, the defendant

5   demonstrated through his own testimony -- and through his own

6   admissions -- that he lied to advance his own interests, and he

7   lied to protect his codefendant.  And those lies are crimes.

8   And, indeed, even after being arrested on his overstay and

9   after the pendency of this case, he admitted on

10  cross-examination that he lied in his asylum application.

11        That, combined with what -- with what I view as -- as

12  the defendant's alarming trajectory of radicalization -- I

13  believe that he was arrested in the very beginning stages of

14  his action to support terrorist groups.  And, in fact, his own

15  expert, the last testimony that the jury heard, the defendant's

16  very own expert, Dr. Sageman, on cross-examination testified

17  that, indeed, the defendant was a supporter of these terrorist

18  groups.

19        And so I think that when the Court analyzes the

20  evidence presented in this case, what we see, again, is from

21  the government's perspective the beginnings of an alarming

22  trajectory.  His activity online, while unlike other activity

23  is not a crime, that activity, combined with the defendant's

24  demonstrated volatility -- he talked about how he gets

25  emotional, that's why he says those things.  And, indeed, he

1    gets emotional, and that's why he did those things.  To me,

2    that's alarming.  And, again, the defendant was caught in his

3    crime at the very cusp of an action that creates criminal

4    liability.

5            And so I think when you look at the evidence in this

6    case, I would submit that $300 was merely the beginning, Your

7    Honor.  And, indeed, the defendant was almost compelled -- even

8    after the arrest of his codefendant, he still was viewing

9    violent rhetoric, he was still engaging in behavior that was

10   stoking his own sense of injustice and what he claims is

11   injustice towards Muslims.  And that is what -- at least when I

12   look at the analysis of the nature and circumstances of this

13   offense and the history and characteristics of this defendant,

14   those are the things that stand out to me.

15           At no point during the arc of his case does he pull

16   back.  And, indeed, again, I view this as a beginning -- a

17   beginning of radicalization.  And combined with his volatility,

18   I think if left unchecked, is something that I believe would

19   have continued, especially in light of conversations he had

20   with his codefendant.

21           I think it's important to note that even as his

22   codefendant was preparing to travel, Mr. Jumaev's encouragement

23   to Mr. Muhtorov seemed to increase.  Indeed, there was a

24   conversation where Mr. Jumaev is the one who brings up to

25   Mr. Muhtorov the notion that supporting the wedding, supporting

1    those that go to the wedding, is just as important.  Indeed,

2    the defendant is reflective of questions that get asked when a

3    terrorist event happens or people support terrorism, there is

4    criminal liability.  And I think that, again, the defendant's

5    behavior is such that he was caught by the government at the

6    very beginnings of his criminality.  And when you look at the

7    arc of that behavior, the government's requested sentence is

8    entirely appropriate.

9         It should be noted that the government's requested

10   sentence of 15 years is a departure from the guidelines.  The

11   guidelines call for a sentence of double that, given the two

12   counts of conviction.

13        I believe that the presentence investigation report is

14   written incredibly well, and I -- and, again, I've had

15   experience with Ms. Bell, and she does her job thoroughly and

16   carefully.  And I believe that her analysis is appropriate, the

17   observations she makes in there are appropriate.

18        I also believe the government's sentence above and

19   beyond the circumstances of the offense and the history and

20   characteristics of the defendant is one that, indeed, does

21   avoid unwarranted sentencing disparities.

22        The Court is right, these are unusual cases, and there

23   aren't many of them.  I would note that the cases cited by the

24   defense are all pleas, not all -- there are two cases that are

25   not.  One of those cases listed doesn't have a sentence.  The

1   other one resulted in a sentence of 15 years.

2        I would submit that to the extent that it is

3   persuasive, the most analogous case for the Court to consider

4   is the first one on the government's list.  As requested by the

5   Court, I believe the most illustrative is the case of *United*

6   *States v. Nicholas Young*, where Mr. Young attempted to provide

7   $245 worth of gift cards to a designated foreign terrorist

8   organization, I don't think the amount is necessarily a driver

9   here; it's the intent of the defendant and the future

10  dangerousness.  And, indeed, there is no monetary threshold for

11  the support of terrorism.  And I do believe that, again, if

12  left unchecked, the defendant would have endeavored to continue

13  his support and expand his support.

14       And that's what brings me to the deterrent effect of

15  this.  Terrorism cases are serious crimes.  Should be an

16  obvious statement.  And the deterrent effect of a sentence to

17  this defendant and his active support of the Islamic Jihad

18  Union is important to consider.  And in light of the other

19  sentences, as requested by the Court, 15 years is in line with

20  avoiding unwarranted sentencing disparities.  The probation

21  officer's recommendation, while a bit less, is far more in line

22  with avoiding unwarranted sentencing disparities and promoting

23  respect for the law than the defendant's requested sentence of

24  time served.

25       Defense counsel has done a very good job of casting

 1   the defendant's behavior in a light that seems innocuous.  But,

 2   as the jury found and as the government proved, the defendant's

 3   behavior in this case was not innocuous.  And while $300 may

 4   not be much to us, it is critical to a terrorist group.  And,

 5   indeed, what is even more important is the behavior, the

 6   emotion, that path of radicalization, that frustration, and

 7   that anger that led this defendant to cross the Rubicon, if you

 8   will, from thought and speech into action.

 9          And that being said, Your Honor, that's why the

10   government's recommended sentence of 15 years is appropriate

11   under the factors as listed under 3553(a).

12          *THE COURT:*  Thank you.

13          *MR. HOLLOWAY:*  Thank you, Your Honor.

14          *MR. SAVITZ:*  Your Honor, good morning.

15          *THE COURT:*  Good morning.

16          *MR. SAVITZ:*  Your preliminary comments allow me to

17   skip a significant portion of my argument.  With your

18   invitation, I will go into the 3553 issues as well.

19          And before I do so, Mr. Muhtorov's pleading,

20   Document 1918, regarding his analysis of the sentencing

21   guidelines contain many of these same arguments that we have

22   advanced in our sentencing statement, particularly as it

23   concerns the terrorism enhancement and other parts of the

24   guidelines.  And we want to make sure that the record reflects

25   our agreement with the arguments raised in Mr. Muhtorov's

1   document, and we ask permission of the Court to adopt that

2   document, with the exception of Mr. Muhtorov distinguishes his

3   role in the offense to Mr. Jumaev's role in the offense.  And

4   we continue to advance our argument regarding Mr. Jumaev's role

5   in the offense as being minimal or minor, compared to the

6   alleged conduct of Mr. Muhtorov.

7        I'm going to briefly just comment on some of the

8   points that government counsel has made before I go into my

9   additional analysis.  I don't want to lose sight of the

10  comments that have been made.

11       One of the comments that was made, that Mr. Jumaev's

12  presence in this country began with him breaking the law with

13  respect to jobs that he obtained and employment that he

14  obtained.  Not to suggest that every -- that it was okay to do

15  that, but this is a custom and practice that millions of

16  immigrants who flee oppressive governments and countries and

17  come to this country with the idea of a better life engage in

18  in order to capture the American dream of a good-paying job and

19  the ability to support loved ones back home.

20       For more than ten, eleven years while he was living in

21  Philadelphia, as the Court commented in its initial remarks,

22  Mr. Jumaev lived a law-abiding life.  He was a plain and simple

23  man.  And all he wanted to do was find work, earn money, and

24  pay for the well-being of his family thousands of miles away,

25  while he lived an impecunious and impoverished lifestyle at the

1   sacrifice of himself for the betterment of his family.

2           Counsel for the government makes a point on Mr. Jumaev

3   lying on his immigration application.  Mr. Jumaev owned that

4   responsibility when he testified to this jury about the

5   comments that he made.  He did not retreat from that

6   responsibility.  He did not hide behind the comments that he

7   made in his asylum application.  In my opinion, the

8   government's accusations directed to Mr. Jumaev regarding lying

9   and what have you is similar to the pot calling the kettle

10  black.

11          We have a situation in this case, when government

12  counsel made a representation to the Court regarding a discrete

13  portion of an exhibit that it wanted to introduce at trial,

14  Exhibit 313, and despite that representation, and despite the

15  order of court, surreptitiously and without telling anyone,

16  deceitfully caused the entire exhibit to be introduced to the

17  jury.

18          MR. HOLLOWAY:  Your Honor, I object.  I'm going to

19  note my objection to that.

20          THE COURT:  All right.  It's noted.

21          MR. SAVITZ:  In addition, during pleadings regarding

22  that very issue, government counsel was not forthright --

23          MR. HOLLOWAY:  Your Honor, objection.  That is simply

24  not true.

25          THE COURT:  Overruled.  This is argument.  It's not --

 1    it's just argument.  You can make a rebuttal if you wish.

 2           *MR. HOLLOWAY:*  All right.

 3           *MR. SAVITZ:*  -- in terms of what he did.  He is

 4    protected by his role in this case as an attorney to be able to

 5    say certain things in the courtroom.  However, now he's seeking

 6    to punish my client with things that he owned to.  And we

 7    respectfully submit that there is a -- a different level of

 8    acceptance of responsibility as concerns my client, as it

 9    concerns government counsel.

10           A comment was made that Dr. Sageman said that

11    Mr. Jumaev satisfied the criteria of a pathway to violence.

12    Conversely, and contrary to government counsel's statement,

13    Dr. Sageman said that Mr. Jumaev never satisfied the first

14    criteria in Dr. Sageman's model regarding the pathway to

15    violence, particularly, identifying with a particular terrorist

16    organization that was the subject matter of the offenses.

17           Counsel for the government wants the Court to punish

18    Mr. Jumaev with respect to crimes that have never been

19    committed by Mr. Jumaev but which the government speculates

20    that Mr. Jumaev may commit in the future.  I suggest to you

21    that the record regarding Mr. Jumaev's background and his

22    character indicates that he is the least likely person to

23    recidivate with respect to the conduct with which he has been

24    charged and convicted.

25           Government counsel refers the Court to an emotional

1    expression of Mr. Jumaev in court before you when government

2    co-counsel was informing you about the reasons that one of the

3    sons could not be granted special parole to come to this state

4    to testify.  Mr. Jumaev misunderstood what the comments were,

5    thinking they had to do with the government's arrest of his

6    son.  And as a father who had not seen his son for six years

7    and who spent the first 19 years of that son's life caring for

8    him and supporting him, became upset, as any father naturally

9    would.  And once he realized that he misunderstood what was

10   being said, he apologized for his comment.  But to take that

11   snippet of six years of his presence in this courtroom and his

12   gentlemanly behavior in this courtroom during that time and to

13   point to it as being reflective of who this man is, I submit to

14   you is shameful.

15         The government paints itself as being magnanimous and

16   generous in terms of a sentencing recommendation of 15 years,

17   characterizing that as a departure.  That's fallacious

18   reasoning.  The sentence cannot exceed the statutory maximum of

19   15 years, so what the government is requesting is the statutory

20   maximum.

21         Let me address some of the other issues under 3553(a).

22   With respect to the purposes of sentencing under 3553(a)(2),

23   including that the sentence imposed shall reflect the

24   seriousness of the offense, promote respect for the law, and

25   provide just punishment for this offense, I submit to you that

Mr. Jumaev's confinement at a pretrial detention facility for 76 months satisfies each of those purposes.  That confinement, as the Court knows, represents what is called real, quote, hard time, close quote, in the sense that if he were sentenced to a BOP facility, as part of his imprisonment after the offense, he would not exist -- he would not -- he would be afforded much more accommodations, including education, treatment, vocational training, than was afforded him while he was detained at F.D.C. His confinement at F.D.C. for 76 months, if you calculated the sentencing guidelines, and if he were sentenced to 90 months of imprisonment for his offense, given credit for time served, that would amount to the time he has already served, namely, 76 months.

And during that confinement, as you have already alluded to and as we have articulated in the sentencing statement, Mr. Jumaev had little contact with his family. During that time for the ten or eleven years before he was arrested while he lived in Philadelphia, he was in contact with his family daily.  He saw expressions of his family, saw his wife, saw their pains and happiness, he was able to comfort them, and they were able to see those expressions of his as well.  While confined, none of that occurred.  Surely, there may have been the spoken word from time to time when he was able to call his family.  But he knew that every time he called, someone was listening to that phone call -- someone,

not his family, but someone in the prison system -- so he could

not afford to be open, he could not afford to say certain

things out of fear that they would find themselves in a

discovery document of audio conversations and transcripts of

conversations that he had with his family.

During the government's closing argument, they made a

comment that Mr. Jumaev played a *de minimis* or small role with

respect to the upbringing of his sons while Mr. Jumaev was

living in this country.  That is also a shameful comment.

Because as you heard from the testimony of his son Davlat,

Mr. Jumaev played an ongoing role in that son's education,

nurturing, Islamic guidance, for the entirety of that young

man's life while he was able to communicate visually with his

father.  And for the government to try to emasculate

Mr. Jumaev's role as a husband and father for the time he was

in this country is unforgivable, especially when the government

tried to paint Mr. Jumaev as playing a substantial role in the

guidance of his son Davlat Abdullo's life pursuits by bringing

the Superseding Indictment and adding Counts 5 and 6 and

alleging the interaction between Mr. Jumaev and his son in

order to get his son to be a part of terrorism.

The government cannot have it two ways.  They cannot

criticize Mr. Jumaev for the time he was in this country and

his parenting across the sea as being insignificant, but in a

Third Superseding Indictment, try to say that the influence of

 1   Mr. Jumaev over his son was a part of criminal conduct.

 2           In terms of this purpose, reflect the seriousness of

 3   the crime, promote respect for the law, and provide just

 4   punishment for the offense, as you know, the immigration

 5   collateral consequences that Mr. Jumaev faces are substantial.

 6   His confinement is not over once you impose your sentence,

 7   because once your sentence is imposed, Mr. Jumaev faces an

 8   indefinite future of confinement with immigration.

 9           With respect to seriousness of the offense and

10   promoting respect for the law, I must explain anecdotally my

11   comments with respect to those two issues.

12           Throughout the entire six plus years of this case, we,

13   defense counsel, have been loath to ever characterize these

14   offenses as "just $300."  We have never denigrated in front of

15   you or the jury during pretrial proceedings that, Judge, ladies

16   and gentlemen, we're just talking about $300, and we're talking

17   about $300 that supposedly was earmarked for a few guys running

18   around in the woods of North Pakistan, who, essentially, have

19   been a spent organization for the past several years and have

20   not done anything in Uzbekistan for so many years.  We have

21   never taken that position.

22           At sentencing, I believe it's appropriate, as we talk

23   about some of these purposes of sentencing, to express to you

24   that over the course of our involvement in this case, when we

25   have told colleagues and friends what kind of case we're

1   involved in, and they're saying, Spending six years on this

2   case, what the heck is it all about?  And I try to explain,

3   It's about a guy who came over here from a country called

4   Uzbekistan, and he met another guy, and they supposedly sent

5   $300 earmarked to an organization in Pakistan who wanted to

6   overthrow a regime in Uzbekistan.  And they say, You've been

7   sending six years and all the resources and time spent for that

8   kind of case?  And I say, Yes.

9           So in terms of talking about the seriousness of the

10  offense and promoting respect for the law, I suggest to you

11  that those factors have been met by Mr. Jumaev's service and

12  detention in jail for over six years.

13          The government and the probation officer talked about

14  adequate deterrence.  In its sentencing statement, the

15  government states, "These crimes are difficult to discover,

16  investigate, and prosecute."  Really?  Is it difficult when the

17  NSA conducts their electronic secretive investigation, records

18  communications from people, provides that communication to law

19  enforcement?  Is it so difficult when the FBI is able to use

20  assets that they call confidential human sources to befriend

21  people in the Muslim and other communities and at times record

22  conversations they have with those people so the FBI has all of

23  that data?  Is it so difficult to prosecute when the FBI is

24  able to obtain FISA warrants, electronic warrants, and search

25  warrants that are secretive in nature and sit back while all of

1  those communications are intercepted and get transcriptions of

2  those?  Is it so difficult when the FBI is able to go into

3  someone's house and install bugs and listen to whatever

4  utterances are made in the privacy of a man's castle, 24/7, and

5  just sit back and reap the benefits of that surveillance?  Is

6  that so difficult to prosecute when it takes an AUSA at least

7  three or four months to get caught up to speed of a case that's

8  lasted six years to be able to try it for seven weeks?

9          I suggest to you that the government's argument

10  regarding deterrence, that it's too difficult to discover,

11  investigate, and prosecute, should be more closely examined in

12  terms of how valid that argument is.

13          The PSR -- revised PSR at page R-4 -- and before I

14  quote from that, let me also applaud Andrea Bell for the work

15  and the diligence that she has expressed and shown in her work

16  product.  From day one, she reached out to us defense attorneys

17  to get information from us and at every step of the way, tried

18  to ensure that she was providing the Court with the information

19  to which you are entitled.

20          She makes the comment at page R-4, "The need for

21  deterrence is the most significant factor in cases such as the

22  instant one, that financial support is the lifeblood to a

23  terrorist organization, particularly in situations where

24  individuals tend to be very committed to their cause."

25          A noble comment, and certainly a comment that can be

 1    adopted in many cases.  But I suggest to you that it may not

 2    entirely apply to the facts of this case, because in this case,

 3    the IJU didn't want the financial support that Mr. Muhtorov

 4    supposedly possessed and was willing to give to them.  They

 5    tried to discourage him from coming to wherever they were

 6    situated.  They didn't give Mr. Muhtorov instructions regarding

 7    who to contact.  And you saw in communications from him to --

 8    to them where he was saying, Who do I contact?  How do I get

 9    this to you?  And they're kind of saying, Just cool it for a

10    while.  We'll get back to you.  So whatever letter was

11    exchanged between the two of them, the IJU never had an

12    interest in showing Mr. Muhtorov how to get anything to them,

13    let alone $300.

14         And I will reiterate -- only because I think it's

15    important -- that what Dr. Sageman did emphasize was that

16    Mr. Jumaev did not satisfy that first criteria of the pathway

17    to violence, which was to identify with the IJU as an entity.

18         From the outset, this Court wanted to know, how have

19    other cases been treated before this one?  Because the Court,

20    obviously, had in mind the notion of unwarranted disparities of

21    sentencing.  And we in our sentencing statement provided you

22    with our matrix, distinguished the matrix that the government

23    presented to you and the one that the probation department

24    presented to you.

25         There seems to be few, if any, cases that arguably are

1    similar to the one of Mr. Jumaev, for a man on one occasion has

2    given another man $300, and the other man has indicated he

3    intended to give that to the IJU.   There was no planning by

4    Mr. Jumaev to travel anywhere, unlike Mr. Muhtorov.   There was

5    no communication between Mr. Jumaev and the terrorist

6    organizations, unlike the situation of Mr. Muhtorov.   There was

7    no communication between Mr. Jumaev and a CHS regarding plans

8    to do things with the organization, unlike Mr. Muhtorov.   So

9    Mr. Jumaev's case is somewhat unique in terms of its factual

10   overlay.

11         The cases that we recommended that the Court review

12   and consider are *United States v. Esse*, described at pages 18

13   and 19 of our sentencing statement.   United States -- and

14   that's where Ms. Esse was sentenced to a five-year term of

15   probation.   *United States v. Benkahla*, B-E-N-K-A-H-L-A,

16   discussed in our sentencing statement at pages 20 to 21, where

17   a range -- a guideline range of 210 to 262 months was varied to

18   a sentence of 121 months, affirmed by the Fourth Circuit.   And

19   the more recent case of *United States v. Aaron Daniels*, which

20   is in our document, 1917, of supplemental materials that we

21   provided to you, where Mr. Daniels was intending to send $250

22   to ISIS.   That's where the government's sentencing memo,

23   similar to this case, was suggesting how generous the

24   government is, because Mr. Daniels had mental health

25   challenges.   Where the maximum in the Daniels case because of

1   the date of the offense was 20 years --

2          MR. BAKER:  Your Honor, I don't mean to interrupt.

3   Mr. Jumaev would ask for a very brief recess.  He needs to use

4   the facilities.

5          THE COURT:  All right.  We'll take a recess.  Let me

6   know when you're ready.

7          (Recess at 11:01 a.m.)

8          (In open court at 11:08 a.m.)

9          THE COURT:  Thank you.

10         Please be seated.

11         Please go ahead.

12         MR. SAVITZ:  Thank you, Your Honor.  I was in the

13  midst of talking about the *United States v. Daniels* case,

14  discussed in Document 1970, where the guidelines calculated a

15  20-year advisory range, and the government thought it was being

16  generous by requesting 17 years for the minimum of 15 years for

17  Mr. Daniels.  The judge's sentence in that case was 80 months.

18         You had told us that you had already calculated the

19  advisory guideline range, that you intend to vary from it.  You

20  told us that you disagree with the so-called sentencing

21  enhancement Section 3A1.4 of the guidelines.  And you have told

22  us that you intend that your sentence that you eventually will

23  impose will be the sentence notwithstanding that it may be

24  later determined that your calculation was inaccurate.

25         What I would request that you do, in terms of the

1    sentence imposed in accordance with the factors under 3553(a)

2    and the purposes of sentencing under subsection 2, is to

3    sentence Mr. Jumaev to time served, which is what he has

4    already served, of some 76 months.  And I submit to you that

5    amount to a hard-time sentence of 90 months.

6           If you impose a sentence greater than time served, we

7    request that you recommend that the Bureau of Prisons designate

8    F.C.I. Englewood as the place of imprisonment, because as you

9    probably have determined over the course of years, that the

10   people that Mr. Jumaev is closest to are those that have

11   defended him for the past six years.  We are the main channel

12   of information that he obtains about his situation, and we are

13   the main channel and intermediaries that communicate between

14   him and his family.  Without us being close to him, he loses

15   that tenuous connection, but it is a connection that he has

16   with the outside world and to his family.

17          Once his sentence has been served in this case and

18   Immigration gets ahold of him, he, essentially, is going to be

19   a man without a country.  He does not want to go back to

20   Uzbekistan because he fears he'll be imprisoned and tortured

21   there.  And you have also well been familiar with the horrors

22   of that country, notwithstanding the new regime.  A former

23   Uzbek citizen who enters that country as a convicted terrorist

24   is not going to be received with open arms.  He has an

25   opportunity to argue to Immigration that if he's sent back to

1    Uzbekistan, he'll be subject to torture.  And whether or not

2    the Immigration court will agree with that analysis remains to

3    be seen.

4           But wherever the Department of Justice through its

5    Department of Homeland Security and Immigration and Customs

6    Enforcement decides to transfer Mr. Jumaev once he finishes

7    whatever sentence you impose upon him, we would like you to

8    recommend the Department -- even order the Department of

9    Justice that we be kept informed of Mr. Jumaev's whereabouts,

10   because he is going to need the assistance of lawyers during

11   his immigration process, and he doesn't have the tools to find

12   that out.  We're going to have to help him determine that.

13          Other than that, Your Honor, I stand here willing to

14   answer any questions the Court may have with respect to any of

15   the other factors of 3553(a) or to clarify any arguments that

16   we have made in our sentencing statement.

17          *THE COURT:*  Thank you very much.

18          *MR. SAVITZ:*  You're welcome.

19          *THE COURT:*  Mr. Holloway, if you want to make a

20   statement for the record about the accusations made against

21   you, but I don't want to go into further rebuttal of this,

22   because then I have to go back to Mr. Savitz and get that

23   rebuttal.

24          *MR. HOLLOWAY:*  Certainly.

25          *THE COURT:*  But I think you're entitled to make a

1    statement as to the accusations against you.

2           MR. HOLLOWAY:  Thank you very much, Your Honor.  I

3    appreciate that, Your Honor.

4           Most pointedly, Your Honor, as the Court can already

5    tell, I take exception to that accusation.  There has been

6    litigation regarding that issue already.  The government and I

7    stand on the representations as I briefed them for the Court

8    and have indicated and detailed in pleadings regarding that

9    issue.  I take exception to counsel making that accusation

10   against me regarding the confusion surrounding the exhibit.

11   And I stand on the pleadings as filed with the Court.  I

12   appreciate the opportunity to make that record.

13          THE COURT:  All right.  Thank you.

14          MR. HOLLOWAY:  Thank you, Your Honor.

15          THE COURT:  Now, you said Mr. Jumaev wants to make

16   another statement?

17          MR. SAVITZ:  That's my understanding.  But I don't

18   know if based upon the comments I've already made to the Court,

19   if he still does.  I'll ask him if he wants to make a

20   statement.

21          THE COURT:  You have the right, Mr. Jumaev, to make a

22   statement now.  And I have read your letter, so you can say

23   that that's your statement, what we call allocution, your final

24   statement, or you can make an additional statement if you wish.

25   It's up to you.

 1           (All statements of the defendant through the

 2   interpreter.)

 3           *THE DEFENDANT:*  May I say something else?

 4           *THE COURT:*  Yes.  Yes.

 5           *MR. SAVITZ:*  Do you want him to come to the lectern?

 6           *THE COURT:*  Yes, I do.

 7           *MR. SAVITZ:*  Mr. Jumaev, come to the lectern.

 8           *THE DEFENDANT:*  Thank you so much, Your Honor, for

 9   giving me this opportunity to speak.

10           In Quran, Allah says, according to Allah's words, when

11   truth comes, don't be sorry for anyone.  Don't be sorry even

12   for family.

13           I do not want to accuse anybody, I do not want to

14   insult anybody.  Your Honor, I deeply respect you.  For six

15   years I deeply respected you and everybody; and if not for

16   that, I wouldn't be here.  I heard so many good things about

17   you.  And I stand here in front of you not as a criminal, but

18   as an innocent man.

19           I know this trial is over, it has passed.  And, again,

20   I do not want to accuse anyone.  However, I never thought that

21   this is the trial you should expect from American justice

22   system.  I wanted this trial to happen because I was innocent,

23   so this is why I really wanted this trial to happen.

24           As a conclusion, I would like to ask your permission

25   for the interpreter to read some parts of my letter.  And this

1    is where I'm just going to end my statement.  But also I would

2    like to say that I truly appreciate your listening to me.  And,

3    again, I don't want to accuse anybody, but I do not agree.  I

4    do not agree with this trial.

5         *INTERPRETER:*  After waiting in the detention center

6    for six years, I finally got to trial earlier this year.  To

7    his credit, the trial judge himself noted how difficult it is

8    to get a fair trial once the term "terrorism" is invoked.  He

9    noted that it is too easy for the focus to become the general

10   concern and fear people have about terrorism instead of the

11   specific question of whether my $300 was intended to support

12   terrorism or to partially pay back a loan.

13        In 2014, the Columbia Law School's Human Rights

14   Institute released a report titled, "Illusion of Justice, Human

15   Rights Abuses in U.S. Terrorism Prosecutions."  In

16   contemplating whether I received a fair trial, consider this:

17   The report lists five factors under the category of unfair

18   trial.  All five factors are applicable in my case.

19        Prejudicial evidence.  The category includes evidence

20   obtained by coercion.  My false confession meets this criteria.

21   This category also includes inflammatory evidence about

22   terrorism in which the defendant played a part.  This was

23   present at my trial in the form of an hour-long terrorist

24   propaganda video that had nothing to do with my case.  The

25   judge permitted 111 seconds of it to be played during trial,

which itself was inappropriate.  But when the jury went to deliberate, the prosecution intentionally gave them the full version of the video and the transcript, despite the judge's order not to.

Second, evidence from warrantless wiretaps under FISA. The cases of my defendant and I -- the cases of my defendant and I were the first federal cases every where prosecutor submitted the evidence from warrantless wiretaps was used, prompting involvement from the ACLU.

Third, classified evidence.  Classified evidence is difficult to contest.  The prosecution abused the classification of evidence as classified in my case, first, by attempting to claim that large quantities of audio files were classified, when they were, in fact, recordings of conversations I had participated in.  They also justified delays by arguing that they were processing classified evidence that was vital to the trial.  That vital evidence never materialized.

Fourth, biased juries.  My jurors were all white, not a single minority or Muslim.  When it was discovered partway through the trial that the juror said that he had already concluded that I was terrorist, he was dismissed; but no attempt was made to determine whether he had tainted other jurors.

Five, pretrial solitary confinement and other

1    conditions of confinement.  As previously noted, I spent my

2    first nine months in solitary confinement.  In addition to

3    being denied a fair trial, I was denied my right to a speedy

4    trial.  This is more than just an inconvenience.  It caused

5    irreparable harm to the presumption of innocence.  Many people

6    upon hearing that the defendant has been detained for six years

7    awaiting trial automatically assume that this person must be

8    guilty of something.  Nobody wants to believe that in a country

9    that has freedom, an innocent man could be detained for so

10   long.

11           THE DEFENDANT:  Thank you, Your Honor.  And if I said

12   something wrong, I do apologize.  But I have deep trust in you,

13   and I heard so many good things about you.  And I also want

14   people just to hear my voice.  And, lastly, I want to say that

15   I am not guilty.  Not -- I'm not guilty and not for -- in front

16   of American citizens, not in front of my family, not in front

17   of you, I just want to say that I'm not guilty.

18           MR. SAVITZ:  Thank you, Your Honor.

19           THE COURT:  All right.  Thank you.

20           I will take a half-an-hour recess to make some changes

21   in this written opinion.  And it has an appendix, by the way,

22   attached to it which I've already done, and I want you to

23   understand what it is.

24           I personally have reviewed 368 terrorism cases that

25   have been prosecuted where the sentences are since 9/11.  The

1    cases include 86 including conviction for material support.

2    That is the dominant charge for which people have been

3    convicted.  41 of those 86 are solely for material support.

4    The other of those 86 were multiple counts, including RICO,

5    piracy, fraud, firearms, explosives, theft, and conspiracy to

6    murder, kidnap, maim, to commit sedition, and for explosives,

7    and one for stealing missiles.  So those are the -- but 41 were

8    solely for material support.  Of the 41 that I examined for

9    material support, 7 were for money contribution only.  The rest

10   included providing personnel or equipment in addition to money

11   contributions.  The average sentence for material support only

12   is 70.7 months.

13         And I think that the other thing I do want to point

14   out, the government has suggested that *U.S. v. Nicholas Young*

15   is the most comparable.  I do not agree with that.  Mr. Young

16   was a police officer, and his offenses included multiple

17   transfers of gift coupons in support of terrorism.

18         So the analysis that's already been done on these

19   cases will show in the written opinion, but I do want to make

20   some changes based on what I heard and also come to a final

21   conclusion now that I have heard the sentence to be imposed.

22         Before I forget this, though -- and Mr. Savitz has

23   mentioned that he wants an order to be advised where the --

24   Mr. Jumaev might be located.  I find that that's essential for

25   the Court as well as the government.  And I'm going to ask the

 1   probation department to maintain a constant understanding of

 2   where he is, what institution he might be in, and make that

 3   available information upon inquiry from the prosecution,

 4   defense, or from me.  That's as much as I can do about it.

 5            *MR. SAVITZ:*  Thank you, Your Honor.

 6            *THE COURT:*  All right.

 7            We'll be in recess until noon.

 8            (Recess at 11:29 a.m.)

 9            (In open court at 1:32 p.m.)

10            *THE COURT:*  Thank you.  Please be seated.

11            I apologize for keeping you waiting, but I had -- and

12   I said 30 minutes.  I forgot we have a noon hour, and there is

13   only so many things that people can do over the noon hour, and

14   I wanted to make sure the defendant had a chance to eat

15   something.

16            I have written an opinion and made the changes in it

17   that I thought were necessary as a result of the statements

18   made in oral argument this morning.  And it has an appendix to

19   it of cases that have been reviewed.  The written opinion is

20   incorporated here in my findings by reference and a part of

21   this record and includes the judgment in its entirety.

22            I do want to go over a few things, however.  And

23   that's the criteria for this sentence and to explain it to the

24   extent I can.

25            Although Mr. Jumaev's offense only involves a single

1    check on a single occasion, the surrounding events are

2    troublesome.  Mr. Jumaev not only watched and discussed videos

3    that I find to be repulsive in many ways, but he commented on

4    the videos, saying things like, "Hey, you immoral hypocrite,

5    infidels.  Your days are over whether you like it or not.  Now

6    it is your turn.  We will not let you have peace because God's

7    promise is true."

8         I am also concerned by Mr. Jumaev's encouragement of

9    Mr. Muhtorov on his path.  And that's comments such as, "You're

10   my teacher.  Do you know that Abumumin?  Let me tell you the

11   truth.  When it comes to the matter with wedding festivities, I

12   think it is you who really is walking the walk."  Even if he

13   believed Mr. Muhtorov to be joking, he could have disagreed

14   with him, distanced himself from him, or simply not encouraged

15   him.

16        A common recitation in the criminal law regarding a

17   defendant's intent is that we cannot know another person's

18   mind.  But Mr. Jumaev's testimony, his recorded comments, and

19   interactions with others give an idea of his sense of identity

20   and self-perception.

21        There are reasons why Mr. Jumaev acted as he did, and

22   they are to be found in his conduct, not in some Manichaean

23   struggle between good and evil.  It is clear that Mr. Jumaev

24   became a participant in supporting a terrorist organization

25   because of traumatic events in his life.  The extent to which

1   he was abused and tortured by the government in Uzbekistan is

2   problematic, but the evidence is overwhelming that he and other

3   unfortunate citizens of that country were subjected to

4   deprivations of basic human rights and significant diminishment

5   of individual worth.  No matter how horrible the language and

6   circumstances of the Islamic fundamentalism he embraced, he was

7   searching for a structure and a belief system that would

8   validate his existence.  That he accepted or tacitly endorsed

9   versions of Islam favored by militants is explained more by the

10  social milieu in his exile from home and family than by any

11  doctrinal epiphany.

12          In the most favorable terms, Mr. Jumaev sought and

13  gained employment, worked long and arduous hours in the United

14  States, and all the while maintained communication with his

15  wife and family and provided them with financial support.  For

16  him, the friendship he developed with Mr. Muhtorov and the form

17  of Islam he eventually embraced presented a promise of social

18  justice that would right the many wrongs he had seen and

19  experienced in his homeland of Uzbekistan, his separation from

20  his family, and his anomie while in the United States.  While

21  the actions of jihadis stem from what many consider to be

22  misinterpretations of the Holy Quran, Mr. Jumaev took on this

23  cause, in a minimally supportive way, because it gave him a

24  sense of purpose and value in the fight against social

25  injustice and economic deprivation to which his family and he

1    were subjected.

2          His sentiments and speech were clearly supportive of

3    the IJU and therefore viewed with grave suspicion and little

4    sympathy, yet they must be considered for sentencing purposes

5    as reflections of his great need for identification rather than

6    as evidence of a deliberate intention to do evil.  The complete

7    absence of violence in this case provides a window into how he

8    saw himself and why he succumbed to the pressures he

9    experienced.  Such were the causes of his behavior.  To be

10   sure, he was influenced by others, perhaps too easily; but he

11   did not act in any manner as an instigator or a leader or

12   conduit for others to engage in similar conduct.

13         The crimes with which Mr. Jumaev has been convicted

14   are undoubtedly grave, and he must be sentenced accordingly.

15   The material support statute is on its face a preventative

16   measure.  It criminalizes not terrorist attacks themselves, but

17   aid that makes the attacks more likely to occur.  So says the

18   Supreme Court in *Holder v. Humanitarian Law Project* in 2010.

19   "When it enacted 18 U.S.C. Section 2339B in 1996, Congress made

20   specific findings regarding the serious threat posed by

21   international terrorism."  Specifically, it found, "Foreign

22   organizations that engage in terrorist activity are so tainted

23   by their criminal conduct that any contribution to such an

24   organization facilitates that conduct."

25         Recognizing the seriousness of the offense, I

1   nevertheless find the government's request for a sentence of 15

2   years' imprisonment to be irrational.  The NYU Center on Law

3   and Security determined that for the 548 cases from 2001 to

4   2012 involving crimes inspired by jihadist ideas, the average

5   sentence imposed was 14 years' imprisonment.  The government

6   provides no basis for why Mr. Jumaev's offenses are above

7   average.

8           To arrive at the appropriate sentence, I ask:  What

9   sentence is necessary to convey that any support for terrorism

10  will not be tolerated?  I believe that message has been sent in

11  this case.  Mr. Jumaev has already been subjected to

12  significant punishment.  He has spent 76 months in pretrial

13  detention in Denver, far from his friends in Pennsylvania and

14  even farther from his family in Uzbekistan and elsewhere.

15  During that period, he has only been able to see one of his

16  sons via video conference for ten minutes.  He has been unable

17  to provide for his family, his long-standing role.  Mr. Jumaev

18  also has lived with the knowledge that his communications with

19  his family and friends were monitored for an extended period of

20  his life, such that his private concerns have become public.

21  At trial, the government even took the liberty of commenting on

22  his absence as a father in his children's lives.  I have no

23  doubt that Mr. Jumaev's time in detention and his experience

24  throughout the investigation and prosecution of this case do

25  not trivialize his actions.

1          If I imposed a term of imprisonment over the time

2    Mr. Jumaev has already served, additional disparate

3    consequences are possible or even likely.  Muslims frequently

4    experience discrimination while incarcerated.  The U.S.

5    Department of Justice Office of the Inspector General Reports

6    to Congress on Implementation of Section 1001 of the U.S.A.

7    Patriot Act illustrate the discriminatory treatment Muslims

8    face while incarcerated.  Since Mr. Jumaev has been convicted

9    of charges related to terrorism, it also would not be unheard

10   of for him to be subjected to harsher conditions or

11   restrictions while imprisoned.

12          While the message is clear that the U.S. prosecution

13   of terrorism crimes is unrelenting and inexorable, I am not

14   positive I would be sending an effective message of deterrence

15   by sentencing Mr. Jumaev to a longer term of imprisonment.  It

16   is possible, instead, that I would be encouraging the

17   commission of more serious crimes, given that the sentence

18   would be the same regardless.

19          Many commentators warn against unnecessarily lengthy

20   sentences for terrorism offenses.  One of the reasons behind

21   these warnings is the possibility of further radicalization

22   while in prison.  And I quote from the Office of the U.S.

23   inspector General, Department of Justice, who says, "Prison

24   systems throughout the world have been and continue to be

25   breeding grounds for radicalism, recruiting grounds for

extremist movements, and facilities for the planning and training of radical activities."

The report also says, and I quote, "In recent years, policy decisions have produced shortages in Islamic leadership. The lack of trained leadership renders the religion at perpetual risk of being guided by inmates who can hardly deliver authoritative spiritual guidance.  More critically, it allows individuals to exploit the pulpit, depart from traditional teachings, and even propagate an extremist agenda."

These factors, to my mind, weigh against a protracted additional term of imprisonment.

Mr. Jumaev has no criminal history, and as I have already stated, there is no indication that he will recidivate. He is subject to deportation and may never again be out of custody in the U.S.  The government contends that Mr. Jumaev's conduct reflects a clear upward trajectory, indicating that "If left unchecked," Mr. Jumaev would have "endeavored to continue his support and expand his support."  That's the government's argument that was made this morning.

I am not persuaded in the least bit by this argument. Mr. Jumaev wrote the $300 check in March 2011.  He was not arrested in this case until March 2012.  Yet, during that year period, there is no evidence that he committed any other crime or attempted to support terrorism in any other way.  When Mr. Muhtorov finally told Mr. Jumaev he was leaving for Turkey,

1    Mr. Jumaev did not write him another check to take with him or

2    try to assist him with his travel.

3         As Judge Janet Hall found in the *U.S. v. Ahmad* in the

4    District of Connecticut on July 16, 2014, I cannot sentence

5    Mr. Jumaev on an unfounded fear that he might do something and

6    extend his sentence as a result.  I must look to what he

7    actually did and determine whether it is likely that he will do

8    something similar or greater in the future.  From the facts

9    before me, I find it is not.

10         To my knowledge, the Bureau of Prisons offers no

11   relevant training or rehabilitation programs available for

12   Mr. Jumaev and his crimes.  This is significant because there

13   is little hope that the negative influences resulting from a

14   longer period of incarceration will be balanced with a

15   productive program.  I have considered the opportunity for

16   Mr. Jumaev to pursue additional educational opportunities while

17   in prison, but have determined that special benefit is

18   outweighed by the other factors.

19         Mr. Jumaev has now been in detention to 2,316 days.  I

20   could impose an additional term of imprisonment up to the

21   maximum sentence under the statute, 15 years for each count, or

22   I sentence him to the time he has already served.  Sentencing

23   him to a term of less than 2,316 days he has spent in detention

24   would be meaningless at this point.  Violations of

25   18 U.S.C. Section 2339B can also carry a maximum fine of up to

1   $250,000 and up to a life term of supervised release.

2           In evaluating the sentences available, I have

3   considered the immigration consequences and available forms of

4   relief for Mr. Jumaev as well.  I commend defense counsel for

5   their thoroughness in presenting the related material for

6   sentencing purposes.  Mr. Jumaev is currently in immigration

7   proceedings and will likely be detained by Immigration and

8   Customs Enforcement as soon as he is released from custody in

9   this case.  Mr. Jumaev could then be removed to Uzbekistan and

10  face an uncertain future there or could be detained here for

11  and extended period pursuant to the Convention Against Torture.

12  See, for example, *Yusupov v. Attorney General of the United*

13  *States*, 650 F.3d 968, the Third Circuit in 2011, discussing the

14  likelihood that the petitioners, two Uzbek nationals, would be

15  persecuted and tortured if removed to Uzbekistan because of

16  their religious and political beliefs; explaining the forms of

17  relief available and the impact of a determination that an

18  alien is a danger to the security of the United States; and

19  holding that the government had not proved that the petitioners

20  were a danger to the security of the United States, so they

21  were entitled to mandatory withholding of removal.  Either way,

22  Mr. Jumaev's options are bleak, and continued detention

23  separate from this case is most probably in his future.

24  Additionally, as a result of his immigration status and the

25  corresponding proceedings, any period of supervised release

1    imposed will likely be an unrealized figment of his sentence.

2          Finally, I must consider the need to avoid unwarranted

3    sentence disparities among defendants with similar records who

4    have been found guilty of similar conduct.  Understanding that

5    the sentencing guidelines are not useful for avoiding

6    sentencing disparities in terrorism-related cases, I ordered

7    the parties and the probation office to submit summaries of

8    previous cases in which a defendant has been convicted under

9    18 U.S.C. Section 2339B.  I have reviewed their submissions,

10   along with the relevant cases listed in the sentencing

11   compilation matrix prepared by the defense in *U.S. v. Ahmad*,

12   and that's the District of Connecticut case that I just

13   referred to with Judge Hall.

14         While the material support statutes have been among

15   the most frequently prosecuted federal anti-terrorism statutes,

16   there are only a few cases that bear enough likeness to

17   Mr. Jumaev's to be worthy of comparison, and even these are

18   readily distinguishable.  But as is apparent, each of the

19   defendants engaged in substantially more culpable conduct than

20   Mr. Jumaev, such as participating in intricate conspiracy

21   networks, contributing considerable sums of money, providing

22   support on a recurrent basis, joining in recruitment efforts,

23   plotting against the United States, and so on.

24         I will not go through the cases which I discuss.

25   They're there in the written opinion and available for your

1    examination.

2            And summarized as follows:  All of the above

3    defendants share with Mr. Jumaev that their convictions involve

4    the provision of money as the form of material support.  Yet

5    Mr. Jumaev's conduct does not reach the level of any of theirs.

6    He did not attempt to purchase any weapons, he had no direct

7    contact with members of terrorist organization, he did not

8    associate with terrorists to try to support them while in the

9    U.S. Armed Forces or law enforcement, he did not take pictures

10   of U.S. monuments to encourage a terrorist attack, he did not

11   buy a ticket to travel anywhere, he did not serve in a

12   leadership role of an organization, he did not solicit funds

13   from other individuals or attempt to recruit them, he did not

14   provide thousands or hundreds of thousands of dollars in

15   support, he did not provide support on multiple occasions, his

16   funds did not result in purchase of tactical equipment, and his

17   efforts were neither organized nor methodical.  The defendants

18   in the other cases which I have compared share at least some of

19   those elements that he does not have in his record.

20            I'll get right to the sentence.  And I do want to

21   point out something.  I realize that Mr. Jumaev feels that he

22   is not guilty, but I have never sentenced anybody that I felt

23   wasn't, and I'm not doing so today.  I think there is evidence

24   there that the jury listened to and the jury found and the jury

25   decided that he was guilty, and it was based upon evidence.

1  And I do think he crossed a line from pure fantasy into

2  providing money that he knew and that he said was going there.

3         Judge Marvin Frankel, who wrote the definitive book,

4  *Law Without Order*, which inspired the creation of the

5  sentencing guidelines -- much to his chagrin, in the way they

6  turned out -- but he did say, and I quote, "It is our duty to

7  see that the force of the state, when it is brought to bear

8  through the sentences of our courts, is exerted with the

9  maximum we could muster of rational thought, humanity, and

10 compassion."  Despite the nature of this case, or perhaps even

11 because of it, I have endeavored with every ounce of my being

12 to craft a sentence for Mr. Jumaev that is based on rational

13 thought, humanity, and compassion.

14        After serious reflection on all of the factors

15 discussed above, I sentence the defendant, Bakhtiyor Jumaev, to

16 time served, in effect, 76 months and three days.  Mr. Jumaev

17 shall be placed on supervised for a term of ten years for each

18 count, to run concurrently.  Mr. Jumaev shall immediately pay a

19 special assessment of $200.  I find he does not have the

20 ability, prospects, or resources to pay a fine; and so I waive

21 the fine in this case.

22        Now, if Mr. Jumaev is deported, he obviously cannot be

23 on supervised release.  But within 72 hours of release from

24 custody by the Bureau of Prisons, if he is released, he shall

25 report to the probation office in the District of Colorado.

1    And while on supervision, he is subject to the conditions that

2    may be changed or modified before his release.  If he returns

3    to this country or if he is released and he returns to country,

4    the conditions of supervised will then be determined *in toto*.

5         In that regard, I will not go over the conditions of

6    release, because it seems clear to me that he's not going to be

7    released.  But if he is deported, he must not thereafter

8    reenter the United States illegally.  If he reenters the United

9    States legally, he must report to the nearest U.S. probation

10   office within 72 hours of his return.

11        Mr. Jumaev, you have the right to appeal your

12   conviction and sentence.  If you desire to appeal, a notice of

13   appeal must be filed with the Clerk of Court within 14 days

14   after the entry of judgment or your right to appeal will be

15   lost.  If you're unable to afford an attorney for an appeal,

16   the Court will appoint one to represent you.  And if you so

17   request, the Clerk of Court will immediately prepare and file a

18   notice of appeal on your behalf.

19        Is there anything from the government?

20        *MR. HOLLOWAY:*  No.  Thank you, Your Honor.

21        *THE COURT:*  Anything from the defense?

22        *MR. SAVITZ:*  Just briefly, Your Honor.

23        You have presented a 42-page memorandum and order of

24   sentencing, which, as you described it, involved rational

25   thought, humanity, and compassion.  And those are the

1   characteristics that you have brought to this case from the

2   very first day that we appeared before you more than six years

3   ago.

4           I remember as a young lawyer when a mentor of mine who

5   was doing domestic relations, or divorce work, said, David, if

6   you do that kind of work, you're going to have -- whenever

7   there is an order, one side will think the judge is brilliant;

8   another side will think the judge is really a stupid guy.

9   Sometimes that's the same thing we hear in criminal cases.

10  When we aggressively on both sides of the aisle argue for our

11  specific positions, when the judge rules in our favor, we think

12  he is brilliant; when he doesn't, we have a different adjective

13  to describe his ruling.

14          Judges often in this courthouse do not leave a case

15  without knowing what their legacy is.  And what we want to

16  inform you is that you leave this case with a legacy of

17  profound respect, admiration, and thank you.  We know that you

18  have given up a lot of your time and issues regarding your

19  health to see this case and Mr. Muhtorov's case through to the

20  very end.  We now wish that you take care of yourself and do

21  the things that you need to do to live a long and fruitful

22  life, and we hope to be a part of that in the future.

23          Thank you for your service.

24          THE COURT:  Thank you.

25          Never had anybody say that before.  Thank you very

1    much.

2            It's my profound wish, Mr. Jumaev, that you be able to

3    rejoin your family in a safe environment and that you no longer

4    engage in this kind of activity.

5            We'll be in recess.

6            (Recess at 1:55 p.m.)

7

8                        REPORTER'S CERTIFICATE

9        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

10

11           Dated at Denver, Colorado, this 25th day of July,
     2018.

12

13           _____

14           Therese Lindblom,CSR,RMR,CRR

15

16

17

18

19

20

21

22

23

24

25